# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FT. PIERCE DIVISION

**04-14140**

The Estate of SOPHIA SCHWERAK,
by and through CAROL A. HORTON
and JOHN P. SCHWERAK,
as Co-Personal Representatives,

Case No.

Division

MAGISTRATE JUDGE
LYNCH

           Plaintiffs,

vs.

CENTENNIAL HEALTHCARE
INVESTMENT CORPORATION,
CENTENNIAL HEALTHCARE
CORPORATION, CENTENNIAL
HEALTHCARE MANAGEMENT
CORPORATION, and CENTENNIAL
HEALTHCARE PROPERTIES
CORPORATION (as to
EMERALD HEALTH CARE),

           Defendants.

_____/

## DEFENDANT'S NOTICE OF REMOVAL

Defendant, CENTENNIAL HEALTHCARE INVESTMENT CORP. pursuant to 28 U.S.C.

§1441, removes that action now pending in the Circuit Court of the Nineteenth Judicial Circuit in

and for St. Lucie County, State of Florida, Case No. 04-CA-000635 (ON), styled The Estate of

SOPHIA SCHWERAK, by and through CAROL A. HORTON and JOHN P. SCHWERAK, as Co-

Personal Representatives, Plaintiffs, v.   CENTENNIAL HEALTHCARE INVESTMENT

CORPORATION, CENTENNIAL HEALTHCARE CORPORATION, CENTENNIAL

HEALTHCARE MANAGEMENT CORPORATION, and CENTENNIAL HEALTHCARE

PROPERTIES CORPORATION (as to EMERALD HEALTH CARE), Defendants, wherein Plaintiff

1

demands judgment against CENTENNIAL HEALTHCARE INVESTMENT CORP. and the other listed Defendants, and respectfully shows unto this Honorable Court as follows.

1.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332.

2.  This is a civil action regarding a former resident of the Emerald Health Care nursing home, wherein Plaintiff purportedly pleads claims brought pursuant to Florida Statutes §400.023 for deprivation of nursing home resident's rights set forth in Florida Statutes §400.022, negligence, and wrongful death against the Defendants. Based on the allegations within Plaintiffs' Complaint, CENTENNIAL HEALTHCARE INVESTMENT CORP. in good faith avers that Plaintiffs are seeking to recover damages in excess of $75,000.00, plus interest, costs and attorney's fees.

3.  At all times material to this action, Plaintiffs' decedent, Sophia Schwerak, was a citizen of the state of Florida.

4.  At all times material to this action, Defendant CENTENNIAL HEALTHCARE INVESTMENT CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia.

5.  At all times material to this action, Defendant CENTENNIAL HEALTHCARE CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia.

6.  At all times material to this action, Defendant CENTENNIAL HEALTHCARE MANAGEMENT CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia.

7.     At all times material to this action, Defendant CENTENNIAL HEALTHCARE PROPERTIES CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia.

8.     Because all the named Defendants, including CENTENNIAL HEALTHCARE INVESTMENT CORP., were foreign corporations, complete diversity of citizenship exists and, accordingly, this cause is properly removable pursuant to 28 U.S.C. §1332.

9.     This action was commenced in the Circuit Court of the Nineteenth Judicial Circuit in and for St. Lucie County, Florida. CENTENNIAL HEALTHCARE INVESTMENT CORP. initially learned of Plaintiff's Complaint, said pleading specifically naming it as a Defendant for the first time, on or about May 12, 2004, following service of process on CENTENNIAL HEALTHCARE INVESTMENT CORP.

10.    Named Defendant, CENTENNIAL HEALTHCARE MANAGEMENT CORP., consents to the removal of this action. Named Defendants, CENTENNIAL HEALTHCARE CORP., and CENTENNIAL HEALTHCARE PROPERTIES CORP., likewise consent to the removal of this action. The Affidavit of counsel, Kirsten K. Ullman, Esq., is submitted as **Exhibit "A"** in support of this Notice of Removal.

11.    Copies of all process, pleadings and orders served upon CENTENNIAL HEALTHCARE INVESTMENT CORP. and such other papers that are attachments as required by 28 U.S.C. §1446 and local court rules, are filed herein. (See composite **Exhibit "B"**.)

3

12.     Pursuant   to   28   U.S.C.   §1446(d),   CENTENNIAL   HEALTHCARE

INVESTMENT CORP. has provided written notice to all adverse parties and has

filed a copy of this Notice of Removal with the Clerk of the Circuit Court of the

Nineteenth Judicial District, in and for St. Lucie County, Florida. (A copy of the

Notice of Filing Notice of Removal to opposing counsel is attached hereto as

**Exhibit "C"**; a copy of the Certification of Notice of Removal is attached hereto

as **Exhibit "D"**.)

WHEREFORE, Defendant, CENTENNIAL HEALTHCARE INVESTMENT CORP.

submits this matter to this Court's jurisdiction.

Respectfully submitted,

KIRSTEN K. ULLMAN
Florida Bar No. 857210
ULLMAN, KURPIERS, BURSA & RAGANO, LLC
410 South Ware Blvd., Suite 1100
Tampa, FL 33619
(813) 739-1900
Fax: (813) 739-1919
E-Mail: kullman@uklawoffices.com
*Attorney for Defendant Centennial Healthcare*
*Investment Corp.*

4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to W.

LEE KING, JR., ESQ., 900 South Federal Highway, Suite 100, Stuart, Florida  34994, by regular

U.S. Mail, this 4th day of June, 2004

KIRSTEN K. ULLMAN
Florida Bar No. 857210
ULLMAN, KURPIERS, BURSA & RAGANO, LLC
410 South Ware Blvd., Suite 1100
Tampa, FL  33619
(813) 739-1900
Fax:  (813) 739-1919
E-Mail:  kullman@uklawoffices.com
*Attorney for Defendant Centennial Healthcare
Investment Corp.*



.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FT. PIERCE DIVISION

The Estate of SOPHIA SCHWERAK,       Case No.
by and through CAROL A. HORTON
and JOHN P. SCHWERAK,           Division
as Co-Personal Representatives,

               Plaintiffs,

vs.


CENTENNIAL HEALTHCARE
INVESTMENT CORPORATION,
CENTENNIAL HEALTHCARE
CORPORATION, CENTENNIAL
HEALTHCARE MANAGEMENT
CORPORATION, and CENTENNIAL
HEALTHCARE PROPERTIES
CORPORATION (as to
EMERALD HEALTH CARE),

               Defendants.
_____/

## AFFIDAVIT OF KIRSTEN K. ULLMAN, ESQ.

STATE OF: FLORIDA

COUNTY OF: HILLSBOROUGH

    Before me, the undersigned officer, duly authorized to administer oaths, personally

appeared KIRSTEN K. ULLMAN, who being duly sworn according to law did depose and state:

1.    I, KIRSTEN K. ULLMAN, ESQ., am over the age of eighteen (18), have personal

      knowledge of the facts and matters set forth herein, and am competent to testify as to

      the facts and matters set forth herein.

1



EXHIBIT

A

ALL-STATE LEGAL®

2.    The undersigned is counsel for the named Defendants in the above-captioned action.

3.    A fair reading of the Complaint and Plaintiff's allegations therein indicate that the amount in controversy exceeds the sum or value of $75,000.00, exclusive of attorney's fees, interest and costs.

4.    At all times material to this action, Plaintiffs' decedent, Sophia Schwerak, was a citizen of the State of Florida.

5.    At all times material to this action, Defendant CENTENNIAL HEALTHCARE INVESTMENT CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia.

6.    At all times material to this action, Defendant CENTENNIAL HEALTHCARE CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia.

7.    At all times material to this action, Defendant CENTENNIAL HEALTHCARE MANAGEMENT CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia.

8.    At all times material to this action, Defendant CENTENNIAL HEALTHCARE PROPERTIES CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia.

9.    CENTENNIAL HEALTHCARE INVESTMENT CORP. initially learned of Plaintiff's Complaint, said pleading specifically naming it as a Defendant for the first time, on or about May 12, 2004, following service of process on CENTENNIAL HEALTHCARE INVESTMENT CORP.

10.   Named Defendant, CENTENNIAL HEALTHCARE MANAGEMENT CORP.,
consents to the removal of this action. Named Defendants, CENTENNIAL
HEALTHCARE CORP., and CENTENNIAL HEALTHCARE PROPERTIES
CORP., likewise consent to the removal of this action.

11.   That on the 4TH day of June, 2004, enclosed copies of the Notice of Removal to
Opposing Counsel, together with the copy of the foregoing Notice, and envelope
addressed to the opposing attorney, at his address, were duly sealed, stamped,
addressed and deposited in the United States Mail at Tampa, Florida, for transmission
to the same address on the date aforesaid.

FURTHER AFFIANT SAYETH NOT.

_____
KIRSTEN K. ULLMAN, ESQ.

SUBSCRIBED and SWORN to
before me this _4th_ day of June, 2004.


Notary Public

My Commission Expires:

_Jill Gaylord Cleaves_

Jill Gaylord Cleaves
MY COMMISSION # DD018725 EXPIRES
August 6, 2005
BONDED THRU TROY FAIN INSURANCE, INC.

3



*7/13/04   Nancy Collins*

# CT System

**Service of Process Transmittal Form**

**Plantation, Florida**

**05/12/2004**

**Via Federal Express (2nd Day)**

TO:  Tracey C Cosby V.P. Regulatory Affairs
     Centennial HealthCare Corporation
     400 Perimeter Center Terrace, NE
     Suite 650
     Atlanta, GA  30346-0000

RE:  **PROCESS SERVED IN FLORIDA**

FOR     Centennial HealthCare Investment Corporation Domestic State: Ga

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

| | |
|---|---|
| 1. TITLE OF ACTION: | The Estate of Sophia Schwerak, etc., Pltf. vs Centennial Healthcare Investment Corporation, et al, Dfts. |
| 2. DOCUMENT(S) SERVED: | Alias Summons, Complaint, Exhibit |
| 3. COURT: | St. Lucie County Circuit Court, FL<br>Case Number 04-CA-635-ON |
| 4. NATURE OF ACTION: | Fatal injuries; improper care and treatment |
| 5. ON WHOM PROCESS WAS SERVED: | CT Corporation System, Plantation, Florida |
| 6. DATE AND HOUR OF SERVICE: | By Process server on 05/12/2004 at 09:00 |
| 7. APPEARANCE OR ANSWER DUE: | Within 20 days |
| 8. ATTORNEY(S): | W. Lee King Jr.<br>772-223-2100<br>900 S. Federal Highway<br>Ste. 100<br>Stuart, Fl 34994 |
| 9. REMARKS: | According to the records of our office our services have been discontinued in this state.<br>i-Note sent 05/12/2004 to NCOLLINS@CENTENNIALHC.COMi-Note sent 05/12/2004 to TCC@CENTENNIALHC.COM |

CC:  Nancy Collins VP. Senior General Counsel
     Centennial HealthCare Corporation
     400 Perimeter Center Terrace, NE
     Suite 650
     Atlanta, GA  30346-0000

SIGNED     CT Corporation System

PER          Anne Boutilier /LH
ADDRESS    1200 South Pine Island Road
             Plantation, FL  33324
             SOP WS 0006294866

Information contained on this transmittal form is recorded for C T Corporation System's record keeping purposes only and to permit quick reference for the recipient. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information that can be obtained from the documents themselves. The recipient is responsible for interpreting the documents and for taking the appropriate action.



EXHIBIT
Composite
B

IN THE CIRCUIT COURT OF THE 19TH JUDICIAL CIRCUIT OF FLORIDA
IN AND FOR ST. LUCIE COUNTY

The Estate of SOPHIA SCHWERAK
by and through CAROL A. HORTON
and JOHN P. SCHWERAK, as
Co- Personal Representatives,

        Plaintiff,

vs.

CENTENNIAL HEALTHCARE INVESTMENT
CORPORATION, CENTENNIAL HEALTHCARE
CORPORATION; CENTENNIAL HEALTHCARE
MANAGEMENT CORPORATION; CENTENNIAL
HEALTHCARE PROPERTIES CORPORATION;
(as to EMERALD HEALTH CARE),

        Defendants.

_____/

CASE NO. *04 CA000635 (ON)*

**Assigned To
Judge Bryan**

**ALIAS
S U M M O N S**

THE STATE OF FLORIDA:
To Each Sheriff of the State:

      YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this
action on Defendant:

By Serving:               C.T. Corporation System
        **Registered Agent for:Centennial Healthcare Investment Corporation**
               1200 South Pine Island Road
               Plantation, FL   33324

      Each defendant is required to serve written defenses to the Complaint on **W. LEE KING,
Jr., ESQUIRE**, Plaintiffs' attorney, whose address is FULFORD & KING, LLC, 900 S. Federal
Highway, Suite 100, Stuart, FL 34994 (772/2223-2100) within 20 days after service of this
summons on that defendant, exclusive of the day of service, and to file the original of the
defenses with the Clerk of this Court either before service on plaintiffs' attorney or immediately
thereafter. If a defendant fails to do so, a default will be entered against that defendant for the
relief demanded in the Complaint.

Dated: *May 4, 2004*

         **JoANNE HOLMAN**

         CLERK OF CIRCUIT COURT

By:    **s/ PATTIE MAIN**
            Deputy Clerk

In accordance with the Americans with Disabilities Act, persons with disabilities needing a special
accommodation to participate in this proceeding should contact Court Administration at 221 S.
Indian River Drive, Fort Pierce, Florida 34954, telephone (772) 462-6900, not later than seven (7) days
prior to the proceeding. If hearing impaired (TTD) 1-800-955-8771, or voice (V) 1-800-955-8770, via
Florida Relay Service.

IMPORTANT

A lawsuit has been filed against you.  You have twenty (20) calendar days after this summons is served on you to file a written response to the attached complaint/petition with the Clerk of this Court.  A phone call will not protect you.  Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court.  There are other legal requirements.  You may want to call an attorney right away.  If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

IMPORTANTE

Usted ha side demandado legalmente.  Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal.  Una llamada telefonica no lo protegera.  Si usted desea que el escrito, incluyendo el numero del case y los nombres de las partes interesadas.  Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiendades, o privado de sus derechos, sin previo aviso del usted consultar a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefinica.  Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous, Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal.  Un simple coup de telephone est insuffisant pour vous proteger.  Vous estes oblige de deposer votre response ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous resquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis alterieur du tribunal.  Il y a d' autres obligations juridiques et vous pouvez requerir les services immediats d' un avocat.  Si vous ne connaissez pas d' avocat, vous pourriez telephoner a un service de reference d' avocats ou a un bureau d' assistance juridique (figurant a l' annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

W. Lee King, Jr., Esquire
Fulford & King, LLC
900 S. Federal Highway
Suite 100
Stuart, FL  34994
772/223-2100 phone

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR ST. LUCIE COUNTY, FLORIDA
CIVIL DIVISION

The Estate of SOPHIA SCHWERAK
by and through CAROL A. HORTON
and JOHN P. SCHWERAK, as
Co- Personal Representatives,

      Plaintiff,

vs.

CENTENNIAL HEALTHCARE INVESTMENT
CORPORATION, CENTENNIAL HEALTHCARE
CORPORATION; CENTENNIAL HEALTHCARE
MANAGEMENT CORPORATION; CENTENNIAL
HEALTHCARE PROPERTIES CORPORATION;
(as to EMERALD HEALTH CARE),

      Defendants.

CASE NO. 04 CA01 0635 (ON)

Assigned To
Judge Bryan

_____/

## COMPLAINT

Plaintiff, CAROL A. HORTON and JOHN P. SCHWERAK, as Co-Personal Representatives of the Estate of SOPHIA SCHWERAK, by and through its undersigned attorneys, does hereby file suit and bring this Complaint against defendants, CENTENNIAL HEALTHCARE INVESTMENT CORPORATION; CENTENNIAL HEALTHCARE CORPORATION; CENTENNIAL HEALTHCARE MANAGEMENT CORPORATION; CENTENNIAL HEALTHCARE PROPERTIES CORPORATION; (as to EMERALD HEALTH CARE).

### JURISDICTION, PARTIES AND VENUE ALLEGATIONS

1, This is an action for damages in excess of Fifteen Thousand Dollars ($15,000.00).

2. Plaintiff, CAROL A. HORTON and JOHN P. SCHWERAK are the Co-Personal Representatives of the Estate of SOPHIA SCHWERAK (see Exhibit "A" attached).

3.      Defendant, CENTENNIAL HEALTHCARE INVESTMENT CORPORATION ("CENTENNIAL INVESTMENT"), is a GEORGIA corporation, which is authorized to do business in Florida.

4.      Defendant, CENTENNIAL HEALTHCARE CORPORATION ("CENTENNIAL CORP") is a GEORGIA corporation, which is authorized to do business in Florida.

5.      Defendant, CENTENNIAL HEALTHCARE MANAGEMENT CORPORATION ("CENTENNIAL MANAGEMENT") is a GEORGIA corporation, which is authorized to do business in Florida.

6.      Defendant, CENTENNIAL HEALTHCARE PROPERTIES CORPORATION ("CENTENNIAL PROPERTIES"), is a GEORGIA corporation, which is doing business in Florida.

7.      Defendant, CENTENNIAL INVESTMENT, established, conducted, managed, operated, or maintained EMERALD HEALTH CARE during SOPHIA SCHWERAK's period of residency and is a licensee pursuant to Chapter 400, Florida Statutes.

8.      Defendant, CENTENNIAL CORP., established, conducted, managed, operated, or maintained EMERALD HEALTH CARE during SOPHIA SCHWERAK's period of residency and is a licensee pursuant to Chapter 400, Florida Statutes.

9.      Defendant, CENTENNIAL MANAGEMENT, established, conducted, managed, operated, or maintained EMERALD HEALTH CARE during SOPHIA SCHWERAK's period of residency and is a licensee pursuant to Chapter 400, Florida Statutes.

10.      Defendant, CENTENNIAL PROPERTIES, established, conducted, managed, operated, or maintained EMERALD HEALTH CARE during SOPHIA SCHWERAK's period of residency and is a licensee pursuant to Chapter 400, Florida Statutes.

11.      At all times material hereto, SOPHIA SCHWERAK was a person over sixty (60) years of age who suffered from the infirmities of aging to the extent that she was impaired in her ability to adequately provide for her own care and protection, and as such, plaintiff is one of that class of persons which the Florida Legislature sought to protect from abuse, neglect and

2

exploitation, by enactment of Chapter 415 of the Florida Statutes.  SOPHIA SCHWERAK died on May 26, 2002.

12.     Defendants owed a duty to the plaintiff to protect her from abuse, as that term is defined in Section 415.102 Florida Statutes.

13.     Defendants' actions and omissions as described herein resulted in the nonaccidental infliction of physical or psychological injury to plaintiff, so as to constitute abuse, neglect and exploitation of the elderly as defined in Chapter 415, Florida Statutes.

14.     Alternatively, defendants' actions and omissions as herein described could reasonably be expected to result in physical or psychological injury to plaintiff, so as to constitute abuse, neglect and exploitation of the elderly as defined in Chapter 415, Florida Statutes.

15.     On March 8, 2002, SOPHIA SCHWERAK was admitted to EMERALD HEALTH CARE, located at 1655 W.E. WALTON ROAD, PORT ST. LUCIE 34952, ST. LUCIE COUNTY, FLORIDA, where she remained in primary residence until her discharge on May 23, 2002.

16.     While a resident of EMERALD HEALTH CARE, SOPHIA SCHWERAK suffered from abuse, as defined in §415.102 Florida Statutes, dehydration, unassessed and inappropriately treated physical, mental and emotional problems, an unsafe environment, delays in the provision of care, inadequate preventative custodial skin care, and inconsistent and inappropriate documentation, as well as the other injuries enumerated herein.

17.     Plaintiff has performed all conditions precedent to commencement of this action.   No!

18.     By the undersigned signature of the attorney filing this action, plaintiff's counsel certifies that counsel has made a reasonable investigation, which gives rise to a good faith belief that there has been negligence in the care or treatment of plaintiff and that grounds exist for an action against each named defendant.

19.     Plaintiff has retained the undersigned counsel and agreed to pay a reasonable fee for their services.

3

Count I
Deprivation or Infringement of Residents'
Right Claim Against
CENTENNIAL HEALTHCARE INVESTMENT CORPORATION;
CENTENNIAL HEALTHCARE CORPORATION; CENTENNIAL HEALTHCARE
MANAGEMENT CORPORATION; CENTENNIAL HEALTHCARE PROPERTIES
CORPORATION; (as to EMERALD HEALTH CARE)

21.     Plaintiff realleges Paragraphs 1 through 16 above.

22.     Defendants had a statutorily mandated responsibility to provide SOPHIA SCHWERAK her nursing home residents' rights as set forth in §400.022, Florida Statutes.

23.     Defendants' responsibilities to SOPHIA SCHWERAK as outlined in §400.022 are nondelegable.

24.     Notwithstanding the responsibility of the defendants to provide SOPHIA SCHWERAK her statutorily mandated nursing home residents' rights, SOPHIA SCHWERAK was deprived of such rights by the acts or omissions of the defendants which include the following:

        a.      failing to provide adequate and appropriate health care and protective and support services to protect SOPHIA SCHWERAK from physical injury.

        b.      failing to provide adequate and appropriate therapeutic and rehabilitative services;

        c.      failing to protect SOPHIA SCHWERAK's right to be adequately informed of her medical condition and proposed treatment, and the right to participate in the planning of her medical treatment;

        d.      failing to provide SOPHIA SCHWERAK with reasonable access to health, social, legal or other services;

        e.      failing to develop, implement, and update an adequate and appropriate resident care plan to meet the needs of SOPHIA SCHWERAK;

        f.      failing to maintain accurate medical and/or clinical records which contain sufficient information to justify the diagnosis and treatment and to accurately document the

4

results, including at a minimum documented evidence of assessments of the needs of the resident, of establishment of appropriate plans of care and treatment, and of the care and services provided;

        g.    failing to appropriately monitor SOPHIA SCHWERAK and recognize significant signs and symptoms of changes in her health condition.

        h.    failing to properly notify the family of SOPHIA SCHWERAK of significant changes in her health status;

        i.    failing to properly supervise staff;

        j.    failing to properly train staff;

        k.    improper retention of staff;

        l.    failing to protect the dignity of SOPHIA SCHWERAK; and

        m.    failing to protect the privacy of SOPHIA SCHWERAK.

25.    As a result, plaintiff suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, aggravation of a previously existing condition and ultimately death.

WHEREFORE, plaintiff demands judgment against the defendants for damages for the deprivation of SOPHIA SCHWERAK's rights as stated above and further demands attorneys' fees and costs and a trial by jury.

### Count II
### Negligence Survival Claim Against
### CENTENNIAL HEALTHCARE INVESTMENT CORPORATION;
### CENTENNIAL HEALTHCARE CORPORATION; CENTENNIAL, MANAGEMENT
### CORPORATION; CENTENNIAL HEALTHCARE PROPERTIES CORPORATION;
### (as to EMERALD HEALTH CARE)

26.    Plaintiff hereby realleges Paragraphs 1 through 16 above.

27.    This is a survival claim brought pursuant to §46.021, Florida Statutes.

28.     Defendant employed licensed professionals; hired, supervised and/or controlled licensed professionals as consultants; and employed unlicensed persons to provide care and services to residents at EMERALD HEALTH CARE, including SOPHIA SCHWERAK.

29.     Defendants owed a duty to residents, including SOPHIA SCHWERAK, to comply with her nursing home residents' rights described in §400.022, Florida Statutes.

30.     Defendants owed a duty to residents, including SOPHIA SCHWERAK, to hire, train, and supervise employees, both licensed and unlicensed, so that such employees delivered care and services to residents in a safe and beneficial manner as statutorily required by the Nursing Home Residents' Rights Act as codified in §400.022, Florida Statutes.

31.     Licensed employees and consultants of EMERALD HEALTH CARE owed a duty to residents, including SOPHIA SCHWERAK, to provide care and treatment which met the standard of care required of similarly situated, reasonably prudent nursing home employees and consultants who provide care and treatment to nursing home residents under the same or similar circumstances to those applicable to Plaintiff's cause of action, and was described herein according to accepted standards of care for similar professionals in Florida and similar communities.

32.     Unlicensed employees of EMERALD HEALTH CARE owed duties to residents, including SOPHIA SCHWERAK, to render custodial care and services consistent with the residents' rights specified in §400.022 and as reasonably prudent and similarly situated nursing home employee would render care and services, including but not limited to rendering care and services in a safe and beneficial manner.

33.     Section 400.022, Florida Statutes, imposes a duty upon nursing homes and their employees and consultants to protect a particular class of persons, aged and disabled persons,

6

including residents of nursing homes, from an inability to protect themselves, and to protect such persons from abuse, as defined in §415.102 Florida Statutes.

34.     Section 400.022, Florida Statutes, is designed to protect nursing home residents from particular harm in the form of infringements and deprivations of their nursing home residents' rights as set forth in §400.022.

35.     Defendants' responsibilities to SOPHIA SCHWERAK as outlined in §400.022 are nondelegable.

36.     Defendants and their employees and consultants breached their common law duties as set forth above when they violated the rights of SOPHIA SCHWERAK as set forth in §400.022, Florida Statutes.

37.     The breach of the duty of care to SOPHIA SCHWERAK by the Defendants and their employees and consultants include the following acts and omissions:

        a.      failing to provide adequate and appropriate healthcare and protective and support services to protect SOPHIA SCHWERAK from physical injury;

        b.      failing to develop, implement, and update an adequate and appropriate resident care plan to meet the needs of SOPHIA SCHWERAK.

        c.      failing to maintain accurate medical and/or clinical records which contain sufficient information to justify the diagnosis and treatment and to accurately document the results, including at a minimum documenting evidence of assessments of the needs of the resident, of establishment of appropriate plans of care and treatment, and of the care and services provided;

        d.      failing to appropriately monitor SOPHIA SCHWERAK and recognize significant signs and symptoms of change in her health condition;

        e.      failing to properly notify the family of SOPHIA SCHWERAK of significant changes in her health status;

        f.      failing to properly supervise staff;

7

g.      failing to properly train staff;

h.      improper retention of staff;

i.      failing to protect the dignity of SOPHIA SCHWERAK;

j.      failing to protect the privacy of SOPHIA SCHWERAK; and

k.      failing to provide proper custodial care, wound care and to administer proper medication to prevent SOPHIA SCHWERAK's existing medical conditions from worsening to the point of becoming life-threatening.

38.      As a direct proximate result of the Defendants' acts, omissions and violations of §400.022, Florida Statutes, SOPHIA SCHWERAK suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of remaining life, expense of hospitalization, medical and nursing care and treatment and aggravation of a previously existing condition.

WHEREFORE, Plaintiff demands judgment for damages against the Defendants and costs and further demands a trial by jury.

### Count III
### Wrongful Death Claim Against
### CENTENNIAL HEALTHCARE INVESTMENT, CORPORATION;
### CENTENNIAL HEALTHCARE CORPORATION; CENTENNIAL, MANAGEMENT
### CORPORATION; CENTENNIAL HEALTHCARE PROPERTIES CORPORATION;
### (as to EMERALD HEALTH CARE)

39.      Plaintiff incorporates Paragraphs 1 through 16 above.

40.      Defendant employed licensed professionals; hired, supervised and/or controlled licensed professionals as consultants; and employed unlicensed persons to provide care and services to residents at EMERALD HEALTH CARE, including SOPHIA SCHWERAK.

41.      Defendants owed a duty to residents, including SOPHIA SCHWERAK, to comply with her nursing home residents' rights described in §400.022, Florida Statutes.

42.      Defendants owed a duty to residents, including SOPHIA SCHWERAK, to hire, train, and supervise employees, both licensed and unlicensed, so that such employees

8

delivered care and services to residents in a safe and beneficial manner and statutorily as required by the Nursing Home Residents' Rights Acts as codified in §400.022, Florida Statutes.

43.     Licensed employees and consultants of EMERALD HEALTH CARE owed a duty to residents, including SOPHIA SCHWERAK, to provide care and treatment which met the standard of care required of a similarly situated, reasonably prudent nursing home employee and consultant who provide care and treatment to nursing home residents under the same or similar circumstances to those applicable to Plaintiff's causes of action and as described herein.

44.     Unlicensed employees of EMERALD HEALTH CARE owed duties to residents, including SOPHIA SCHWERAK, to render custodial care and services consistent with the residents' rights specified in §400.022 and as a reasonably prudent and similarly situated nursing home employee would render care and services, including but not limited to rendering care and services in a safe and beneficial manner.

45.     Section 400.022, Florida Statutes, imposes a duty upon nursing homes and its employees and consultants to protect a particular class of persons, aged and disabled persons, including residents of nursing homes, from an inability to protect themselves, and to protect such persons from abuse, as defined in §415.102.

46.     Section 400.022, Florida Statutes, is designed to protect nursing home residents from particular harm in the form of infringement and deprivations of their residents' rights as set forth in §400.022.

47.     Defendants' responsibilities to SOPHIA SCHWERAK as outlined in §400.022 are nondelegable.

48.     Defendants and their employees and consultants breached their common law duties as set forth above when they violated the rights of SOPHIA SCHWERAK as set forth in §400.022, Florida Statutes.

49.     The breach of the duty of care to SOPHIA SCHWERAK by the Defendants and their employees and consultants include, the following acts and omissions.

9

       a.     failing to provide adequate and appropriate healthcare and protective and support services to protect SOPHIA SCHWERAK from physical injury;

       b.     failing to develop, implement, and update an adequate and appropriate resident care plan to meet the needs of SOPHIA SCHWERAK.

       c.     failing to maintain accurate medical and/or clinical records which contain sufficient information to justify the diagnosis and treatment and to accurately document the results, including at a minimum documenting evidence of assessments of the needs of the resident, of establishment of appropriate plans of care and treatment, and of the care and services provided;

       d.     failing to SOPHIA SCHWERAK and recognize significant signs and symptoms of change in her health condition;

       e.     failing to properly notify the family of SOPHIA SCHWERAK of significant changes in her health status;

       f.     failing to properly supervise staff;

       g.     failing to properly train staff;

       h.     improper retention of staff;

       i.     failing to protect the dignity of SOPHIA SCHWERAK;

       j.     failing to protect the privacy of SOPHIA SCHWERAK; and

       k.     failing to provide proper custodial care, wound care and to administer proper medication to prevent SOPHIA SCHWERAK's existing medical conditions from worsening to the point of becoming life-threatening.

    50.    As a direct and proximate result of the Defendants' acts, omissions and deprivations and infringements of this nursing home resident's rights pursuant to §400.022, Florida Statutes, SOPHIA SCHWERAK died.

    51.    As a direct and proximate result of the Defendants' acts, omissions, and deprivations and infringements of this nursing home resident's rights pursuant to §400.022,

Florida Statutes, which resulted in the death of SOPHIA SCHWERAK, the Estate of SOPHIA

SCHWERAK has incurred extensive medical, nursing, funeral and other expenses.

52.    SOPHIA SCHWERAK died with surviving children CAROL A. HORTON and

JOHN P. SCHWERAK who are potential beneficiaries of a recovery for wrongful death.

53.    As a result of the death of SOPHIA SCHWERAK, CAROL A. HORTON and

JOHN P. SCHWERAK suffered loss of support and services and will suffer such losses in the

future, loss of parental companionship, instruction and guidance, and mental pain and suffering.

WHEREFORE, Plaintiff demands judgment for damages against defendants and costs

and further demands a trial by jury.

W. Lee King, Jr., Esquire
Fulford & King, L.L.O.
Attorneys for Plaintiff
900 S. Federal Hwy., Suite 100
Stuart, Florida 34994
(772) 223-2100
Florida Bar No. 724490

IN THE CIRCUIT COURT IN AND FOR
ST LUCIE COUNTY, FLORIDA
IN RE: ESTATE OF                              PROBATE DIVISION

SOPHIA SCHWERAK                               CASE NO.:   03-CP-545-FM

        Deceased.

_____/

LETTERS OF ADMINISTRATION
(Single Personal Representative)

TO ALL WHOM IT MAY CONCERN

    WHEREAS, **SOPHIA SCHWERAK**, a resident of Stuart, Martin County, Florida, died

on September 17, 2001, owning assets in the State of Florida; and

    WHEREAS, CAROL A. HORTON and JOHN P. SCHWERAK have been appointed Co-

Personal Representatives of the estate of the Decedent and have performed all acts prerequisite to

issuance of Letters of Administration in the estate;

    NOW, THEREFORE, I, the undersigned Circuit Judge, declare CAROL A. HORTON

and JOHN P. SCHWERAK to be duly qualified under the laws of the State of Florida to act as

Co-Personal Representatives of the Estate of **SOPHIA SCHWERAK**, deceased, with full power

to administer the estate according to law; to ask, demand, sue for, recover and receive the

property of the Decedent; to pay the debts of the Decedent as far as the assets of the estate will

permit and the law directs; and to make distribution of the estate according to law.

    WITNESS my hand and the seal of this Court this _15th_ day of __MAY__, 2003.

                        FOR   Circuit Court Judge    MARC A. CIANCA

Copy to:
W. Lee King, Jr., Esquire

STATE OF FLORIDA
ST. LUCIE COUNTY
THIS IS TO CERTIFY THAT THIS IS A
TRUE AND CORRECT COPY OF THE
ORIGINAL.
JoANNE HOLMAN, CLERK
BY
Deputy Clerk
DATE May 15 2003

c:\rlec probate intgenson letters.adm

03 MAY 15  AM 10:23

Exhibit "A"

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR  ST. LUCIE  COUNTY, FLORIDA

The Estate of SOPHIA SCHWERAK, by and through
CAROL A. HORTON and JOHN P. SCHWERAK,
as Co-Personal Representatives,

        Plaintiffs,

                              Case No. 04-CA-000635 (ON)

vs.


CENTENNIAL HEALTHCARE INVESTMENT CORPORATION,
CENTENNIAL HEALTHCARE CORPORATION,
CENTENNIAL HEALTHCARE MANAGEMENT CORPORATION,
and CENTENNIAL HEALTHCARE PROPERTIES CORPORATION
(as to EMERALD HEALTH CARE),

        Defendants.
_____/

## DEFENDANT CENTENNIAL HEALTHCARE INVESTMENT CORPORATION'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT

Defendant, Centennial HealthCare Investment Corporation, by and through the undersigned attorneys, move to compel arbitration and to stay discovery, and as grounds therefore, state as follows:

1.      Plaintiffs, Carol A. Horton and John P. Schwerak, as Co-Personal Representatives of the Estate of Sophia Schwerak, have filed a lawsuit against Centennial HealthCare Investment Corporation and other corporate Defendants relating to Sophia Schwerak's residency at Emerald Health Care.  Said lawsuit is in express contravention and violation of the Admission and Financial Agreements entered into between Plaintiff Carol A. Horton on behalf of Sophia Schwerak and Emerald Health Care dated March 13,

2002 and April 1, 2002. A copy of both Admission Contracts are attached hereto as Exhibits A and B, respectively, and incorporated herein by reference.

2. Specifically, the Admission and Financial Agreements contain the following arbitration clause on pages 7-8:

### Arbitration

To the extent that the Grievance Policy and Procedures and Dispute Resolution provisions of this Agreement fail to provide resolution, the parties to this Agreement do hereby agree that any and all controversies, claims, disputes, or disagreements of any kind arising out of, or relating to this Agreement, or concerning any rights arising hereunder or the breach thereof, including, but not limited to, any alleged tort, personal injury, negligence, or other claim of any kind, shall be settled exclusively by binding arbitration, which shall be conducted in accordance with the applicable rules of the American Arbitration Association ("AAA") and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitration shall be conducted where the Facility is located, or if not practical, as close to the Facility as practical. The arbitration shall be before one neutral arbitrator selected in accordance with the rules of the AAA.

The prevailing party in any arbitration proceeding hereunder as determined by the arbitrator or in any legal proceedings or actions arising from or in connection with such arbitration proceeding or this section of the Agreement shall be entitled to recover reasonable attorneys' fees and costs actually incurred. The parties hereto acknowledge and agree that this Agreement evidences a transaction involving interstate commerce. Accordingly, the enforcement of this Section of the Agreement shall be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any provision of this Agreement to the contrary. The provisions of this section of the Agreement shall survive any termination or breach of this Agreement.

3. All language contained within the Arbitration clause quoted above is in the same size font as the remainder of the document. Further, the language within the Arbitration clause is *italicized* to further emphasize those two paragraphs. The signature

of Plaintiff Carol A. Horton appears on page 9 of the Admission and Financial Agreements.

4.      The arbitration clause is unambiguous and expressly prohibits the filing of a lawsuit such as the one filed in this case. Further, the law favors arbitration as a matter of policy.

5.      In the case at issue, there is a valid arbitration agreement executed on two separate occasions, which is specifically directed to the type of claim which is at issue in this lawsuit, and, thus, an arbitrable issue clearly exists. Further, this Motion to Compel is in response to the initial Complaint and, accordingly, there has been no waiver of the right to arbitration. Further, this Motion specifically contains a request to stay all discovery in order to ensure that the right to arbitration is not waived. Accordingly, the arbitration provision contained in the Admission and Financial Agreements should be enforced in this case.

6.      Significantly, a similar arbitration clause was upheld in the case of *Gainesville Health Care Center, Inc. v. Weston*, 857 So. 2d 278 (Fla. 1st DCA 2003), another lawsuit by a personal representative against a nursing home. In that case, the court enforced the arbitration clause. Likewise, this Court should enforce the arbitration clauses signed by Plaintiff Carol A. Horton in the case at bar.

7.      Based on the foregoing, it is respectfully requested that the Court Compel Arbitration of the above referenced matter.

8.      Further, on December 20, 2002, all named Defendants filed for Chapter 11 Bankruptcy Protection pursuant *to In Re: Centennial HealthCare Corporation, et al.*, in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta,

Division, Case No. 02-74974 et al, Jointly Administered. 11 U.S.C. Section 362(a)(1) of the Code provides for an automatic stay of all legal proceedings against the debtor. In accordance therewith, Defendant Centennial HealthCare Investment Corporation respectfully prays that this matter be automatically stayed.

## INCORPORATED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

### FACTUAL BACKGROUND:

Plaintiffs, Carol A. Horton and John P. Schwerak, filed this lawsuit on May 4, 2004, in the Nineteenth Judicial Circuit in and for St. Lucie County, Florida, as Co-Personal Representatives of the Estate of Sophia Schwerak, deceased. Plaintiffs have alleged in Counts I through III of the Complaint violations of nursing home resident's rights under Chapter 400, *Florida Statutes*, arising out of the residency of Sophia Schwerak at Emerald Health Care, a nursing home in Port St. Lucie, Florida, from March 8, 2002, through May 23, 2002. On March 13, 2002 and again on April 1, 2002, Plaintiff, Carol A. Horton, entered into identical Admission and Financial Agreements on behalf of Sophia Schwerak with Emerald Health Care. The Admission and Financial Agreements contained identical arbitration clauses (set forth above), wherein Plaintiff agreed to binding arbitration in order to resolve all claims arising out of, or relating to the Agreements, or concerning any rights or the breach of the Agreement, including but not limited to alleged tort, personal injury, or negligence. *See* Exhibits A and B.

### LEGAL ANALYSIS:

**I.    The arbitration clauses are binding upon Plaintiffs and should be enforced.**

Arbitration clauses are favored as a matter of public policy. The enforcement of the arbitration provision applicable to this case is consistent with Florida Law.

"Arbitration clauses are to be given the broadest possible interpretation to accomplish the salutory purpose of resolving controversies out of court." *Benedict v. Pensacola Motor Sales, Inc.*, 846 So. 2d 1238, 1240 (Fla. 1st DCA 2003) (citations omitted). Specifically, as stated in *Terminix International Company v. Ponzio*, 693 So. 2d 104, 107 (Fla. 5th DCA 1997):

> As the federal courts do with comparable provisions under the United States Arbitration Act, 9 U.S.C. sections 1 - 14 (1982), we too should resolve all doubts about the scope of an arbitration agreement as well as any questions about waivers thereof in favor of arbitration, rather than against it.

(citing *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, (1983)). Further, as recognized in *Regency Group, Inc. v. McDaniels*, 647 So. 2d 192, 194 (Fla. 1st DCA 1994):

> Any time a contract contains an arbitration clause, there is a presumption of arbitrability in the sense that in order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

(citations omitted).

The Florida Supreme Court has previously considered the issue of what a court must consider in ruling on a motion to compel arbitration, and ruled that are three elements for consideration: ". . .(1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived." *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999). The basic question presented is purely a legal one, whether, accepting as true the allegations of the Plaintiff's Complaint, the Plaintiff has asserted claims that were subject to arbitration. *Terminix International Company v. Ponzio*, 693 So. 2d at 106. Arbitration clauses have

5

been regularly enforced in Florida lawsuits filed by or on behalf of nursing home residents and alleging improper care by the nursing home. *See Integrated Health Services of Green Briar, Inc. v. Lopez-Silvero*, 827 So. 2d 338 (Fla. 3d DCA 2002); and *Eldridge v. Integrated Health Services, Inc.*, 805 So. 2d 982 (Fla. 2d DCA 2001).

There is no question that Plaintiff executed valid agreements to arbitrate. In addition, there has been no waiver of the arbitration clauses because Defendant has not engaged in any discovery in this lawsuit. Further, based on the language of the arbitration clauses at issue, Plaintiff's claims are subject to arbitration. The arbitration clauses state, in pertinent part:

> . . . the parties to this Agreement do hereby agree that any and all controversies, claims, disputes, or disagreements of any kind arising out of, or relating to this Agreement, or concerning any rights arising hereunder or the breach thereof, including, but not limited to, any alleged tort, personal injury, negligence, or other claim of any kind, shall be settled exclusively by binding arbitration. . . .

Clearly, the arbitration clause encompasses Plaintiff's claims of violations of nursing home resident's rights under Chapter 400, *Florida Statutes*, negligence, and wrongful death.

A similar arbitration clause was upheld in the case of *Gainesville Health Care Center, Inc. v. Weston*, 857 So. 2d 278 (Fla. 1st DCA 2003). The plaintiff in that case argued that the arbitration clause was both procedurally and substantively unconscionable. However, the court found insufficient evidence to support the plaintiff's contention that the arbitration clause was unconscionable. *Id.* at 288. Likewise, this Court should enforce the arbitration clauses signed by Plaintiff Carol A. Horton in the case at bar. Based on the foregoing, Plaintiffs' claims are subject to binding arbitration

consistent with the terms of the arbitration agreement entered into by Plaintiff Carol A. Horton.

**II.      All proceedings should be stayed.**

On December 20, 2002, all named Defendants filed for Chapter 11 Bankruptcy Protection pursuant *to In Re: Centennial HealthCare Corporation, et al.*, in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta, Division, Case No. 02-74974 et al, Jointly Administered.  11 U.S.C. Section 362(a)(1) of the Code provides for an automatic stay of all legal proceedings against the debtor.  By filing the Complaint, Plaintiff has violated the Order of the bankruptcy court.   Defendant Centennial HealthCare Investment Corporation respectfully prays that this matter be automatically stayed, as ordered by the bankruptcy court.

**WHEREFORE**, for the reasons set forth above, it is respectfully requested that this Court enter an Order Compelling Arbitration and an Order Staying All Proceedings.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to W. LEE KING, JR., ESQ., 900 South Federal Highway, Suite 100, Stuart, Florida  34994, by regular U.S. Mail, this 1st day of June, 2004

ULLMAN & KURPIERS, LLC

Lauren M. Levy
Florida Bar No. 0062103
410 South Ware Boulevard, Suite 1100
Tampa, Florida 33619
813/739-1900
813/739-1919 (fax)
*Attorney for Defendant*

7

Westlaw.

857 So.2d 278
28 Fla. L. Weekly D2201
(Cite as: 857 So.2d 278)

Page 1

**H**

District Court of Appeal of Florida,
First District.

GAINESVILLE HEALTH CARE CENTER, INC.,
as licensee and d/b/a Integrated
Health Services at Gainesville, Appellant,
v.
Margaret WESTON, as Personal Representative of
the Estate of Isabella Brooks,
Appellee.

No. 1D02-5101.

Sept. 18, 2003.
Rehearing Denied Oct. 23, 2003.

Personal representative of estate filed a civil damage action against nursing home, asserting claims based on negligence, wrongful death and violation of the nursing home residents' bill of rights. Nursing home moved to compel arbitration and abate proceedings. The Circuit Court, Alachua County, Larry G. Turner, J., denied motion, finding that the admission contract containing the arbitration provision was procedurally and substantially unconscionable. Nursing home appealed. The District Court of Appeal, Webster, J., held that: (1) evidence was insufficient to permit finding that the admission contract was a contract of adhesion; (2) evidence was insufficient to establish that the arbitration provision was procedurally unconscionable; and (3) personal representative's alternative arguments regarding unenforceability of the arbitration provision were legally without merit.

Reversed and remanded.

West Headnotes

[1] Arbitration 2.2
33k2.2 Most Cited Cases

[1] Arbitration 6.2
33k6.2 Most Cited Cases

[1] States 18.15
360k18.15 Most Cited Cases

Both the Federal Arbitration Act and the Florida

Arbitration Code permit a challenge to the validity of an arbitration provision based upon any state-law contract defense. 9 U.S.C.A. §§ 1-16; West's F.S.A. §§ 682.01-682.22.

[2] Contracts 1
95k1 Most Cited Cases

A court may decline to enforce a contract on the ground that it is unconscionable.

[3] Appeal and Error 842(9)
30k842(9) Most Cited Cases

The trial court's decision that is based in part on factual findings presents a mixed question of law and fact on appeal.

[4] Appeal and Error 1010.1(4)
30k1010.1(4) Most Cited Cases

[4] Appeal and Error 1010.1(6)
30k1010.1(6) Most Cited Cases

The standard of review applicable to the trial court's factual findings is whether they are supported by competent, substantial evidence.

[5] Arbitration 23.25
33k23.25 Most Cited Cases

The standard of review applicable to the trial court's construction of the arbitration provision, and to its application of the law to the facts found, is de novo.

[6] Contracts 1
95k1 Most Cited Cases

Before a court may hold a contract unconscionable, it must find that it is both procedurally and substantively unconscionable.

[7] Contracts 1
95k1 Most Cited Cases

To determine whether a contract is procedurally unconscionable, a court must look to the circumstances surrounding the transaction to determine whether the complaining party had a meaningful choice at the time the contract was

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

857 So.2d 278
28 Fla. L. Weekly D2201
(Cite as: 857 So.2d 278)

Page 2

entered.

**[8] Contracts** 🔑1
95k1 Most Cited Cases

Among the factors to be considered to determine whether a contract is procedurally unconscionable are whether the complaining party had a realistic opportunity to bargain regarding the terms of the contract, or whether the terms were merely presented on a take-it-or-leave-it basis, and whether he or she had a reasonable opportunity to understand the terms of the contract.

**[9] Contracts** 🔑1
95k1 Most Cited Cases

To determine whether a contract is substantively unconscionable, a court must look to the terms of the contract itself, and determine whether they are so outrageously unfair as to shock the judicial conscience.

**[10] Arbitration** 🔑23.11
33k23.11 Most Cited Cases

Evidence was insufficient as a matter of law to permit finding that the nursing home admission contract containing the mandatory arbitration provision was a contract of adhesion, absent any evidence to support finding that it was offered to resident's daughter who held power of attorney on a "take-it-or- leave-it" basis, that had daughter so requested, the arbitration provision would not have been deleted, and that the daughter could not have obtained a satisfactory placement for her mother except by acquiescing to the terms as written.

**[11] Arbitration** 🔑23.11
33k23.11 Most Cited Cases

Whether person holding power of attorney for nursing home resident was not told that, by signing the admission contract containing the arbitration provision, the resident would be giving up the right to a trial in a court, that resident's choice of arbitrators would be limited to a group likely to be biased in favor of nursing home, that the burden of persuasion on some types of claims would be greater than it would in a court, and that resident would be subject to a different rule regarding the award of attorney's fees from that applicable in a court was insufficient, as a matter of law, to support the conclusion that the arbitration provision was procedurally

unconscionable.

**[12] Arbitration** 🔑6.2
33k6.2 Most Cited Cases

Mere fact that nursing home allegedly failed to explain terms of the arbitration provision to resident's daughter, who held power of attorney, and that daughter did not understand the arbitration provision was insufficient to establish that the arbitration provision was procedurally unconscionable, where no evidence supported personal representative's other contentions that the resident's choice of arbitrators would be limited to a group likely to be biased in favor of the nursing home, or that the resident's burden of persuasion would be greater in arbitration than it would in a court; the standard for recovering punitive damages or attorney fees under arbitration provision was no different in substance from standard generally applicable under nursing home resident's' bill of rights. West's F.S.A. § § 400.022, 400.023(1), 400.0237(4).

**[13] Arbitration** 🔑23.10
33k23.10 Most Cited Cases

The parties and arbitral body conducting a proceeding may not be presumed to be unable or unwilling to retain competent, conscientious and impartial arbitrators.

**[14] Contracts** 🔑1
95k1 Most Cited Cases

**[14] Contracts** 🔑93(2)
95k93(2) Most Cited Cases

One should not be permitted to avoid the consequences of a contract freely entered into simply because he or she elected not to read and understand its terms before executing it, or because, in retrospect, the bargain turns out to be disadvantageous; to sanction such a result would be to render contracts worthless as a tool of commerce.

**[15] Arbitration** 🔑23.10
33k23.10 Most Cited Cases

As the party seeking to avoid the arbitration provision on the ground of unconscionability, the burden is on that party to present evidence sufficient to support the claim.

**[16] Arbitration** 🔑23.13

857 So.2d 278
28 Fla. L. Weekly D2201
(Cite as: 857 So.2d 278)

33k23.13 Most Cited Cases

Whether an enforceable arbitration provision did not exist because the nursing home admission contract containing the arbitration provision, by its own terms, allegedly terminated on the date of resident's death, was an issue is for the arbitrator, not for the trial court.

[17] Arbitration ☜6.2
33k6.2 Most Cited Cases

A resident's acceptance of an arbitration provision to resolve disputes does not constitute "consideration" from a Medicare/Medicaid patient so as to be illegal under federal law. 42 C.F.R. § 483.12(d)(3).

[18] Arbitration ☜6.2
33k6.2 Most Cited Cases

A fiduciary does not breach her fiduciary duty by entering into an otherwise valid arbitration agreement.

[19] Arbitration ☜1.2
33k1.2 Most Cited Cases

[19] Arbitration ☜7.1
33k7.1 Most Cited Cases

Arbitration agreements are a favored means of dispute resolution, and doubts concerning their scope should generally be resolved in favor of arbitration.

[20] Arbitration ☜23.10
33k23.10 Most Cited Cases

The burden on the party seeking to avoid the arbitration provision on the ground of unconscionability encompasses the obligation to prove both procedural and substantive unconscionability.
*280 R. Daniel Noey and Charles G. Eichhorn, Jr., of Dore, Lanier, Noey, & Fannin, Chartered, Jacksonville, for Appellant.

Gerald D. Schackow of Schackow & Mercadante, PA, Gainesville, for Appellee.

WEBSTER, J.

Appellant seeks review of a non-final order denying

its motion to compel arbitration and abate appellee's civil action. We have jurisdiction. Art. V, § 4(b)(1), Fla. Const.; Fla. R.App. P. 9.030(b)(1)(B), 9.130(a)(3)(C)(iv). The trial court held that appellant is not entitled to arbitration because the arbitration provision is unconscionable. We conclude that the trial court's determination that the arbitration provision is procedurally unconscionable is erroneous as a matter of law, and that appellee's alternative arguments regarding unenforceability of the arbitration provision are legally without merit. Accordingly, we reverse.

I.

Appellee, as personal representative of the estate of Isabella Brooks, filed a civil damage action against appellant, asserting claims based on negligence, wrongful death and violation of section 400.022, Florida Statutes (sometimes referred to as the nursing home residents' bill of rights). Appellant responded by filing a motion to compel arbitration and abate proceedings. Attached to that motion was a six-page document titled "Admission Contract," which appellant asserted had been executed on Isabella Brooks' behalf by her daughter, Barbara West, pursuant to a power of attorney previously executed by Ms. Brooks. That document includes the following provision:

VI. ARBITRATION
Except as prohibited by applicable law, pursuant to the Federal Arbitration Act, any action, dispute, claim, or controversy of any kind (*e.g.*, whether in contract or in tort, statutory or common law, legal or equitable, or otherwise) now existing or hereafter arising between the parties in any way arising out of, pertaining to or in connection with the provision of healthcare services, any agreement between the parties, the provision of any other goods or services by *281 the Health Care Center or other transactions, contracts or agreements of any kind whatsoever, any past, present, or future incidents, omissions, acts, errors, practices, or occurrence causing injury to either party whereby the other party or its agents, employees or representatives may be liable, in whole or in part, or any other aspect of the past, present, or future relationships between the parties shall be resolved by binding arbitration administered by the National Health Lawyers Association (the "NHLA").
Immediately below this provision is the following:
THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ AND UNDERSTOOD THIS CONTRACT, AND THAT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

857 So.2d 278
28 Fla. L. Weekly D2201
(Cite as: 857 So.2d 278)

EACH OF THEM VOLUNTARILY CONSENTS TO ALL OF ITS TERMS

The signature lines are immediately below this language. In two memoranda opposing appellant's motion to compel arbitration, appellee raised a number of issues, including that the arbitration provision is procedurally and substantively unconscionable.

At the hearing held on appellant's motion to compel arbitration, the parties relied exclusively on the documents executed by Ms. West on her mother's behalf and the depositions of Ms. West and Tammy Miller, the employee of appellant with whom Ms. West dealt. Viewed in a light most favorable to appellee, those depositions establish that Ms. West and her sister (appellee) desired to transfer Ms. Brooks from the nursing home where she was residing to appellant's facility because they were dissatisfied with the care their mother had received at the first facility. Ms. Brooks was admitted to appellant's facility on February 9, 2001. After Ms. Brooks had been admitted to appellant's facility, Ms. West made an appointment to meet with Tammy Miller. That meeting occurred at appellant's facility on March 28, 2001.

The meeting between Ms. West and Ms. Miller took place during the former's lunch break. It probably lasted 15 to 20 minutes. During that meeting, Ms. West told Ms. Miller that she possessed a power of attorney on behalf of her mother, and executed several documents in that capacity. One of those documents was the Admission Contract. No substantive discussion occurred regarding that document. Ms. West (who is a high school graduate and, at the time, held a clerical/administrative position with a major healthcare provider) asked no questions about it; nor did she indicate that she had not read and understood it, as the acknowledgment immediately preceding the signature line recited (although she now claims that she did not read it before she executed it). Ms. West did not ask to be permitted to take the documents with her, so that she might study them or seek the advice of a lawyer or other more knowledgeable person before signing. Had she done so, that would have been permitted. It is clear that any haste associated with reviewing and signing the documents was self-imposed by Ms. West. There is no suggestion that the Admission Contract was presented on a "take-it-or-leave-it" basis; nothing to suggest that, had Ms. West requested to amend that document in some material respect, such a request would have been denied; and no evidence that Ms. West could not have obtained a

satisfactory placement for her mother except by acquiescing to the terms of the contract.

During the hearing, the trial court observed that it appeared Ms. West had had "ample opportunity" to read the documents before she executed them. It noted that Ms. Brooks had been residing at appellant's *282 facility for several weeks before the documents were executed and that, had Ms. West been uncomfortable with the documents, she might have taken them home to study or discuss "with other family members or trusted friends or advisers." The court also noted that Ms. West could have had a lawyer review them, had she so desired. Notwithstanding those observations, however, at the conclusion of the hearing the trial court held that the Admission Contract was procedurally and substantively unconscionable. (It did not expressly hold that the arbitration provision contained in that document was, likewise, unconscionable, but it is clear that such was its intent.) It based that holding on the findings that the Admission Contract was a "contract of adhesion"; that nobody on behalf of appellant explained the terms of the arbitration provision to Ms. West, including what arbitration is and what rights appellee would be giving up; and that Ms. West did not understand the arbitration provision. More particularly, the trial court was of the opinion that appellant was obliged to explain to Ms. West that, by signing the Admission Contract, appellee would be giving up the right to a trial in a court; that appellee's choice of arbitrators would be limited to a group likely to be biased in favor of appellant; that the burden of persuasion on some types of claims would be greater than it would in a court; and that appellee would be subject to a different rule regarding the award of attorney's fees from that applicable in a court. The trial court incorporated its findings and holding by reference in a subsequent order denying appellant's motion to compel arbitration and abate the action. This appeal follows.

II.

A.

The arbitration provision in the Admission Contract provides that the Federal Arbitration Act (9 U.S.C. § § 1-16) is to apply to any subsequent dispute. The parties have not specifically addressed whether that Act or the Florida Arbitration Code (ch. 682, Fla.Stat.) controls, and the trial court made no ruling on this question. However, for purposes of this appeal, the answer is irrelevant because the analysis is the same in either case.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

857 So.2d 278
28 Fla. L. Weekly D2201
(Cite as: 857 So.2d 278)

Page 5

According to our supreme court,

[u]nder both federal statutory provisions and Florida's arbitration code, there are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived.

*Seifert v. U.S. Home Corp.*, 750 So.2d 633, 636 (Fla.1999) (citing *Terminix Int'l Co. v. Ponzio*, 693 So.2d 104, 106 (Fla. 5th DCA 1997)). Accord *John B. Goodman Ltd. P'ship v. THF Constr., Inc.*, 321 F.3d 1094 (11th Cir.2003). Pursuant to the first element for consideration, it is relatively clear that the issue is "whether a valid written agreement to arbitrate exists," not whether a valid written contract containing an arbitration provision exists. *Seifert*, 750 So.2d at 636; *John B. Goodman Ltd. P'ship*, 321 F.3d at 1095-98. This focus on the validity of the arbitration provision, rather than of the contract containing the provision, is the result of the holding by the United States Supreme Court in a case construing the Federal Arbitration Act "that[,] in passing upon a[n] ... application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, 87 S.Ct. *283|801, 18 L.Ed.2d 1270 (1967). It has become known as the "separability" doctrine. *John B. Goodman Ltd. P'ship*, 321 F.3d at 1095; *See also Ronbeck Constr. Co. v. Savanna Club Corp.*, 592 So.2d 344, 347 (Fla. 4th DCA 1992) (discussing "separability" pursuant to section 682.03 of the Florida Arbitration Code). While the trial court did not expressly hold that the arbitration provision, as opposed to the Admission Contract, was unenforceable, it is clear that such was its intent, and that the parties presented the issue that way. No issue has been raised as to either the existence of an arbitrable issue or waiver by appellant of the right to arbitrate. Accordingly, we are concerned only with whether the arbitration provision contained in the Admission Contract is "valid."

[1][2] Both the Federal Arbitration Act and the Florida Arbitration Code permit a challenge to the validity of an arbitration provision based upon any state-law contract defense. See *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (holding that section 2 of the Federal Arbitration Act permits "generally applicable contract defenses, such as fraud, duress, or unconscionability, [to] be applied to invalidate

arbitration agreements"); *Medident Constr., Inc. v. Chappell*, 632 So.2d 194, 195 (Fla. 3d DCA 1994) (fraud and other grounds for avoidance or invalidation of a contract may be applied to invalidate an arbitration agreement). In Florida, a court may decline to enforce a contract on the ground that it is unconscionable. *E.g., Powertel, Inc. v. Bexley*, 743 So.2d 570, 574 (Fla. 1st DCA 1999). Because the trial court refused to enforce the arbitration provision contained in the Admission Contract on the ground that it was unconscionable, we must review the propriety of that determination.

[3][4][5] The trial court's decision was based in part on factual findings. Accordingly, it presents a mixed question of law and fact. The standard of review applicable to the trial court's factual findings is whether they are supported by competent, substantial evidence. *E.g., State v. Wilford*, 720 So.2d 617, 618 (Fla. 1st DCA 1998). However, the standard of review applicable to the trial court's construction of the arbitration provision, and to its application of the law to the facts found, is *de novo. See, e.g., Powertel*, 743 So.2d at 573 (construction of contracts, including arbitration provisions, presents an issue of law, subject to *de novo* review); *Connor v. State*, 803 So.2d 598, 608 (Fla.2001) (the application of the law by the trial court to the facts found by it presents an issue of law, subject to *de novo* review).

B.

The concept of unconscionability has been described as "chameleon-like," *Steinhardt v. Rudolph*, 422 So.2d 884, 890 (Fla. 3d DCA 1982), and as " 'so vague ... that neither the courts, practicing attorneys, nor contract draftsmen can determine with any degree of certainty ...' when it will apply in any given situation." *Fotomat Corp. of Fla. v. Chanda*, 464 So.2d 626, 628 n. 1 (Fla. 5th DCA 1985) (quoting from 15 Samuel Williston, A Treatise on the Law of Contracts § 1763A (3d ed.1972)). It has been referred to as a "safety valve in our law of contracts" to permit courts to refuse to enforce a contract when to enforce it " 'would not be in keeping with the basic function of any court--the administration of justice.' " *Steinhardt*, 422 So.2d at 890 (citation omitted). One Florida court has said that "[s]ynonyms for the term unconscionable include 'shocking to the conscience' and 'monstrously harsh.' " *Garrett v. Janiewski*, 480 So.2d 1324, 1326 (Fla. 4th DCA 1985) (quoting from *284|Jeffery v. Weintraub*, 32 Wash.App. 536, 648 P.2d 914 (1982), and *Montgomery Ward & Co. v. Annuity Bd. of S. Baptist Convention*, 16 Wash.App. 439, 556 P.2d 552 (1976)).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

857 So.2d 278
28 Fla. L. Weekly D2201
(Cite as: 857 So.2d 278)

Page 6

In an early case explaining the modern application of unconscionability, the court said that "[u]nconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir.1965) (citing *Campbell Soup Co. v. Wentz*, 172 F.2d 80 (3d Cir.1948), and *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960)). Florida courts have adopted this description. *E.g.*, *Fotomat*, 464 So.2d at 628; *Steinhardt*, 422 So.2d at 889; *Kohl v. Bay Colony Club Condo., Inc.*, 398 So.2d 865, 867-68 (Fla. 4th DCA 1981). However, Florida courts have also emphasized that the concept is to be used with great caution:

[The concept of unconscionability] does not mean, however, that a court will relieve a party of his obligations under a contract because he has made a bad bargain containing contractual terms which are unreasonable or impose an onerous hardship on him. Indeed, the entire law of contracts, as well as the commercial value of contractual arrangements, would be substantially undermined if parties could back out of their contractual undertakings on that basis. " 'People should be able to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain. Also, they should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side. It is only where it turns out that one side or the other is to be penalized by the enforcement of the terms of a contract so unconscionable that no decent, fairminded person would view the ensuing result without being possessed of a profound sense of injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability.' "

*Steinhardt*, 422 So.2d at 890 (quoting from 14 Samuel Williston, A Treatise on the Law of Contracts § 1632 (3d ed.1972)). Accord *Fotomat*, 464 So.2d at 630.

[6][7][8][9] Before a court may hold a contract unconscionable, it must find that it is *both* procedurally and substantively unconscionable. *E.g.*, *Bellsouth Mobility LLC v. Christopher*, 819 So.2d 171, 173 (Fla. 4th DCA 2002); *Powertel*, 743 So.2d at 574; *Complete Interiors, Inc. v. Behan*, 558 So.2d 48, 52 (Fla. 5th DCA 1990); *Steinhardt*, 422 So.2d at 889; *Kohl*, 398 So.2d at 867. To determine whether a contract is procedurally unconscionable, a court must look to the "circumstances surrounding the

transaction" to determine whether the complaining party had a "meaningful choice" at the time the contract was entered. *Williams*, 350 F.2d at 449. Accord *Steinhardt*, 422 So.2d at 889; *Kohl*, 398 So.2d at 869. Among the factors to be considered are whether the complaining party had a realistic opportunity to bargain regarding the terms of the contract, or whether the terms were merely presented on a "take-it-or-leave-it" basis; and whether he or she had a reasonable opportunity to understand the terms of the contract. As one Florida court has noted, while this may "require[ ] an examination into a myriad of details including [the complaining party's] experience and education and the sales practices that were employed by the [other party] ..., the basic concept is 'an absence of meaningful choice.' " *Kohl*, 398 So.2d at 869. To determine whether a contract is substantively unconscionable, a court must look to the terms of the contract, itself, and determine *285 whether they are so "outrageously unfair" as to "shock the judicial conscience." *See, e.g.*, *Belcher v. Kier*, 558 So.2d 1039, 1043 (Fla. 2d DCA 1990) (declining to equate "unconscionability" with mere "unreasonableness"); *Free Unitholders of Outdoor Resorts at Orlando, Inc. v. Outdoor Resorts of Am., Inc.*, 460 So.2d 382, 383 (Fla. 2d DCA 1984); *Steinhardt*, 422 So.2d at 889.

### III.

As discussed above, to determine whether a contract is procedurally unconscionable, a court must look to the "circumstances surrounding the transaction" to determine whether the complaining party had a "meaningful choice" at the time the contract was entered. *Williams*, 350 F.2d at 449. Accord *Steinhardt*, 422 So.2d at 889; *Kohl*, 398 So.2d at 869.

### A.

It is apparent that a principal basis for the trial court's conclusion that the arbitration provision is procedurally unconscionable was its finding that the Admission Contract (and, therefore, the arbitration provision) is a "contract of adhesion." Either the trial court applied a legally incorrect definition of what constitutes a "contract of adhesion," or its finding in this regard is unsupported by competent, substantial evidence.

[10] We have previously defined "an adhesion contract" as

a "standardized contract form offered to consumers of goods and services on essentially [a] 'take it or

857 So.2d 278
28 Fla. L. Weekly D2201
(Cite as: 857 So.2d 278)

leave it' basis without affording [the] consumer [a] realistic opportunity to bargain and under such conditions that [the] consumer cannot obtain [the] desired product or services except by acquiescing in the form contract."

*Powertel*, 743 So.2d at 574 (quoting Black's Law Dictionary (6th ed.1990)). As we said in *Powertel*, the fact that a contract is one of adhesion is a strong indicator that the contract is procedurally unconscionable because it suggests an absence of "meaningful choice." *Id.* at 574-75. Although the parties appear to have agreed in their legal memoranda filed in the trial court that the foregoing definition is correct, it is unclear whether the trial court used it. To the extent that it did, however, it is clear that the evidence was insufficient as a matter of law to permit the finding that the Admission Contract is a "contract of adhesion."

It appears that the Admission Contract was pre-printed. However, there is no evidence to support a finding that it was offered to Ms. West (or anybody else) on a "take-it-or-leave-it" basis. More particularly, there is nothing to suggest that, had Ms. West so requested, the arbitration provision would not have been deleted. There is also no evidence that Ms. West could not have obtained a satisfactory placement for her mother except by acquiescing to the terms as written. Certainly, nothing on the face of the Admission Contract permits such findings.

B.

[11] The trial court also based its conclusion that the arbitration provision is procedurally unconscionable on its findings that nobody associated with appellant explained its terms to Ms. West, and that Ms. West did not understand the provision. More particularly, the trial court found that Ms. West was not told that, by signing the Admission Contract, appellee would be giving up the right to a trial in a court; that appellee's choice of arbitrators would be limited to a group likely to be biased in favor of appellant; that the burden of persuasion on some types of claims would be greater than it would in a court; *286 and that appellee would be subject to a different rule regarding the award of attorney's fees from that applicable in a court. These findings are in part unsupported by competent, substantial evidence. They are also insufficient, as a matter of law, to support the conclusion that the arbitration provision is procedurally unconscionable.

1.

[12][13] There is no evidence to support the determination that appellee's choice of arbitrators would be limited to a group likely to be biased in favor of appellant. The evidence regarding the organization from which the arbitrators must be chosen according to the arbitration provision was limited to a stipulation. It recited that the organization "is the nation's largest[ ] nonpartisan, ... educational organization devoted to legal issues in the healthcare field"; that it "is now the nation['']s largest educational association devoted to legal issues in the health industry[,] with 9,000 members"; that, while it "is made up of primarily health-related attorneys who represent and counsel hospitals and hospital systems, physicians, managed care organizations, insurers, long term care facilities, home health agencies, and other healthcare entities on business, corporate and regulatory matters," it also has members who are "physicians, accountants, and healthcare executives"; and that its "Alternative Dispute Resolution Service ... [has] establish[ed] and maintain[s] panels of trained healthcare arbitrators, mediators, hearing officers and other dispute resolvers." No evidence was presented to indicate that Ms. West would be unable to obtain an unbiased arbitrator from the organization. Like the United States Supreme Court, in the absence of such evidence, " '[w]e decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators.' " *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (rejecting a claim that arbitration panels would be biased, and quoting from *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 634, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).

2.

There is, likewise, no evidence to support the determination that appellee's burden of persuasion would be greater in arbitration than it would in a court on any of the claims raised in the complaint. The parties stipulated that, pursuant to the rules of the organization designated to arbitrate any disputes, punitive damages may only be recovered if "the arbitrator determines ... that there is clear and convincing evidence that the party against whom such damages are awarded is guilty of conduct evincing an intentional or reckless disregard for the rights of another party or fraud, actual or presumed." This standard is not different in substance from the standard generally applicable in Florida. *See Owens-Corning Fiberglas Corp. v. Ballard*, 749 So.2d 483,

857 So.2d 278
28 Fla. L. Weekly D2201
(Cite as: 857 So.2d 278)

486-87 (Fla.1999). However, appellee argued in the trial court that the burden of persuasion required to obtain punitive damages pursuant to the claim for violation of the nursing home residents' bill of rights (§ 400.022) was only by the greater weight of the evidence. According to appellee, the arbitration provision was unconscionable because it failed to disclose that the burden of persuasion on such a claim would be greater in arbitration than it would in a court. Appellee also claimed that the arbitration provision was unconscionable because it failed to disclose that, while the arbitrator *may* award attorney's fees to the prevailing party, a party prevailing *287 in court on a damage claim for a violation of the nursing home residents' bill of rights *must* be awarded attorney's fees. Apparently, the trial court accepted these representations regarding a claim for violation of a nursing home resident's rights. Our review of the relevant statutory provisions, however, leads us to conclude that the representations were incorrect.

Appellee's claim for a violation of the nursing home residents' bill of rights (§ 400.022) is controlled by the 2001 versions of the relevant statutory provisions. Effective May 15, 2001, those provisions were amended in significant respects. Ch.2001-45, Laws of Fla. Section 400.0237 was created, providing (in subsection (4)) that "[t]he plaintiff must establish at trial, by clear and convincing evidence, its entitlement to an award of punitive damages." Ch.2001-45, § 9, at 229, Laws of Fla. In addition, section 400.023(1) was amended to provide that attorney's fees to a prevailing party "shall be awarded solely for ... injunctive or administrative relief and not for any claim or action for damages whether such claim or action is brought together with a request for an injunction or administrative relief or as a separate action, except as provided under s. 768.79 [relating to offers of judgment] or the Florida Rules of Civil Procedure." Ch.2001-45, § 4, at 221, Laws of Fla. Accordingly, there was no basis for the representations made by appellee in the trial court.

3.

The trial court's conclusion that the arbitration provision is procedurally unconscionable also appears to have been based upon either a misunderstanding regarding the law, or a misapplication of the law to the facts. This is because, as we have previously stated, to determine whether a contract is procedurally unconscionable, a court must look to the "circumstances surrounding the transaction" to determine whether the complaining party had a "meaningful choice" at the time the contract was entered. *Williams*, 350 F.2d at 449. Accord *Steinhardt*, 422 So.2d at 889; *Kohl*, 398 So.2d at 869. It appears that the trial court either failed to apply this law, or misapplied it to the facts.

There is competent, substantial evidence to support the trial court's findings that nobody associated with appellant explained the terms of the arbitration provision to Ms. West, and that Ms. West did not understand the arbitration provision. However, these are only two of the "circumstances surrounding the transaction." To determine whether Ms. West had a "meaningful choice" at the time she executed the Admission Contract, *all* of the circumstances must be considered. Although the trial court noted that Ms. West had had "ample opportunity" to read the documents before she executed them and that, had she been uncomfortable with them, she might have taken them home to study or discuss "with other family members[,] ... trusted friends or advisers" or a lawyer, it does not seem to have given these facts any weight. Among the other circumstances which the trial court does not appear to have given any weight are the facts that Ms. West asked no questions about the arbitration provision and said or did nothing to indicate she had not read and understood that provision before she executed the contract (as the acknowledgment immediately above the signature lines recited); there is nothing to suggest that the contract was presented on a "take-it-or-leave-it" basis, or that, had Ms. West requested that the arbitration provision be deleted, it would not have been; there is no evidence that Ms. West could not have obtained a satisfactory placement for her mother except by acquiescing to the terms of the contract; and that, to the extent Ms. West did not, in fact, read the arbitration provision, nothing appellant did or said had any impact on her failure to do *288 so. In short, if one looks to *all* of the "circumstances surrounding the transaction," it is simply not reasonably possible to reach the conclusion that Ms. West had no "meaningful choice" at the time she executed the Admission Contract.

C.

[14] To permit one to avoid the requirements of the arbitration provision on the basis of the evidence presented to the trial court would stand contract law on its head. One should not be permitted to avoid the consequences of a contract freely entered into simply because he or she elected not to read and understand its terms before executing it, or because, in retrospect, the bargain turns out to be

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

857 So.2d 278
28 Fla. L. Weekly D2201
**(Cite as: 857 So.2d 278)**

disadvantageous. To sanction such a result would be to render contracts worthless as a tool of commerce.

[15] As the party seeking to avoid the arbitration provision on the ground of unconscionability, the burden was on appellee to present evidence sufficient to support that claim. *E.g., Complete Interiors, 558 So.2d at 53; Meeting Makers, Inc. v. Am. Airlines, Inc., 513 So.2d 700, 701 (Fla. 3d DCA 1987).* That burden encompassed the obligation to prove *both* procedural and substantive unconscionability. *E.g., Bellsouth Mobility, 819 So.2d at 173; Powertel, 743 So.2d at 574; Complete Interiors, 558 So.2d at 52; Steinhardt, 422 So.2d at 889; Kohl, 398 So.2d at 867.* Because appellee failed to present evidence sufficient to establish that the arbitration provision is procedurally unconscionable, she failed to carry this burden, and we need not decide whether the provision is substantively unconscionable. Having been afforded one opportunity to do so, she is not entitled to a second. *Complete Interiors, 558 So.2d at 53 n. 4.*

### IV.

[16][17][18][19][20] Perhaps anticipating our decision, appellee argues that, even if the trial court was incorrect on the unconscionability issue, the order denying appellant's request for arbitration should still be affirmed because the arbitration provision is unenforceable for other reasons--i.e., that the trial court reached the right result, but for the wrong reason. *See, e.g., Robertson v. State, 829 So.2d 901, 906-07 (Fla.2002)* (explaining what has come to be known as the "tipsy coachman rule"). First, appellee claims that there is no arbitration provision to enforce because the Admission Contract, by its own terms, terminated on the date of Ms. Brooks' death. However, in an identical case, the Second District Court of Appeal has held that such an issue is for the arbitrator, not for the trial court. *Estate of Blanchard v. Central Park Lodges (Tarpon Springs), Inc., 805 So.2d 6, 8 (Fla. 2d DCA 2001)* (citations omitted). We agree with the Second District. Second, appellee claims that the arbitration provision is unenforceable because it is illegal under federal law which prohibits a nursing home from accepting any additional consideration from a Medicare/Medicaid patient aside from the standard rate paid by Medicare/Medicaid. 42 C.F.R. § 483.12(d)(3). We have found no authority from any jurisdiction which holds that an arbitration provision constitutes "consideration" in this sense; nor do we believe that the federal regulation was intended to apply to such a situation. Finally, appellee claims

that the arbitration provision is invalid and unenforceable because it constitutes an act of self-dealing in violation of appellant's fiduciary duty to Ms. Brooks. In the first place, no evidence was presented sufficient to establish the existence of a fiduciary duty owed by appellant to Ms. Brooks. Moreover, assuming that a fiduciary duty did exist, we have found no authority which holds that a fiduciary breaches that duty by entering into an otherwise valid arbitration agreement. *289 Arbitration agreements are a favored means of dispute resolution, and doubts concerning their scope should generally be resolved in favor of arbitration. *E.g., Grektorp v. City Towers of Fla., Inc., 644 So.2d 613, 614 (Fla. 2d DCA 1994).*

### V.

The burden was on appellee to present evidence sufficient to establish that the arbitration provision is unconscionable and, therefore, unenforceable. Because that burden was not carried and appellee's alternative arguments regarding unenforceability of the arbitration provision are legally without merit, we reverse and remand with directions that the trial court enter an order granting appellant's motion to compel arbitration and abate the civil action.

REVERSED and REMANDED, with directions.

KAHN and DAVIS, JJ., concur.

857 So.2d 278, 28 Fla. L. Weekly D2201

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

846 So.2d 1238
28 Fla. L. Weekly D1359
**(Cite as: 846 So.2d 1238)**

Page 1

District Court of Appeal of Florida,
First District.

Eugenia M. BENEDICT, Appellant,

v.

PENSACOLA MOTOR SALES, INC, d/b/a/ Bob
Tyler, etc, Appellee.

**No. 1D02-5252.**

June 9, 2003.

Car dealership moved to compel arbitration of car purchaser's breach of contract claim against dealership. The Circuit Court, Escambia County, T. Michael Jones, J., granted motion. Purchaser appealed. The District Court of Appeal, Hawkes, J., held that: (1) a party to a contract containing an arbitration clause who seeks to avoid arbitration by asserting implied waiver based on inconsistent acts must show prejudice, and (2) purchaser was not prejudiced by dealership's filing motion to compel arbitration after filing its answer, and thus, dealership did not impliedly waive right to arbitration.

Affirmed and conflict certified.

West Headnotes

**[1] Arbitration ⟲23.25**
33k23.25 Most Cited Cases

District Court of Appeal reviews de novo a trial court's ruling on a motion to compel arbitration.

**[2] Arbitration ⟲23.3(2)**
33k23.3(2) Most Cited Cases

Purchaser of car was not prejudiced by the sequence of car dealership's filings, and therefore, dealership did not impliedly waive its right to arbitrate under car purchase agreement, where dealership filed its answer, which did not reference the arbitration clause, 28 days prior to filing its motion to compel arbitration due to fact that dealership's counsel had not seen the purchase agreement containing the arbitration clause until after the answer was filed.

**[3] Arbitration ⟲7.1**
33k7.1 Most Cited Cases

Arbitration clauses are to be given the broadest possible interpretation to accomplish the salutory purpose of resolving controversies out of court.

**[4] Arbitration ⟲8**
33k8 Most Cited Cases

**[4] Arbitration ⟲23.3(1)**
33k23.3(1) Most Cited Cases

When parties contractually agree to arbitrate, a court must give effect to that agreement, and all arbitrable issues must be resolved through arbitration unless arbitration has been waived.

**[5] Arbitration ⟲23.3(1)**
33k23.3(1) Most Cited Cases

All questions regarding waiver of arbitration should be construed in favor of arbitration.

**[6] Arbitration ⟲23.3(1)**
33k23.3(1) Most Cited Cases

When a party to a contract containing an arbitration clause seeks to avoid arbitration by asserting implied waiver based on inconsistent acts, it must show prejudice.

**[7] Arbitration ⟲23.3(1)**
33k23.3(1) Most Cited Cases

The Federal Arbitration Act has been interpreted to require a showing of prejudice before an implied waiver of arbitration can be found. 9 U.S.C.A. § 1 et seq.

**[8] Arbitration ⟲23.3(2)**
33k23.3(2) Most Cited Cases

Requiring a showing of prejudice to be made before a party opposing arbitration can assert implied waiver of arbitration by inconsistent acts is consistent with the policy of avoiding hypertechnical application of the law in a manner that would allow substantive determinations to be made based on the sequence of pleadings rather than on the merits of the claims.

**[9] Estoppel ⟲52.10(2)**
156k52.10(2) Most Cited Cases

"Waiver" is defined as the intentional or voluntary relinquishment of a known right, or conduct which warrants an inference of the relinquishment of a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

846 So.2d 1238
28 Fla. L. Weekly D1359
(Cite as: 846 So.2d 1238)

Page 2

known right.

**[10] Arbitration** 🔑23.3(2)
33k23.3(2) Most Cited Cases

Waiver of a contractual right to arbitrate may occur as a result of the moving party's active participation in a lawsuit.

**[11] Arbitration** 🔑23.3(2)
33k23.3(2) Most Cited Cases

Waiver of arbitration rights exists where active participation in litigation results in prejudice to the party opposing a motion to compel arbitration.
*1240 Appellant, pro se.

John B. Trawick, Shell, Fleming, Davis & Menge, Pensacola, for Appellee.


HAWKES J.

[1] We have for review an interlocutory order compelling arbitration. We have jurisdiction pursuant to Florida Rule of Appellate Procedure Rule 9.130(a)(3)(C)(iv). This court reviews de novo a trial court's ruling on a motion to compel arbitration. *See Florida Title Loans, Inc. v. Christie*, 770 So.2d 750, 751 (Fla. 1st DCA 2000). We affirm.

I

Appellee, Bob Tyler Toyota, sold Appellant, Eugenia M. Benedict, what was represented to her as a new car, and she signed a Sales Agreement which included an arbitration clause. Appellant subsequently discovered the car she bought as "new" was, in fact, one which had been sold to another couple and returned to them due to mechanical problems. Appellant also learned that Appellee had the fuel injection system replaced by his service department prior to its sale to Appellant, all without notice. Upon Appellant's request, the Department of Highway Safety and Motor Vehicles conducted an investigation which revealed the above-stated facts.

On April 25, 2002, Appellant filed a Complaint against Appellees. The Sales Agreement was attached and incorporated by reference through paragraph 37 of count seven, as part of the breach of contract claim. The arbitration provision itself was not specifically referenced. Twenty days after service of the Complaint, Appellee filed a Motion to

Dismiss and an Answer, neither of which referenced the arbitration clause. On June 18, 2002, Appellee filed a Motion to Compel Arbitration pursuant to the contractual provisions of the Sales Agreement. On October 3, 2002, Appellee's counsel filed an Affidavit wherein he attested he had not seen the Sales Agreement and its arbitration clause until he spoke to his client on June 17, 2002, and had the opportunity to review a faxed copy. A hearing was held on Appellee's Motion to Compel Arbitration. After hearing arguments of counsel, the trial court granted the motion subject to the arbitrator's consideration of Appellant's entitlement to punitive damages.

[2] On appeal, Appellant does not dispute the fact that the parties contractually agreed to arbitrate. Nor does she argue that the contested issues are outside the scope of their contractual agreement. Rather, Appellant argues that because she filed a Complaint and Appellee filed an Answer 28 days prior to filing a Motion to Compel Arbitration, the right to arbitrate is waived. In other words, the sequence of pleadings alone resulted in a waiver of arbitration. This argument is not supported by the law.

II

[3][4][5] Arbitration clauses are to be given the "broadest possible interpretation to accomplish the salutory purpose of resolving controversies out of court." *Royal Caribbean Cruises, Ltd. v. Universal Employment Agency*, 664 So.2d 1107, 1108 (Fla. 3d DCA 1996). When parties contractually agree to arbitrate, a court must give effect to that agreement, and all arbitrable issues must be resolved through arbitration unless arbitration has been waived. All questions regarding waiver of arbitration should be construed in favor of arbitration. *See Zager Plumbing, Inc. v. JPI Nat'l Constr., Inc.*, 785 So.2d 660, 662 (Fla. 3d DCA 2001).

[6][7][8] In furtherance of these principles and for the reasons discussed below, we *1241 hold that when a party to a contract containing an arbitration clause seeks to avoid arbitration by asserting implied waiver based on inconsistent acts, it must show prejudice. Our holding is based on three premises. First, the Florida Supreme Court's ruling in *Seifert v. U.S. Home Corp.*, 750 So.2d 633, 636 (Fla.1999), provides that, when ruling on a motion to compel arbitration, the trial court's analysis is the same under both the Federal Arbitration Act (federal act) or the Florida Arbitration Code (Florida Code). The federal Act has consistently been interpreted to require a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

846 So.2d 1238
28 Fla. L. Weekly D1359
(Cite as: 846 So.2d 1238)

Page 5

showing of prejudice before an implied waiver of arbitration can be found. [FN1] Second, the district courts of appeal are divided as to whether, under the Florida Code, a showing of prejudice is required before an implied waiver can be found. We believe *Seifert* eliminates the disparity of analyses between application of the federal Act and the Florida Code, and this is our first opportunity to directly address this issue. Finally, Florida courts consistently require a showing of prejudice prior to compelling strict compliance with many procedural requirements. [FN2] Thus, requiring prejudice here is consistent with the policy of avoiding hypertechnical application of the law in a manner that would allow substantive determinations to be made based on the sequence of pleadings rather than on the merits of the claims. *See Simpson v. State*, 418 So.2d 984, 986 (Fla.1982) (holding "[w]e should seek to avoid, not foster a hypertechnical application of the law.").

FN1. Under federal law, prejudice has consistently been required, and the party arguing waiver of arbitration bears a heavy burden of proof. *See Miami Dolphins, Ltd. v. Cowan*, 601 So.2d 301, 302 (Fla. 3d DCA 1992) (citing *Britton v. Co-op Banking Group*, 916 F.2d 1405, 1412 (9th Cir.1990); *accord Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir.1985)) (party seeking to prove waiver of a right to arbitrate must demonstrate: (1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts).

FN2. *See Derrick v. State*, 581 So.2d 31 (Fla.1991) (holding when discovery violation alleged, trial court must conduct hearing to inquire into circumstances of the violation and its possible prejudice to defendant); *Hoffman v. State*, 397 So.2d 288 (Fla.1981) (allowing amendment of date alleged in State's statement of particulars if no showing of prejudice to defendant); *Atl. Coast Line R.R. Co. v. Edenfield*, 45 So.2d 204 (Fla.1950) (noting pleadings may be amended before, during and after trial; test is whether amendment takes opposing party by surprise); *Buday v. Ayer*, 754 So.2d 771 (Fla. 2d DCA 2000)(noting party entitled to amend pleading to conform to evidence if party can establish issue was tried by

express or implied consent of opposing party and admission of the evidence will not prejudice opposing party); *Anglo Am. Auto Auctions, Inc. v. Tuminello*, 732 So.2d 1218 (Fla. 5th DCA 1999) (holding under rule governing amendments to pleadings to conform with evidence, test of prejudice is primary consideration in determining whether motion for leave to amend should be granted); *Rosser v. State*, 658 So.2d 175 (Fla. 3d DCA 1995) (holding State may substantively amend charging document during trial, even over defendant's objection unless there is a showing of prejudice to substantial rights of defendant); *Tutwiler Cadillac, Inc. v. Brockett*, 551 So.2d 1270 (Fla. 1st DCA 1989) (noting Florida courts have policy of liberality toward vacating defaults and allowing trial on merits; default set aside based on excusable neglect, errors in original complaint, and lack of prejudice resulting from late filed answer); *Trans World Marine Corp. v. Threlkeld*, 201 So.2d 614 (Fla. 3d DCA 1967) (holding defendant permitted to amend answer to include affirmative defense after jury verdict, because evidence of defense presented at trial).

III

The Florida Supreme Court has held that, under either the federal Act or the Florida Code there are "three elements for courts to consider in ruling on a motion to *1242 compel arbitration[ ]:(1) whether a valid written agreement to arbitrate exists;   (2) whether an arbitrable issue exists;  and (3) whether the right to arbitration was waived." *Seifert* 750 So.2d at 636. Accordingly, under either federal or Florida law, when determining the existence of a valid written agreement or an arbitrable issue, the inquiry and result would be the same. Thus, an inquiry into waiver should also yield the same result, regardless of whether the dispute is to be arbitrated pursuant to the federal Act or the Florida Code.

[9][10][11] Waiver is defined as "the intentional or voluntary relinquishment of a known right, or conduct which warrants an inference of the relinquishment of a known right." *Hill v. Ray Carter Auto Sales, Inc.*, 745 So.2d 1136, 1138 (Fla. 1st DCA 1999). Active participation in a law suit may warrant an inference of the relinquishment of arbitration rights. *See id. at 1137*. This court has consistently

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

846 So.2d 1238
28 Fla. L. Weekly D1359
**(Cite as: 846 So.2d 1238)**

Page 4

recognized that waiver of a contractual right to arbitrate may occur as a result of the moving party's active participation in a lawsuit. *See e.g., Maryland Cas. Co. v. Dep't of Gen. Serv., 489 So.2d 54 (Fla. 1st DCA 1986); Transamerica Ins. Co. v. Weed, 420 So.2d 370 (Fla. 1st DCA 1982).* However, while prejudice to the litigant resisting arbitration has arguably been present in each of these cases, there has been no discussion as to whether, under Florida law, a showing of prejudice is required before waiver can be found. *See Maryland Cas. Co.,* 489 So.2d at 55-56 (waiver where defendant filed answer, discovery requests and various motions without demand for arbitration); *Weed,* 420 So.2d at 371-372 (waiver where answer and affirmative defense did not refer to arbitration; and defendant engaged in discovery proceedings, tacitly agreed to set case for trial, and generally participated in suit for nearly four months before moving for arbitration). Thus, although not expressly stated, waiver exists where active participation in litigation results in prejudice to the party opposing a motion to compel arbitration.

In a case factually similar to the case at bar, this court held that the filing of an answer two months prior to filing the motion to compel arbitration did not constitute waiver. *See Hill,* 745 So.2d at 1138. In that case, the defendant's counsel had not received a copy of the contract which contained the arbitration clause at the time the answer was prepared and served. However, based on a review of the case, it is hard to imagine how the party opposing arbitration could have been prejudiced simply because the answer was filed two months before the motion to compel arbitration, absent any other participation in the litigation.

The Third District has held the "well established rule of this district" is that a showing of prejudice is "indispensable" to a conclusion that arbitration was waived because the party seeking to compel arbitration took action inconsistent with arbitration. *See Lane v. Sarfati,* 691 So.2d 5 (Fla. 3d DCA 1997) (certifying conflict with *Donald & Co. Sec., Inc. v. Mid-Fla. Cmty Serv.,* 620 So.2d 192 (Fla. 2d DCA 1993)).

Conversely, the opinions of the remaining three districts, decided prior to *Seifert,* hold prejudice is not required before implied waiver can be found. Significantly, while stating prejudice is not required, those cases discuss how long the case proceeded, the number of pleadings and motions filed, and the extent of discovery, thus indicating active participation in litigation *1243 resulted in prejudice. [FN3]

Interestingly, in *Owens & Minor Med., Inc. v. Innovative Mktg & Distrib. Serv.,* 711 So.2d 176 (Fla. 4th DCA 1998), litigation had been actively ongoing for almost a year before the answer was filed. One month later, the motion to compel arbitration was filed. The *Owens* court found an implied waiver. The time between the filing of the answer and the filing of the motion to compel arbitration was greater in *Hill* than in *Owens.* The only logical reason justifying an implied waiver in *Owens,* but not in *Hill,* is prejudice to the party opposing arbitration resulting from active participation in litigation. Thus, it appears that a requirement of prejudice, had it existed, would have altered the result in very few, if any, of these cases. However, to the extent these cases permit implied waiver without showing prejudice, or require differing analyses depending on the applicable arbitration process, they appear to have been superseded by *Seifert.*

> FN3. *Owens & Minor Med., Inc. v. Innovative Mktg & Distrib. Serv.,* 711 So.2d 176 (Fla. 4th DCA 1998) (in February, 1996, plaintiff filed suit and obtained a prejudgment writ of garnishment; in March, 1996, plaintiff served a request for admissions and filed a second amended complaint; in July, 1996, plaintiff served a request for admissions, a request for production, and two sets of interrogatories; in January, 1997, after its motion to dismiss was denied, defendant filed its answer, affirmative defenses, counterclaim and third party complaint; in February, 1997, plaintiff filed a motion to stay and compel arbitration); *Beverly Hills Dev. Corp. v. George Wimpey of Fla., Inc.,* 661 So.2d 969 (Fla. 5th DCA 1995) (plaintiff sought law suit without first or simultaneously seeking arbitration; defendant filed a motion to dismiss the complaint and compel arbitration, which plaintiff opposed; approximately 1 month later, plaintiff reversed its position and for the first time sought arbitration by filing a motion to compel; 3 months later, defendant reversed its position and withdrew its motion to compel arbitration, and filed an amended motion to dismiss based solely on a claim of failure to state a cause of action; court found both parties waived their right to arbitrate); *Donald & Co. Sec., Inc. v. Mid-Fla. Cmty Serv.,* 620 So.2d 192 (Fla. 2d DCA 1993) (plaintiff filed pleadings and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

846 So.2d 1238
28 Fla. L. Weekly D1359
**(Cite as: 846 So.2d 1238)**

litigated case for 13 months before invoking right to arbitrate and, in interim, defended against vigorous defenses and counterclaims, one of which was ruled on by the trial court and affirmed on appeal; plaintiff also conducted several depositions and was itself deposed).

Subsequent to *Seifert,* at least one district has continued to hold prejudice is not required before an implied waiver can be found. *See Morrell v. Wayne Frier Mfrd. Home Center,* 834 So.2d 395 (Fla. 5th DCA 2003). In that case, the defendant filed an answer, affirmative defenses, and a motion to dismiss. Litigation proceeded to the point that a case management conference was held, and the case was set for mediation and trial. The plaintiffs engaged in discovery and submitted witness lists. The defendant did not assert the right to arbitrate until the eve of trial, nearly one year after the complaint was served. The Fifth District held the right to arbitrate had been waived. Although the court stated prejudice was not required, in that case, as with the cases discussed above, due to active participation in the litigation, it was clearly present.

We find that requiring the trial court to make a factual inquiry as to the possible prejudice the party opposing arbitration would suffer is the only rational test to apply to determine the existence of an implied waiver if the courts are going to give arbitration clauses the "broadest possible interpretation to accomplish the salutory purpose of resolving controversies out of court." *Royal Caribbean Cruises, Ltd.* 664 So.2d at 1108. Without requiring prejudice, any per se rule (either pleading-based or time-based) would have the potential of resulting in unnecessary injustice that application of inflexible procedural rules invariably cause. Accordingly, we *1244 align with the Third District and hold that the party opposing arbitration must demonstrate prejudice before implied waiver can be found based on inconsistent acts. Our conclusion is not only consistent with the ruling in *Seifert,* it supports the goal of avoiding a hypertechnical application of rules without concern for substantive effect. To the extent our holding conflicts with the Fifth District's holding in *Morrell,* we certify conflict.

IV

Because the record fails to show that Appellant was prejudiced by the sequence of Appellee's filings, the trial court's order granting Appellee's motion to compel arbitration is

AFFIRMED, and CONFLICT CERTIFIED.

DAVIS and LEWIS, JJ., concur.

846 So.2d 1238, 28 Fla. L. Weekly D1359

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

693 So.2d 104
22 Fla. L. Weekly D1184
(Cite as: 693 So.2d 104)

Page 1

▷

District Court of Appeal of Florida,
Fifth District.

TERMINIX INTERNATIONAL COMPANY, LP,
Appellant,
v.
Anthony PONZIO and Randy Ponzio, etc., et al.,
Appellees.

No. 96-3091.

May 9, 1997.

Residents of home brought personal injury action claiming that pest control service's negligent failure to control or eradicate all pests was direct and proximate cause of bodily injury. The Circuit Court, Orange County, Rom Powell, J., denied service's motion to dismiss predicated on demand for enforcement of arbitration clause. Service filed interlocutory appeal. The District Court of Appeal, Cobb, J., held that residents' personal injury action fell within scope of arbitration clause contained within pest control services contract.

Reversed and remanded.

West Headnotes

[1] Arbitration ⬤═⥤23.13
33k23.13 Most Cited Cases

In considering request for arbitration, trial court must determine whether valid written agreement to arbitrate exists, whether arbitrable issues exist, and whether right to arbitration was waived.

[2] Arbitration ⬤═⥤7.5
33k7.5 Most Cited Cases

In considering whether claim for personal injuries is included within scope of arbitration clause, scope of right to arbitrate will be resolved in favor of arbitration.

[3] Arbitration ⬤═⥤7.5
33k7.5 Most Cited Cases

Personal injury action brought by residents of home against pest control service based on service's failure to control or eradicate all pests listed in pest control service agreement fell within agreement's arbitration clause.

[4] Arbitration ⬤═⥤8
33k8 Most Cited Cases

Residents of home waived their state constitutional guarantees of access to courts and right to jury trial by contractually consenting to arbitrate disputes arising out of pest control services agreement. West's F.S.A. Const. Art. 1, § § 21, 22.

[5] Arbitration ⬤═⥤7.3
33k7.3 Most Cited Cases

Residents of home who did not sign pest control services agreement were, as third-party beneficiaries of contract, bound by contract's arbitration provision.
*105 James M. Nicholas and Aaron D. Lyons, of James M. Nicholas, P.A., Indian Harbour Beach, for Appellant.

David A. May, of Nebel & May, P.A., Orlando, for Appellees.

COBB, Judge.

Terminix International Company, LP, defendant below, takes this interlocutory appeal from an order denying its motion to dismiss which had been predicated on a demand for enforcement of an arbitration clause. [FN1].

> FN1. Jurisdiction is predicated on Florida Rule of Appellate Procedure 9.130(a)(3)(C)(iv) (review of order determining entitlement of a party to arbitration).

Anthony Ponzio entered into a residential pest control service agreement (the agreement) with Terminix. Ponzio and his wife Randy subsequently filed a five count complaint against Terminix sounding in negligence and breach of contract.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

693 So.2d 104
22 Fla. L. Weekly D1184
(Cite as: 693 So.2d 104)

[FN2] Counts I through IV allege negligence on behalf of each plaintiff and assert that Terminix had a duty to but failed to:

> FN2. The plaintiffs include Anthony Ponzio, his wife Randy, their child Kristy who resides with them, and the mother of another child, Anthony III, who apparently resides primarily with the mother.

(a) control black widow, brown recluse spiders and other insects in and around the Ponzios' house, and (b) eradicate black widow, brown recluse spiders and other insects in and around the Ponzios' house

and that as a direct and proximate result of Terminix's negligence, the plaintiffs suffered bodily injury.

Count V alleges that Terminix breached the agreement by failing to control or eradicate all pests listed in the pest control service agreement and that as a direct and proximate result of Terminix's breach, the plaintiffs suffered bodily injury.

Terminix filed a motion to dismiss the complaint pursuant to the arbitration clause in paragraph 7 of the terms and conditions of the agreement:

The Purchaser and Terminix agree that any controversy or claim between them arising out of or relating to this agreement shall be settled exclusively by arbitration. *106 Such arbitration shall be conducted in accordance with the Commercial Arbitration Rules then in force of the American Arbitration Association. The decision of the arbitrator shall be a final and binding resolution of the disagreement which may be entered as a judgment by any court of competent jurisdiction. Neither party shall sue the other where the basis of the suit is this agreement other than for enforcement of the arbitrator's decision. In no event shall either party be liable to the other for indirect, special or consequential damages or loss of anticipated profits.

The plaintiffs responded by arguing that personal injury claims were not arbitrable, under the terms of this provision, relying on _Terminix v. Michaels,_ 668 So.2d 1013 (Fla. 4th DCA 1996), _rev. denied,_ 679 So.2d 774 (Fla.1996), wherein the Fourth District held that a homeowner's personal injury claim did not arise out of or relate to the interpretation, performance, or breach of the parties' contract within the meaning of the contract's arbitration clause.

The trial court denied Terminix's motion to dismiss.

[1] In considering a request for arbitration, the trial court must determine whether a valid written agreement to arbitrate exists, whether an arbitrable issue exists, and whether the right to arbitration was waived. _Fortune Insurance Co. v. USA Diagnostics, Inc.,_ 684 So.2d 208 (Fla. 4th DCA 1996). The basic question presented in this case is purely a legal one, whether, accepting as true the allegations of the plaintiffs' complaint, the plaintiffs have asserted claims which are subject to arbitration.

Terminix asserts that federal law governs the interpretation and enforceability of the arbitration provision at issue and further asserts that _Michaels,_ which did not reference federal authority, was erroneously decided or at the very least is distinguishable.

The Federal Arbitration Act (Act), 9 U.S.C. § 2, _et seq.,_ mandates arbitration of a claim brought on a contract containing a written agreement calling for arbitration where the contract evidences a transaction involving interstate commerce. In _Allied-Bruce Terminix Companies, Inc. v. Dobson,_ 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995), which involved a breach of contract action brought on a termite protection contract containing an arbitration clause, the Supreme Court, citing a strong federal policy favoring enforceability of arbitration provisions, held that the Act is entitled to a broad construction, one that extends to the limits of Congress' commerce clause power. The Court, in ordering arbitration, explained that where the transaction involves, i.e., affects interstate commerce, it is within the ambit of the Act, even if the parties did not contemplate an interstate commerce connection.

_Allied-Bruce_ did not involve an action seeking recovery for personal injuries. Additionally, unlike in _Allied-Bruce,_ the parties in this case have failed to develop a record or obtain a ruling below relative to applicability of the Federal Arbitration Act.

Looking to state law, in _Terminix v. Michaels,_ the Fourth District, in a 2-1 decision, held that an arbitration provision did not encompass a personal injury claim based upon negligence and strict liability theories. The provision in that case read as follows:

The Purchaser and Terminix agree that any controversy or claim between them arising out of or relating to the interpretation, performance, or

693 So.2d 104                                                                                                       Page 3
22 Fla. L. Weekly D1184
(Cite as: 693 So.2d 104)

breach of any provision of this agreement shall be settled exclusively by arbitration.

The Michaels had their home treated with chemical pesticides and thereafter sued alleging negligence and strict liability in connection with the ultrahazardous activity of applying dangerous chemicals. The Michaels alleged damages including loss of the house through foreclosure proceedings and tangible and intangible personal injuries as a result of pesticide poisoning. The trial court refused to order arbitration ruling that arbitration "would dispense with the Michaels' right to trial by jury where it was not clear that personal injuries were subject to arbitration." 668 So.2d at 1014.

The majority agreed, explaining that under Florida law, a court should order arbitration "when satisfied that there is *no doubt* that an agreement to arbitrate the subject dispute **107** was made." 668 So.2d at 1015 (emphasis in original). The court explained:

 Here the court harbored considerable doubt as to whether the personal injury claim came within the arbitration clause. Ambiguous provisions of a contract for arbitration will be construed against arbitrating a dispute. *Wood-Hopkins Contracting Co. v. C.H. Barco Contracting Co.,* 301 So.2d 479, 480 (Fla. 1st DCA 1974). The personal injury claim did not relate to interpretation, performance or breach of any *provision* of the agreement. Those matters relating to the performance of the contract would be reasonably construed as matters concerning the application of the pesticide to the home and the resulting condition of the property to which it was applied, namely the object of the contract being the eradication of termites in the home. The protection of persons was not within the *subject matter* of the contract. Therefore, the trial court did not err in denying the motion to compel arbitration.

*Id.* at 1015.

The majority relied on *Dusold v. Porta-John Corp.,* 167 Ariz. 358, 807 P.2d 526 (Ct.App.1990) wherein the Arizona court, in considering whether a dispute is subject to arbitration, explained that for a dispute to arise out of or relate to the subject matter of the contract, it must raise some issue which requires a reference to or construction of some portion of the contract itself. The relationship between the dispute and the contact is not satisfied simply because the dispute would not have arisen absent the existence of a contract between the parties. The *Michaels* majority pointed out that since the plaintiffs alleged

that their injuries occurred because of the defendants' failure to warn them of the dangerous nature of the chemicals, the duty owed was a general duty imposed on the producer and distributor of hazardous chemicals, not one imposed by contract. 668 So.2d at 1015.

Judge Polen dissented, noting that the Fourth District had in the past enforced broadly worded arbitration clauses in actions sounding in tort. *See Bachus & Stratton, Inc. v. Mann,* 639 So.2d 35 (Fla. 4th DCA 1994) (suit alleging sexual discrimination, assault and battery and other causes of action was within scope of arbitration clause). Judge Polen explained that the dispositive factor is not the theory upon which a claim is based but rather the connection between the cause of action and the contract containing the provision. Judge Polen found that:

 There is certainly a causal connection between the contract and the alleged injuries. It is clear that but for the contract, the Michaels would not have suffered the alleged injury.

668 So.2d at 1016.

The Fourth District has recently explained in *Advantage Dental Health Plans, Inc. v. Beneficial Administrators, Inc.,* 683 So.2d 1133 (Fla. 4th DCA 1996) that *Michaels* should be "narrowly read and applied" and merely holds that a strict liability claim does not "arise out of or relate to the interpretation, performance, or breach of any provision of the contract." 683 So.2d at 1134, n. 1. In *Advantage,* the appellate court held that it was error for the trial court to stay arbitration. The appellate court explained that "all doubts as to the scope of an arbitration agreement are to be resolved in favor of arbitration rather than against it." *Id.* The court quoted the following language from *Ronbeck Construction Co., Inc. v. Savanna Club Corp.,* 592 So.2d 344, 346 (Fla. 4th DCA 1992):

 "Our supreme court pointed out in *Roe v. Amica Mutual Insurance Co.,* 533 So.2d 279 (Fla.1988), that 'arbitration is a favored means of dispute resolution and courts indulge every reasonable presumption to uphold proceedings resulting in an award.' 533 So.2d at 281. *See also Intracoastal Ventures Corp. v. Safeco Ins. Co. of America,* 540 So.2d 162 (Fla. 4th DCA 1989).

 "As the federal courts do with comparable provisions under the United States Arbitration Act, 9 U.S.C. sections 1-14 (1982), we too should resolve all doubts about the scope of an arbitration agreement as well as any questions about waivers thereof in favor of arbitration, rather than against it.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

693 So.2d 104                                                                      Page 4
22 Fla. L. Weekly D1184
(Cite as: 693 So.2d 104)

*See* *108*Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)."

*Id.*

The court additionally quoted the following language from the First District decision in *Regency Group, Inc. v. McDaniels*, 647 So.2d 192, 194 (Fla. 1st DCA 1994):

"[A]ny time a contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute (quoting *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)) (emphasis added)."

The court in *Advantage* found that while it was not clear from the arbitration provision whether it is limited to claims for benefits, it was equally unclear whether the provision includes a claim as to whether the plan was renewed for another year.  The court concluded that the trial court was thus required to resolve the ambiguity in favor of arbitration of the renewal claim.

While the nature of the causes of action involved in *Michaels* and *Advantage* differ, it is difficult to harmonize the philosophy toward arbitration provisions announced by the Fourth District in the two decisions.  In *Michaels* the majority referenced a restrictive, narrow interpretation which would be accorded arbitration provisions with ambiguities being resolved against arbitrating a dispute.  Conversely, in *Advantage*, the court, in accordance with federal law, announced that arbitration clauses would be interpreted broadly and that doubts concerning the arbitrability of a dispute would be resolved in favor of arbitration.

[2] This court is in accord with the broad, expansive construction of arbitration awards referenced in *Advantage* and the cases cited therein. See e.g., *Beverly Hills Development Corp. v. George Wimpey of Florida, Inc.*, 661 So.2d 969 (Fla. 5th DCA 1995). In *Beverly Hills*, this court recognized that questions concerning the scope of the right to arbitrate should be resolved in favor of arbitration rather than against it, citing *Ronbeck Construction*, 661 So.2d at 971. The arbitration clause in this case is an expansive provision, encompassing "any controversy or claim

between [the parties] arising out of or relating to" the agreement.  In considering whether a claim for personal injuries is included, the scope of the right to arbitrate will be resolved in favor of arbitration.

[3] The allegations of the complaint assert that Terminix had a duty, deriving from its contractual agreement, to eradicate certain pests and that it failed to do so resulting in bodily injury, etc. to the plaintiffs.  There is no strict liability assertion nor is there any assertion of a failure to warn. The controversy or claims here clearly arise out of or derive from Terminix's contractual undertaking.  It is the nature of the injury and damages which differs from the typical breach of contract action but the arbitration language is not limited to merely breach of contract actions.    Under a broad, expansive construction, the plaintiffs' claims would fall within the scope of the arbitration provision.  *Michaels* can be distinguished on the basis that the arbitration provision there, in providing for arbitration of any controversy or claim "arising out of or relating to the interpretation, performance, or breach of any provision of this agreement" is narrower than the provision here. Furthermore, *Michaels* dealt with a common law duty to warn, and not simply a duty imposed by the contract.  Alternatively, *Michaels*, to the extent that the majority gave a narrow limited construction to the arbitration language, appears to be inconsistent with Florida law governing construction of arbitration provisions.    Indeed, Florida courts have not hesitated to order arbitration where tort claims are involved.  *See, e.g., Bachus & Stratton, Inc. v. Mann*, 639 So.2d 35 (Fla. 4th DCA 1994); *Value Car Sales, Inc. v. Bouton*, 608 So.2d 860 (Fla. 5th DCA 1992); *109*Larry Kent Homes v. Empire of America, FSA*, 474 So.2d 868 (Fla. 5th DCA 1985), rev. denied, 484 So.2d 7 (Fla.1986).

[4] Besides relying on *Michaels*, the plaintiffs rely on the state constitutional guarantees of access to courts [FN3] and the right to a jury trial [FN4] to avoid arbitration of their personal injury claims.  They also assert that the contract was one-sided and did not afford adequate notice that they would be waiving their right to a jury trial on a personal injury claim against Terminix.  The short answer to these arguments is that the plaintiffs waived these rights by consenting to arbitrate disputes "arising out of ... the agreement."

FN3. Art. I, § 21, Fla. Const.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

FN4. Art. 1, § 22, Fla. Const.

[5] Finally, the fact that only Anthony Ponzio signed the contract does not limit arbitration to just his claim. The non-signing plaintiffs are in essence asserting third party beneficiary status to the contract as a limited class which was intended to benefit from the contract. *See Technicable Video Systems v. Americable of Greater Miami, Ltd.,* 479 So.2d 810 (Fla. 3d DCA 1985). As third party beneficiaries, these additional plaintiffs are bound by the arbitration provision. *See Raffa Assoc. v. Boca Raton Resort & Club,* 616 So.2d 1096 (Fla. 4th DCA 1993); *Zac Smith & Co., Inc. v. Moonspinner Condominium Assoc., Inc.* 472 So.2d 1324 (Fla. 1st DCA 1985).

We reverse the order denying Terminix's motion to dismiss and remand with instructions that the claims be referred to arbitration.

REVERSED AND REMANDED.

GRIFFIN and ANTOON, JJ., concur.

693 So.2d 104, 22 Fla. L. Weekly D1184

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

103 S.Ct. 927
74 L.Ed.2d 765
(Cite as: 460 U.S. 1, 103 S.Ct. 927)

Page 1

P

Supreme Court of the United States

MOSES H. CONE MEMORIAL HOSPITAL,
Petitioner
v.
MERCURY CONSTRUCTION CORPORATION.

No. 81-1203.

Argued Nov. 2, 1982.
Decided Feb. 23, 1983.

Contractor sought arbitration under Federal Arbitration Act of its dispute with hospital. The United States District Court for the Middle District of North Carolina, at Greensboro, Hiram H. Ward, J., denied arbitration pending disposition of a state action, and contractor sought relief both by way of petition for mandamus and by appeal. The Court of Appeals, 656 F.2d 933, Donald Russell, Circuit Judge, reversed and remanded with directions. Rehearing was denied, 664 F.2d 936, and certiorari was granted. The Supreme Court, Justice Brennan, held that: (1) district court's stay order was appealable as a "final decision" to the Court of Appeals; (2) district court abused its discretion in granting stay; and (3) Court of Appeals acted within its authority in deciding legal issues presented in order to facilitate prompt arbitration that Congress envisaged.

Affirmed.

Justice Rehnquist filed dissenting opinion in which Chief Justice Burger and Justice O'Connor joined.

West Headnotes

[1] Federal Courts ⬬526.1
170Bk526.1 Most Cited Cases
(Formerly 170Bk526)

Court of Appeals has no occasion to engage in extraordinary review by mandamus in aid of its jurisdiction, when it can exercise same review by contemporaneous ordinary appeal. 28 U.S.C.A. § 1651.

[2] Federal Courts ⬬593
170Bk593 Most Cited Cases

Order staying action seeking order compelling arbitration under United States Arbitration Act, pending resolution of state court suit was appealable as a "final decision" to Court of Appeals, since arbitrability issue was only issue present, so that stay of federal suit pending resolution of state suit meant that there would be no further litigation in federal forum. 9 U.S.C.A. § 4; 28 U.S.C.A. § 1291.

[3] Federal Courts ⬬593
170Bk593 Most Cited Cases

Stay order is final for appealability purposes when sole purpose and effect of stay is to surrender jurisdiction of federal suit to state court.

[4] Federal Courts ⬬573
170Bk573 Most Cited Cases

If district court order which stayed action seeking order compelling arbitration under United States Arbitration Act, pending resolution of state court suit, were not final for appealability purposes, it would nevertheless be appealable within exception to finality rule, as order that conclusively determined disputed question, that resolved important issue completely separable from merits of action and that was effectively unreviewable on appeal from final judgment.

[5] Courts ⬬493(3)
106k493(3) Most Cited Cases

Decision whether to dismiss federal action because of parallel state court litigation does not rest on mechanical checklist, but on careful balancing of important factors as they apply in given case, with balance heavily weighted in favor of exercise of jurisdiction.

[6] Mandamus ⬬10
250k10 Most Cited Cases

Party moving for writ of mandamus must show that his right to writ is clear and indisputable. 28 U.S.C.A. § 1651.

[7] Courts ⬬493(3)

103 S.Ct. 927
74 L.Ed.2d 765
(Cite as: 460 U.S. 1, 103 S.Ct. 927)

106k493(3) Most Cited Cases

Federal district court may decline to exercise its jurisdiction because of parallel state court litigation only in exceptional circumstances; only clearest of justifications will warrant dismissal.

[8] Action ⊸69(5)
13k69(5) Most Cited Cases

District court abused its discretion in staying action seeking order compelling arbitration under United States Arbitration Act, pending resolution of state court suit, absent showing of requisite exceptional circumstances; factors of avoidance of piecemeal litigation, order in which current forums obtained jurisdiction, presence of federal issues and probable inadequacy of state court proceeding to protect contractor's rights counseled against stay. 9 U.S.C.A. § 4.

[9] Arbitration ⊸23.9
33k23.9 Most Cited Cases

Decision whether to stay litigation among nonarbitrating parties pending outcome of arbitration is left to district court, or to state trial court under applicable state procedural rules, as matter of its discretion to control its docket. 9 U.S.C.A. § § 1 et seq., 4.

[10] Action ⊸69(3)
13k69(3) Most Cited Cases

In determining whether to stay federal suit out of deference to parallel litigation brought in state court, "priority" element of governing balancing test should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.

[11] Arbitration ⊸7.1
33k7.1 Most Cited Cases

Policy of Arbitration Act requires liberal reading of arbitration agreement.  9 U.S.C.A. § 1 et seq.

[12] Federal Courts ⊸403
170Bk403 Most Cited Cases

Effect of section of Arbitration Act declaring liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary, is to create body of federal substantive law of arbitrability, applicable to any arbitration agreement within coverage of Act.  9 U.S.C.A. § 2.

[13] Arbitration ⊸7.1
33k7.1 Most Cited Cases

Arbitration Act establishes that, as a matter of federal law, any doubts concerning scope of arbitrable issues should be resolved in favor of arbitration, whether problem at hand is construction of contract language itself or allegation of waiver, delay, or like defense to arbitrability. 9 U.S.C.A. § 2.

[14] Courts ⊸493(3)
106k493(3) Most Cited Cases

Presence of federal law issues must always be a major consideration weighing against surrender of federal jurisdiction out of deference to parallel litigation brought in state court.

[15] Arbitration ⊸23.9
33k23.9 Most Cited Cases

State courts, as much as federal courts, are obliged to grant stays of litigation under section of Arbitration Act referring to suit "in any of the courts of the United States." 9 U.S.C.A. § 3.

[16] Action ⊸69(3)
13k69(3) Most Cited Cases

Fact that district court stayed federal court action rather than dismissing it outright did not render inapplicable exceptional circumstances test for determining propriety of district court decision to defer to parallel litigation brought in state court.

[17] Federal Courts ⊸611
170Bk611 Most Cited Cases

Ordinarily, Court of Appeals is not expected to pass on issues not decided in district court.

[18] Federal Courts ⊸612.1
170Bk612.1 Most Cited Cases
(Formerly 170Bk612)

Even though only issue formally appealed to Court of Appeals was propriety of district court's order staying action seeking order compelling arbitration under Arbitration Act, pending resolution of state court suit, Court of Appeals acted within its authority in

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

103 S.Ct. 927
74 L.Ed.2d 765
(Cite as: 460 U.S. 1, 103 S.Ct. 927)

deciding that contractual dispute was arbitrable under Arbitration Act and contract, where court had briefs and evidentiary submissions from both parties on merits of arbitrability. 9 U.S.C.A. § 4.

**929 Syllabus [FN*]

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

*1 Petitioner, a hospital located in North Carolina, entered into a contract with respondent contractor, an Alabama corporation, for construction of additions to the hospital building. Contract disputes were to be initially referred to the architect who was hired to design and oversee the construction project. Disputes decided by the architect or not decided within a specified time could be submitted to binding arbitration under an arbitration clause in the contract. Subsequently, during construction, respondent submitted claims to the architect for extended overhead or increase in construction costs due to petitioner's delay or inaction. But the claims were not resolved, and petitioner refused to pay them. Petitioner then filed an action in a North Carolina state court against respondent and the architect, seeking a declaratory judgment that there was no right to arbitration, that petitioner was not liable to respondent, and that if it was liable it would be entitled to indemnity from the architect. A few days later petitioner obtained an ex parte injunction from the state court forbidding respondent to take any steps toward arbitration, but when respondent objected the stay was dissolved. Respondent then filed a diversity-of-citizenship action in Federal District Court, seeking an order compelling arbitration under § 4 of the United States Arbitration Act. The District Court stayed the action pending resolution of the state-court suit because the two suits involved the identical issue of the arbitrability of respondent's claims. The Court of Appeals, holding that it had jurisdiction under 28 U.S.C. § 1291, reversed the *2 District Court's stay order and remanded the case with instructions to enter an order to arbitrate.

Held:

1. The District Court's stay order was appealable as a "final decision" to the Court of Appeals under 28 U.S.C. § 1291. Since the order was based on the

conclusion that the federal and state actions involved the identical issue of arbitrability, and this issue was the only substantive issue present in the federal action, a stay of the federal action pending resolution of the state action meant that there would be no further litigation in the federal court. Thus, respondent was "effectively out of court" so that the stay order amounted to a dismissal of the federal action. Moreover, even if the stay order was not final for appealability purposes, it was nevertheless appealable within the finality rule exception that applies where an order conclusively determines the disputed question, resolves an important issue completely separate from the merits, and is effectively unreviewable on appeal from a final judgment. Cohen v. Beneficial Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528. Pp. 933-935.

2. The District Court abused its discretion in granting the stay. Pp. 935- 943.

(a) A federal district court may decline to exercise its jurisdiction because of parallel state-court litigation only in exceptional circumstances; only the clearest of justifications will warrant dismissal. Colorado River Water Conservation District v. United States, 424 U.S. 800, 818-819, 96 S.Ct. 1236, 1246-47, 47 L.Ed.2d 483. The decision whether to stay or dismiss a federal action on grounds of wise judicial administration does not rest on a mechanical checklist, but on a careful balancing of the important factors (which court first assumed jurisdiction over property involved in the litigation, inconvenience of the federal forum, avoidance of piecemeal litigation, and the order in which the concurrent forums obtained jurisdiction) relevant to the decision as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction. Ibid. Pp. 935-937.

**930 (b) The exceptional-circumstances test set forth in Colorado River, supra, was not undermined by Will v. Calvert Fire Insurance Co., 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504. Pp. 937-938.

(c) There was no showing of the requisite exceptional circumstances to justify the District Court's stay order. Concededly, there was no assumption by either court of jurisdiction over any res or property or any contention that the federal court was any less convenient to the parties than the state court. The other factors--avoidance of piecemeal litigation and the order in which the current forums obtained jurisdiction--rather than supporting the stay, counsel against it. The fact that

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

if respondent obtains an arbitration order, petitioner will be forced to resolve *3 the dispute with respondent and the related dispute with the architect in different forums is not the result of any choice between federal and state courts but occurs because the relevant federal law, the Arbitration Act, requires piecemeal resolution when necessary to give effect to an arbitration agreement. Hence, the decision to allow the issue of arbitrability to be decided in the state rather than in the federal court does not cause piecemeal resolution of the parties' underlying disputes. And the fact that the state-court suit was filed before the federal suit is not sufficient reason to justify the stay order, where because petitioner's refusal to arbitrate did not occur until less than a day before it filed its state suit, respondent had no reasonable opportunity to file its federal suit first. Moreover, priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions. Here, no substantial proceedings had taken place in the state suit at the time of the District Court's stay order, whereas in the federal suit the parties had taken most of the steps necessary to a resolution of the arbitrability issue. The stay order thus frustrated the Arbitration Act's policy of rapid and unobstructed enforcement of arbitration agreements. Pp. 938-941.

(d) The fact that federal law in the terms of the Arbitration Act governs the issue of the arbitrability of the dispute between petitioner and respondent in either the state or the federal court is another factor militating against the District Court's stay order. See *Calvert, supra.* Pp. 941-942.

(e) Finally, an important reason against allowing a stay is the probable inadequacy of the state suit to protect respondent's rights, since it is doubtful that respondent could obtain from the state court an order compelling petitioner to arbitrate. Pp. 942-943.

(f) The fact that the District Court stayed the federal action rather than dismissing it outright does not render the *Colorado River* exceptional-circumstances test inapplicable. P. 943.

3. The Court of Appeals acted within its authority in deciding that the contractual dispute was arbitrable under the Arbitration Act and the contract, where the court had briefs and evidentiary submissions from both parties on the merits of arbitrability. Pp. 943-944.

656 F.2d 933 (CA4 1981), affirmed.

*4 *Jack W. Floyd* argued the cause for petitioner. With him on the briefs were *Stephen P. Millikin* and *Douglas W. Ey, Jr.*

*A. H. Gaede, Jr.,* argued the cause for respondent. With him on the brief were *Joseph B. Mays, Jr., Charles Nichols,* and *Frank H. McFadden.*

Justice BRENNAN delivered the opinion of the Court.

This case, commenced as a petition for an order to compel arbitration under § 4 of the United States Arbitration Act of 1925 (Arbitration Act or Act), 9 U.S.C. § 4, presents the question whether, in light of the policies of the Act and of our decisions **931 in *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), and *Will v. Calvert Fire Insurance Co.,* 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978), the District Court for the Middle District of North Carolina properly stayed this diversity action pending resolution of a concurrent state-court suit. The Court of Appeals for the Fourth Circuit reversed the stay. 656 F.2d 933, rehearing denied, 664 F.2d 936 (CA4 1981). We granted certiorari. 455 U.S. 937, 102 S.Ct. 1426, 71 L.Ed.2d 647 (1982). We affirm.

I

Petitioner Moses H. Cone Memorial Hospital ("Hospital") is located in Greensboro, North Carolina. Respondent Mercury Construction Corp. ("Mercury"), a construction contractor, has its principal place of business in Alabama. In July 1975, Mercury and the Hospital entered into a contract for the construction of additions to the Hospital building. The contract, drafted by representatives of the Hospital, included provisions for resolving disputes arising out of the contract or its breach. All disputes involving interpretation of the contract or performance of the construction work were to be referred in the first instance to J.N. Pease Associates ("Architect"), an independent architectural firm hired by the Hospital to design and oversee the construction project. With certain *5 stated exceptions, [FN1] any dispute decided by the Architect (or not decided by it within a stated time) could be submitted by either party to binding arbitration under a broad arbitration clause in the contract:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

103 S.Ct. 927
74 L.Ed.2d 765
**(Cite as: 460 U.S. 1, 103 S.Ct. 927)**

FN1. The Architect was given final say on "matters relating to artistic effect." App. 28-29. The contract also excluded arbitration on any claim waived by the making or acceptance of final payment. App. 29. Neither of these exceptions is asserted to apply in this case.

"All claims, disputes and other matters in question arising out of, or relating to, this Contract or the breach thereof, ... shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof." App. 29-30.

The contract also specified the time limits for arbitration demands. [FN2]

FN2. The contract provided that no demand for arbitration could be made later than thirty days after the Architect's written final decision. In the case of arbitrable disputes not subject to submission to the Architect, the demand was required to be made "within a reasonable time after the claim ... has arisen," and in no event after the applicable statute of limitations had run. App. 29-30. The contract also set a starting time limit for arbitration demands. No demand could be made earlier than ten days after presentation of evidence to the Architect, unless the Architect rendered a written decision before that time. App. 29.

Construction on the project began in July 1975. Performance was to be completed by October 1979. [FN3] In fact, construction was substantially completed in February 1979, and final inspections were made that June.

FN3. The completion date, originally set as November 14, 1978, was extended to October 1979 by agreement of the parties.

*6 At a meeting in October 1977 (during construction), attended by representatives of Mercury, the Hospital, and the Architect, Mercury agreed, at the Architect's request, to withhold its claims for delay and impact costs (i.e., claims for extended overhead or increase in construction costs due to delay or inaction by the Hospital) until the work was substantially completed. On this record, the Hospital does not contest the existence of this agreement, although it asserts that the Architect lacked **932 authority to agree to a delay in presentation of claims or to entertain claims after the contract work was completed.

In January 1980, Mercury submitted to the Architect its claims for delay and impact costs. Mercury and the Architect discussed the claims over several months, substantially reducing the amount of the claims. According to the Hospital, it first learned of the existence of Mercury's claims in April 1980; its lawyers assumed active participation in the claim procedure in May. The parties differ in their characterizations of the events of the next few months--whether there were "ongoing negotiations," or merely an "investigation" by the Hospital. In any event, it appears from the record that lawyers for the Hospital requested additional information concerning Mercury's claims. As a result, on August 12, 1980, Mercury gave a detailed presentation of its claims at a meeting attended by Mercury's representatives and lawyers, the Hospital's representatives and lawyers, and representatives of the Architect. Mercury agreed to send copies of its files to an expert hired by the Hospital, and the parties agreed to meet again on October 13.

On October 6, Mercury's counsel telephoned the Hospital's counsel to confirm that the scheduled meeting would go forward. The Hospital's counsel said he would call back the next day. When he did, he informed Mercury's counsel that the Hospital would pay nothing on Mercury's claim. He also said that the Hospital intended to file a declaratory judgment action in North Carolina state court.

*7 True to its word, the Hospital filed an action on the morning of October 8 in the Superior Court of Guilford County, North Carolina, naming Mercury and the Architect as defendants. The complaint alleged that Mercury's claim was without factual or legal basis and that it was barred by the statute of limitations. It alleged that Mercury had lost any right to arbitration under the contract due to waiver, laches, estoppel, and failure to make a timely demand

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

103 S.Ct. 927
74 L.Ed.2d 765
(Cite as: 460 U.S. 1, 103 S.Ct. 927)

for arbitration. The complaint also alleged various delinquencies on the part of the Architect. As relief, the Hospital sought a declaration that there was no right to arbitration; a stay of arbitration; a declaration that the Hospital bore no liability to Mercury; and a declaration that if the Hospital should be found liable in any respect to Mercury, it would be entitled to indemnity from the Architect. The complaint was served on Mercury on October 9. On that same day, Mercury's counsel mailed a demand for arbitration.

On October 15, without notice to Mercury, the Hospital obtained an *ex parte* injunction from the state court forbidding Mercury to take any steps directed toward arbitration. Mercury objected, and the stay was dissolved on October 27. As soon as the stay was lifted, Mercury filed the present action in the District Court, seeking an order compelling arbitration under § 4 of the Arbitration Act, 9 U.S.C. § 4. [FN4] Jurisdiction was based on diversity of citizenship. On the Hospital's motion, the District Court stayed Mercury's federal-court suit pending resolution of the state-court suit because the two suits involved the identical issue of the arbitrability of Mercury's claims. App. to Pet. for Cert. A-38.

> FN4. Simultaneously, Mercury filed a petition for removal of the Hospital's state-court action. The District Court remanded the removed case on the ground that, because the Hospital and the Architect are both North Carolina corporations, there was no complete diversity. The propriety of the removal or remand is not before this Court.

*8 Mercury sought review of the District Court's stay by both a notice of appeal and a petition for mandamus. A panel of the Court of Appeals for the Fourth Circuit heard argument in the case, but before the panel issued any decision, the Court informed the parties that it would consider the case en banc. After reargument, the en banc Court held that it had appellate jurisdiction over the case under 28 U.S.C. § 1291. It reversed the District Court's stay order and remanded the case to the **933 District Court with instructions for entry of an order to arbitrate.

## II

Before we address the propriety of the District Judge's stay order, we must first decide whether that order was appealable to the Court of Appeals under 28 U.S.C. § 1291. [FN5]

> FN5. Section 1291 provides in relevant part: "The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States, ... except where a direct review may be had in the Supreme Court."

[1][2] Mercury sought appellate review through two alternative routes--a notice of appeal under § 1291, and a petition for mandamus under the All Writs Act, 28 U.S.C. § 1651. [FN6] Mercury expressly stated that its appeal was based only on § 1291, and not on 18 U.S.C. § 1292 (relating to interlocutory appeals). The Hospital contends that the order appealed from was not a "final decision" within § 1291. We *9 disagree and hold that the stay order was final for purposes of appellate jurisdiction.

> FN6. The Hospital argues that because Mercury's filing in the Court of Appeals was styled a petition for mandamus first and a notice of appeal only "in the alternative," the Hospital was somehow entitled to have the Court of Appeals apply the stricter standards of review that obtain under the mandamus procedure before considering any appeal. Brief for Petitioner 30-31. We do not understand why this order of proceeding would be of any benefit to the Hospital; but in any event the contention is frivolous. In the first place, Mercury also filed a proper notice of appeal in the District Court, see Fed.Rule App.Proc. 3(a). More fundamentally, a court of appeals has no occasion to engage in extraordinary review by mandamus "in aid of [its] jurisdictio[n]," 28 U.S.C. § 1651, when it can exercise the same review by a contemporaneous ordinary appeal. See, e.g., *Hines v. D'Artois*, 531 F.2d 726, 732, and n. 10 (CA5 1976).

> *Idlewild Liquor Corp. v. Epstein*, 370 U.S. 713, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962), is instructive in this regard. There the plaintiff brought a federal suit challenging the constitutionality of a state statute. The District Judge declined to convene a three-judge court and stayed the federal suit under the *Pullman* abstention doctrine. [FN7] We held that the District Court's action was final and therefore reviewable by the Court of Appeals, stating:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

103 S.Ct. 927
74 L.Ed.2d 765
**(Cite as: 460 U.S. 1, 103 S.Ct. 927)**

FN7. *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

"The Court of Appeals properly rejected the argument that the order of the District Court 'was not final and hence unappealable under 28 U.S.C. § § 1291, 1292,' pointing out that '[a]ppellant was effectively out of court.' " *Id.,* at 715, n. 2, 82 S.Ct. at 1296, n. 2. [FN8]

FN8. The plaintiff in *Idlewild* had requested injunctive relief against enforcement of the state statute. Nevertheless, it is clear that neither the Court of Appeals nor this Court based the holding of appealability on the argument that the District Court had effectively denied injunctive relief. See generally 28 U.S.C. § 1292(a)(1); *Carson v. American Brands, Inc.,* 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981). Section 1292 in terms applies only to *interlocutory* orders, and therefore could hardly have been the basis for a holding that the orders were "final."
There is no basis for the dissent's attempt, *post,* at 945-946, to distinguish *Idlewild* on the basis that in that case there was no pending state-court action when the District Court's stay issued. Neither the Court of Appeals nor this Court suggested in *Idlewild* that the state court's doors were anything but wide open to the plaintiff. "[E]ffectively out of court" means effectively out of *federal* court--in keeping with the fact that the decision under appeal is the refusal to exercise *federal* jurisdiction.
Moreover, the dissent's resolution of the appealability issue would yield the odd result that *Pullman* abstention orders would be immediately appealable in Texas but not in the other 49 states. Compare *American Trial Lawyers Assn. v. New Jersey Supreme Court,* 409 U.S. 467, 93 S.Ct. 627, 34 L.Ed.2d 651 (1973) (stays appropriate in *Pullman* cases), with *Harris County Commissioners Court v. Moore,* 420 U.S. 77, 88-89, and n. 14, 95 S.Ct. 870, 877-78, and n. 14, 43 L.Ed.2d 32 (1975) (dismissal permissible to accommodate Texas jurisdictional requirements). This oddity illustrates the artificiality of resting

appealability on an otherwise substanceless distinction between stays and dismissals in the present context. See *infra,* at Part IV E.

[3] *10 Here, the argument for finality of the District Court's order is even clearer. **934 A district court stay pursuant to *Pullman* abstention is entered with the expectation that the federal litigation will resume in the event that the plaintiff does not obtain relief in state court on state-law grounds. [FN9] Here, by contrast, the District Court predicated its stay order on its conclusion that the federal and state actions involved "the identical issue of arbitrability of the claims of Mercury Construction Corp. against the Moses H. Cone Memorial Hospital." App. to Pet. for Cert. A-38. That issue of arbitrability was the *only* substantive issue present in the federal suit. Hence, a stay of the federal suit pending resolution of the state suit meant that there would be no further litigation in the federal forum; the state court's judgment on the issue would be res judicata. [FN10] Thus, here, even more surely than in *Idlewild,* Mercury was "effectively out of court." Hence, as the Court of Appeals held, this stay order amounts to a dismissal of the suit. [FN11]

FN9. See *England v. Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

FN10. See, *e.g., Ultracashmere House, Ltd. v. Meyer,* 664 F.2d 1176, 1183-1184 (CA11 1981); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu,* 637 F.2d 391, 397-398 (CA5 1981).

FN11. See *In re Mercury Construction Corp.,* 656 F.2d 933, 937-938, and n. 6 (CA4 1981), citing as dispositive *Amdur v. Lizars,* 372 F.2d 103, 105-106 (CA4 1967). See also *Federman v. Empire Fire & Marine Insurance Co.,* 597 F.2d 798, 808, and n. 15 (CA2 1979); *Baltimore Bank for Cooperatives v. Farmers Cheese Cooperative,* 583 F.2d 104, 108-109 (CA3 1978); *Sun Oil Co. v. FEA,* 572 F.2d 867 (Em.App.1978); *Rancho Palos Verdes Corp. v. Laguna Beach,* 547 F.2d 1092, 1093, n. 1 (CA9 1976); *Hines v. D'Artois,* 531 F.2d 726, 730-732 (CA5 1976); *Drexler v. Southwest Dubois School Corp.,*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

103 S.Ct. 927
74 L.Ed.2d 765
(Cite as: 460 U.S. 1, 103 S.Ct. 927)

Page 8

504 F.2d 836, 838 (CA7 1974) (en banc); *Druker v. Sullivan,* 458 F.2d 1272, 1274, n. 3 (CA1 1972). But see *Acton Corp. v. Borden, Inc.,* 670 F.2d 377, 380-382 (CA1 1982); *State Farm Mutual Automobile Insurance Co. v. Scholes,* 601 F.2d 1151, 1153-1154 (CA10 1979); *Frederick L. v. Thomas,* 578 F.2d 513, 515-516 (CA3 1978) (dictum).

Of course, as these cases recognize, *Idlewild* does not disturb the usual rule that a stay is not ordinarily a final decision for purposes of § 1291, since most stays do not put the plaintiff "effectively out of court." See, *e.g., Amdur,* 372 F.2d, at 105-106. *Idlewild* 's reasoning is limited to cases where (under *Colorado River,* abstention, or a closely similar doctrine) the object of the stay is to require all or an essential part of the federal suit to be litigated in a state forum.

This answers the dissent's argument, *post,* at 945-946, that *Idlewild* was overruled by that part of *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469-477, 98 S.Ct. 2454, 2458-62, 57 L.Ed.2d 351 (1978), which rejected the "death knell" doctrine of appealability. The death knell doctrine rested on the argument that in some situations an interlocutory decision (such as a refusal to certify a class) might terminate a suit as a practical matter because the named plaintiff would lack an economic incentive to pursue his individual claim. In a death knell case, however, the order sought to be appealed had no *legal* effect on the named plaintiff's ability to proceed with his individual claim in federal court. There is an obvious difference between a case in which the plaintiff himself *may choose* not to proceed, and a case in which the district court *refuses to allow* the plaintiff to litigate his claim in federal court. Appeal from a stay on abstention or *Colorado River* grounds, therefore, presents no prospect of "appeals of right that turn on the facts of a particular case," as in *Coopers & Lybrand,* 437 U.S., at 476, 98 S.Ct., at 2462. We foresee no great difficulty in determining when a district court has surrendered jurisdiction over a federal lawsuit.

For much the same reason, the dissent errs in likening the stay in this case to an ordinary delay in the interest of docket control, *post,* at 944-945. We do not hold that an order becomes final merely because

it may have the practical effect of allowing a state court to be the first to rule on a common issue. We hold only that a stay order is final when the sole purpose and effect of the stay is precisely to surrender jurisdiction of a federal suit to a state court.

[4] *11 In any event, if the District Court order were not final for appealability purposes, it would nevertheless be appealable within the exception to the finality rule under *Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). The factors required to show finality under this exception have been summarized as follows:

"To come within the 'small class' of decisions excepted from the final-judgment rule by *Cohen,* the order must conclusively determine the disputed question, resolve an important issue completely **935 separate from the merits of the action, and be effectively unreviewable on appeal *12 from a final judgment." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978) (footnote omitted). [FN12]

FN12. Accord, *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 375, 101 S.Ct. 669, 674, 66 L.Ed.2d 571 (1981); *United States v. MacDonald,* 435 U.S. 850, 854-855, 98 S.Ct. 1547, 1549-50, 56 L.Ed.2d 18 (1978); *Abney v. United States,* 431 U.S. 651, 658-659, 97 S.Ct. 2034, 2039-40, 52 L.Ed.2d 651 (1977).

There can be no dispute that this order meets the second and third of these criteria. An order that amounts to a refusal to adjudicate the merits plainly presents an important issue separate from the merits. [FN13] For the same reason, this order would be entirely unreviewable if not appealed now. Once the state court decided the issue of arbitrability, the federal court would be bound to honor that determination as res judicata.

FN13. The "completely separate from the merits" requirement is a distillation of the principle that there should not be piecemeal review of "steps towards final judgment in which they will merge." *Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). In this case, of course, there is no step towards final

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

103 S.Ct. 927
74 L.Ed.2d 765
(Cite as: 460 U.S. 1, 103 S.Ct. 927)

judgment, but a refusal to proceed at all.

The Hospital contends nevertheless that the District Court's stay order did not meet the first of the criteria, namely that it "conclusively determine the disputed question." But this is true only in the technical sense that every order short of a final decree is subject to reopening at the discretion of the district judge. [FN14] In this case, however, there is *13 no basis to suppose that the District Judge contemplated any reconsideration of his decision to defer to the parallel state-court suit. He surely would not have made that decision in the first instance unless he had expected the state court to resolve all relevant issues adequately. See *infra*, at Part IV E. It is not clear why the Judge chose to stay the case rather than to dismiss it outright; for all that the record shows, there was no reason other than the form of the Hospital's motion. Whatever the reason, however, the practical effect of his order was entirely the same for present purposes, and the order was appealable.

> FN14. See Fed.Rule Civ.Proc. 54(b); 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4478, at 788-792 (1981).
> *Coopers & Lybrand* held that the *Cohen* rule did not apply to a class decertification order because, among other reasons, such an order is "inherently tentative" under Federal Rule of Civil Procedure 23(c)(1), which provides that such an order may be "altered or amended before the decision on the merits." 437 U.S., at 469, and n. 11, 98 S.Ct., at 2458, and n. 11. Of course, as Rule 54(b) provides, virtually all interlocutory orders may be altered or amended before final judgment if sufficient cause is shown; yet that does not make all pretrial orders "inherently tentative" in the sense of that phrase in *Coopers & Lybrand*. The rationale behind Rule 23(c)(1) is that a certification decision should be made "[a]s soon as practicable," even though later events or discoveries may mandate a different result. Many other orders, by contrast, are made with the expectation that they will be the final word on the subject addressed. Certainly that was true of the order at issue in this case. The reasoning of *Coopers & Lybrand* does not reach all pretrial orders that are formally subject to revision, but only those as to which some

revision might reasonably be expected in the ordinary course of litigation.

### III

We turn now to the principal issue to be addressed, namely the propriety of the District Court's decision to stay this federal suit out of deference to the parallel litigation brought in state court. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), provides persuasive guidance in deciding this question.

### A

*Colorado River* involved the effect of the McCarran Amendment, 66 Stat. 560, 43 U.S.C. § 666, on the existence and exercise of federal-court jurisdiction to adjudicate federal water rights, 28 U.S.C. § 1345. The Amendment waives the Government's **936 sovereign immunity to permit the joinder of the United States in some state-court suits for the adjudication of water rights. In *Colorado River*, however, the Government proceeded in Federal District Court, bringing suit against some 1,000 nonfederal water users, seeking a declaration of the water rights of certain federal entities and Indian tribes. Shortly thereafter, a defendant in that suit *14 sought to join the United States in a state-court proceeding for the comprehensive adjudication and administration of all water rights within the river system that was the subject of the federal-court suit. The District Court dismissed the federal suit, holding that the abstention doctrine required deference to the state-court proceedings. The Court of Appeals for the Tenth Circuit reversed, holding that the suit of the United States was within the District Court's jurisdiction under 28 U.S.C. § 1345 and that abstention was inappropriate. We reversed the judgment of the Court of Appeals and affirmed the judgment of the District Court dismissing the complaint.

We began our analysis by examining the abstention doctrine in its various forms. We noted:
"Abstention from the exercise of federal jurisdiction is the exception, not the rule. 'The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be

103 S.Ct. 927
74 L.Ed.2d 765
**(Cite as: 460 U.S. 1, 103 S.Ct. 927)**

justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest.' " [FN15]

> FN15. *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976), quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188-189, 79 S.Ct. 1060, 1062-63, 3 L.Ed.2d 1163 (1959).

After canvassing the three categories of abstention, we conclude that none of them applied to the case at hand. 424 U.S., at 813-817, 96 S.Ct. at 1244- 46. [FN16]

> FN16. There is no contention here that any of the categories of the abstention doctrine apply to this case.

Nevertheless, we held that the District Court's dismissal was proper on another ground--one resting not on considerations of state-federal comity or on avoidance of constitutional **\*15** decisions, as does abstention, but on "considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.' " [FN17] We noted that " 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction,' " and that the federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them." [FN18] We continued:

> FN17. *Colorado River,* 424 U.S., at 817, 96 S.Ct., at 1246, quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952).

> FN18. *Colorado River,* 424 U.S., at 817, 96 S.Ct., at 1246, quoting *McClellan v. Carland,* 217 U.S. 268, 282, 30 S.Ct. 501, 504, 54 L.Ed. 762 (1910).

"Given this obligation, and the absence of weightier considerations of constitutional adjudication and state-federal relations, the circumstances permitting the dismissal of a federal

suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention. The former circumstances, though exceptional, do nevertheless exist." *Id.,* at 818, 96 S.Ct., at 1246.

We declined to prescribe a hard and fast rule for dismissals of this type, but instead described some of the factors relevant to the decision.

"It has been held, for example, that the court first assuming jurisdiction over property may exercise that jurisdiction to **\*\*937** the exclusion of other courts.... In assessing the appropriateness of dismissal in the event of an exercise of concurrent jurisdiction, a federal court may also consider such factors as the inconvenience of the federal forum; the desirability of avoiding piecemeal litigation; and the order in which jurisdiction was obtained by the concurrent forums. No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction *\*16* and the combination of factors counselling against that exercise is required. *Only the clearest of justifications will warrant dismissal."* *Id.,* at 818-819, 96 S.Ct., at 1246- 47 (emphasis added; citations omitted).

[5] As this passage makes clear, the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction. The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case. *Colorado River* itself illustrates this principle in operation. By far the most important factor in our decision to approve the dismissal there was the "clear federal policy ... [of] avoidance of piecemeal adjudication of water rights in a river system," *id.,* at 819, 96 S.Ct., at 1247, as evinced in the McCarran Amendment. We recognized that the Amendment represents Congress's judgment that the field of water rights is one peculiarly appropriate for comprehensive treatment in the forums having the greatest experience and expertise, assisted by state administrative officers acting under the state courts. *Id.,* at 819-820, 96 S.Ct., at 1247-48. In addition, we noted that other factors in the case tended to support dismissal--the absence of any substantial progress in the federal-court litigation; the presence in the suit of extensive rights governed by state law; the geographical inconvenience of the federal forum; and the Government's previous willingness to litigate

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

103 S.Ct. 927
74 L.Ed.2d 765
(Cite as: 460 U.S. 1, 103 S.Ct. 927)

similar suits in state court. *Id.*, at 820, 96 S.Ct. at 1247.

## B

Before discussing the application of *Colorado River* 's exceptional- circumstances test, we must address the Hospital's argument that that test was undermined by our subsequent decision in *Will v. Calvert Fire Insurance Co.*, 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978). We find no merit in this argument for at least two reasons.

*17 The Hospital relies on the opinion of Justice REHNQUIST, announcing the judgment of the Court. The Hospital argues that Justice REHNQUIST's opinion, if not expressly overruling *Colorado River*, at least modifies its holding substantially. But it is clear that a majority of the Court reaffirmed the *Colorado River* test in *Calvert.* Justice REHNQUIST's opinion commanded only four votes. It was opposed by the dissenting opinion, in which four Justices concluded that the *Calvert* District Court's stay was impermissible under *Colorado River*, 437 U.S., at 668-669, 672-674, 98 S.Ct., at 2560, 2562-63 (BRENNAN, J., dissenting). Justice BLACKMUN, although concurring in the judgment, agreed with the dissent that *Colorado River* 's exceptional- circumstances test was controlling; he voted to remand to permit the District Court to apply the *Colorado River* factors in the first instance. [FN19] *Id.*, at 667-668, 98 S.Ct., at 2559-60. On remand, the Court of Appeals correctly recognized that the four dissenting Justices and Justice BLACKMUN formed a majority to require application of the *Colorado River* test. *Calvert Fire Insurance Co. v. Will*, 586 F.2d 12 (CA7 1978). [FN20]

> FN19. Our decision in *Colorado River* came down after the District Court's stay order in *Calvert* but before the Court of Appeals issued its mandamus in that case.

> FN20. On remand from our decision in *Calvert*, the District Court and Court of Appeals concluded that the stay should be continued, but rested that decision on a ground not addressed in the prior Court of Appeals decision (*Calvert Fire Insurance Co. v. Will*, 560 F.2d 792 (CA7 1977)) or in any of this Court's opinions in the case. They concluded that the filing of the federal

suit was a "defensive tactical maneuver" based on a contrived federal claim; hence, a stay was called for as "a means to deter vexatious use of the federal courts." The courts also noted that, in the interim, the basis for the plaintiff's assertion of exclusive federal jurisdiction had vanished. *Calvert Fire Insurance Co. v. American Mutual Reinsurance Co.*, 600 F.2d 1228, 1234-1236 (CA7 1979), aff'g 459 F.Supp. 859 (ND Ill.1978). The case did not come before this Court for review a second time.

The Court of Appeals in this case relied on similar reasoning. It concluded that, despite chronological priority of filing, the Hospital's state-court suit was a contrived, defensive reaction to Mercury's expected claim for relief and for arbitration. 656 F.2d at 944-945.

The reasoning of the Courts of Appeals in this case and in *Calvert* -- that the vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state litigation under *Colorado River* --has considerable merit. We need not rely on such reasoning here, however, for we conclude *infra* that even if the Hospital acted in complete good faith there were no exceptional circumstances warranting the District Court's stay.

**938 [6] *18 Even on the basis of Justice REHNQUIST's opinion, however, there is an obvious distinction between *Calvert* and this case. The key to *Calvert* was the standard for issuance of a writ of mandamus under 28 U.S.C. § 1651. [FN21] As Justice REHNQUIST stressed, such extraordinary writs are used in aid of appellate jurisdiction only to confine an inferior court to a lawful exercise of its prescribed authority, or to compel it to exercise its authority when it is its duty to do so. The movant must show that his right to the writ is clear and indisputable. 437 U.S., at 661-662, 664, 665-666, 98 S.Ct., at 2556-57, 2558, 2559 (opinion of REHNQUIST, J.). Justice REHNQUIST concluded that the movant in *Calvert* had failed to meet this burden. At the same time, he noted that the movant might have succeeded on a proper appeal. *Id.*, at 665, 98 S.Ct., at 2558. In this case we have held that the Court of Appeals did have appellate jurisdiction; it properly exercised that jurisdiction to find that the District Court's stay was impermissible under *Colorado River.*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

103 S.Ct. 927                                                                    Page 12
74 L.Ed.2d 765
(Cite as: 460 U.S. 1, 103 S.Ct. 927)

FN21. The Court of Appeals in *Calvert* had held that it lacked jurisdiction to entertain an ordinary appeal, apparently because a portion of the federal litigation was the subject of exclusive federal jurisdiction and would therefore remain to be disposed of in federal court after the conclusion of state-court proceedings. *Calvert Fire Insurance Co. v. Will, 560 F.2d 792, 794 (CA7 1977)*, citing *Cotler v. Inter-County Orthopaedic Assn., 526 F.2d 537, 540 (CA3 1975)*. Cf. *Drexler v. Southwest Dubois School Corp., 504 F.2d 836, 838 (CA7 1974)* (en banc) (stay of litigation pending exhaustion of state remedies is final under *Idlewild* ). The issue of appellate jurisdiction was not presented to this Court in *Calvert*.

[7] The Hospital further contends that *Calvert* requires reversal here because the opinions of Justice REHNQUIST and **19** Justice BLACKMUN require greater deference to the discretion of the District Court than was given by the Court of Appeals in this case. Under both *Calvert* and *Colorado River,* of course, the decision whether to defer to the state courts is necessarily left to the discretion of the district court in the first instance. Yet to say that the district court has discretion is not to say that its decision is unreviewable: such discretion must be exercised under the relevant standard prescribed by this Court. In this case, the relevant standard is *Colorado River* 's exceptional-circumstances test, as elucidated by the factors discussed in that case. As we shall now explain, we agree with the Court of Appeals that the District Court in this case abused its discretion in granting the stay.

IV

[8] Applying the *Colorado River* factors to this case, it is clear that there was no showing of the requisite exceptional circumstances to justify the District Court's stay.

The Hospital concedes that the first two factors mentioned in *Colorado River* are **939 not present here. There was no assumption by either court of jurisdiction over any res or property, nor is there any contention that the federal forum was any less convenient to the parties than the state forum. The remaining factors--avoidance of piecemeal litigation, and the order in which jurisdiction was obtained by

the concurrent forums--far from supporting the stay, actually counsel against it.

A

There is no force here to the consideration that was paramount in *Colorado River* itself--the danger of piecemeal litigation.

[9] The Hospital points out that it has two substantive disputes here--one with Mercury, concerning Mercury's claim for delay and impact costs, and the other with the Architect, concerning the Hospital's claim for indemnity for any liability it may have to Mercury. The latter dispute cannot be sent *20 to arbitration without the Architect's consent, since there is no arbitration agreement between the Hospital and the Architect. It is true, therefore, that if Mercury obtains an arbitration order for its dispute, the Hospital will be forced to resolve these related disputes in different forums. That misfortune, however, is not the result of any choice between the federal and state courts; it occurs because the relevant federal law *requires* piecemeal resolution when necessary to give effect to an arbitration agreement. [FN22] Under the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement. [FN23] If the dispute between Mercury and the Hospital *is* arbitrable under the Act, then the Hospital's two disputes will be resolved separately--one in arbitration, and the other (if at all) in state-court litigation. Conversely, if the dispute between Mercury and the Hospital *is not* arbitrable, then both disputes will be resolved in state court. But neither of those two outcomes depends at all on *which court* decides the question of arbitrability. Hence, a decision to allow that issue to be decided in federal rather than state court does not cause piecemeal resolution of the parties' underlying disputes. Although *21 the Hospital will have to litigate the arbitrability issue in federal rather than state court, that dispute is easily severable from the merits of the underlying disputes.

FN22. This provides a sharp contrast with the key statute at issue in *Colorado River* -- the McCarran Amendment. There, as we stressed, the primary policy of the statute was the *avoidance* of piecemeal litigation. *424 U.S., at 819-820, 96 S.Ct. at 1247.*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

FN23. E.g., _C. Itoh & Co. v. Jordan International Co._, 552 F.2d 1228, 1231-1232 (CA7 1977); _Acevedo Maldonado v. PPG Industries, Inc._, 514 F.2d 614, 617 (CA1 1975); _Hamilton Life Insurance Co. v. Republic National Life Insurance Co._, 408 F.2d 606, 609 (CA2 1969).
In some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court (or to the state trial court under applicable state procedural rules) as a matter of its discretion to control its docket. See generally _Landis v. North American Co._, 299 U.S. 248, 254-255, 57 S.Ct. 163, 165-66, 81 L.Ed. 153 (1936).

B

The order in which the concurrent tribunals obtained and exercised jurisdiction cuts against, not for, the District Court's stay in this case. The Hospital argues that the stay was proper because the state-court suit was filed some 19 days before the federal suit. In the first place, this argument disregards the obvious reason for the Hospital's priority in filing. An indispensable element of Mercury's cause of action under § 4 for an arbitration order is the Hospital's refusal to arbitrate. See n. 27, _infra_. That refusal did not occur until less than a day before the Hospital filed its state suit. Hence, Mercury simply had no reasonable opportunity to file its § 4 petition **940 first. Moreover, the Hospital succeeded in obtaining an _ex parte_ injunction from the state court forbidding Mercury from taking any steps to secure arbitration. [FN24] Mercury filed its § 4 petition the same day that the injunction was dissolved. [FN25]

FN24. Of course we do not mean to say that the state court's injunction could properly have been applied to prevent Mercury from filing or prosecuting a federal lawsuit. See _General Atomic Co. v. Felter_, 434 U.S. 12, 98 S.Ct. 76, 54 L.Ed.2d 199 (1977); _Donovan v. City of Dallas_, 377 U.S. 408, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964). Mercury was not obliged, however, to put itself in danger of contempt sanctions merely in order to cut short the period of the Hospital's priority of filing.

FN25. See also n. 20, _supra_.

[10] That aside, the Hospital's priority argument gives too mechanical a reading to the "priority" element of the _Colorado River_ balance. This factor, as with the other _Colorado River_ factors, is to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand. Thus, priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions. _Colorado River_ illustrates *22 this point well. There, the federal suit was actually filed first. Nevertheless, we pointed out as a factor favoring dismissal "the apparent absence of any proceedings in the District Court, other than the filing of the complaint, prior to the motion to dismiss." 424 U.S., at 820, 96 S.Ct., at 1248. Here, the opposite was true. It was the state-court suit in which no substantial proceedings (excepting only the abortive temporary injunction) had taken place at the time of the decision to stay. In the federal suit, by contrast, the parties had taken most of the steps necessary to a resolution of the arbitrability issue. [FN26] In realistic terms, the federal suit was running well ahead of the state suit at the very time that the District Court decided to refuse to adjudicate the case.

FN26. Under § 6 of the Arbitration Act, 9 U.S.C. § 6, Mercury's application for a § 4 order was properly treated procedurally as a motion. Mercury submitted affidavits, legal briefs, and documentary evidence in support of the order sought. The Hospital responded with full briefing and extensive evidentiary submissions on the arbitrability issue, and it requested oral argument and a jury trial. At the same time, it made its successful motion for a stay. It is readily apparent that if the District Court had denied the stay, it doubtless could and should have gone on to decide the arbitrability point in very short order.

[11] This refusal to proceed was plainly erroneous in view of Congress's clear intent, in the Arbitration Act, to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible. The Act provides two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to

103 S.Ct. 927
74 L.Ed.2d 765
(Cite as: 460 U.S. 1, 103 S.Ct. 927)

arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4. Both of these sections call for an expeditious and summary hearing, with only restricted inquiry into factual issues. [FN27] Assuming that the state **941 court would *23 have granted prompt relief to Mercury under the Act, [FN28] there still would have been an inevitable delay as a result of the District Court's stay. The stay thus frustrated the statutory policy of rapid and unobstructed enforcement of arbitration agreements.

> FN27. Section 3 provides that if a suit is brought on the merits of a dispute covered by an arbitration agreement,
> "the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3.
> Section 4 provides that a district court must enter an order to arbitrate "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." If either of these points is in issue, § 4 provides that "the court shall proceed summarily" to a trial on that point. Section 6 further provides that a request for relief under either § 3 or § 4 is to be treated procedurally as a motion.
> Moreover, the policy of the Arbitration Act requires a liberal reading of arbitration agreements, see infra, at 941. As a result, some issues that might be thought relevant to arbitrability are themselves arbitrable-- further speeding the procedure under §§ 3 and 4. See, e.g., Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

> FN28. See n. 34. infra; but cf. nn. 35-36, infra.

### C

Besides the four factors expressly discussed in Colorado River, there is another that emerges from Calvert --the fact that federal law provides the rule of

decision on the merits. The state-versus-federal-law factor was of ambiguous relevance in Colorado River. [FN29] In Calvert, however, both the four-vote dissenting opinion and Justice BLACKMUN's opinion concurring in the judgment pointed out that the case involved issues of federal law. 437 U.S., at 667, 98 S.Ct., at 2559 (BLACKMUN, J., concurring in the judgment); *24id., at 667-668, 98 S.Ct., at 2560-64 (BRENNAN, J., dissenting). See also Colorado River, 424 U.S., at 815, n. 21, 96 S.Ct., at 1245, n. 21. It is equally apparent that this case involves federal issues.

> FN29. Although the dissenting Justices in Colorado River relied on this point, see 424 U.S., at 825-826, 96 S.Ct., at 1250, the majority concluded that the federal/state law point was not controlling for two reasons. First, there was an affirmative policy in federal law expressly approving litigation of federal water rights in state court--the McCarran Amendment. Second, although the water rights of the United States and the Indian tribes were governed in part by federal law, the bulk of the litigation would necessarily revolve around the state-law water rights of the thousand nonfederal parties in the case--a factor on which we expressly relied in approving the District Court's stay. 424 U.S., at 820, 96 S.Ct., at 1247.

[12][13] The basic issue presented in Mercury's federal suit was the arbitrability of the dispute between Mercury and the Hospital. Federal law in the terms of the Arbitration Act governs that issue in either state or federal court. Section 2 is the primary substantive provision of the Act, declaring that a written agreement to arbitrate "in any maritime transaction or a contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. [FN30] Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act. In Prima Paint Corp. v. Flood & Conklin Mfg. Corp., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), for example, the parties had signed a contract

103 S.Ct. 927
74 L.Ed.2d 765
**(Cite as: 460 U.S. 1, 103 S.Ct. 927)**

Page 15

containing an arbitration clause, but one party alleged that there had been fraud in the inducement of the entire contract (although the alleged fraud did not go to the arbitration clause in particular). The issue before us was whether the issue of fraud in the inducement was itself an arbitrable controversy. We held that the language and policies of the Act required the conclusion that the fraud issue was arbitrable. *Id.,* at 402-404, 87 S.Ct., at 1805-06. Although our holding in *Prima Paint* extended only to the specific issue presented, the courts of appeals have since consistently concluded that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. We agree. The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues *25 should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability. [FN31]

> FN30. "Maritime transaction" and "commerce" are defined in § 1 of the Arbitration Act, 9 U.S.C. § 1.

> FN31. *E.g., Dickinson v. Heinold Securities, Inc.,* 661 F.2d 638, 643 (CA7 1981); *Wick v. Atlantic Marine, Inc.,* 605 F.2d 166, 168 (CA5 1979); *Becker Autoradio U.S.A. Inc. v. Becker Autoradiowerk GmbH,* 585 F.2d 39, 43-45 (CA3 1978); *Hanes Corp. v. Millard,* 174 U.S.App.D.C. 253, 266, 531 F.2d 585, 598 (1976); *Acevedo Maldonado v. PPG Industries, Inc.,* 514 F.2d 614, 616-617 (CA1 1975); *Germany v. River Terminal R. Co.,* 477 F.2d 546, 547 (CA6 1973); *Coenen v. R.W. Pressprich & Co.,* 453 F.2d 1209, 1211-1212 (CA2 1972); *Hart v. Orion Insurance Co.,* 453 F.2d 1358, 1360-1361 (CA10 1971).

**942 [14]** To be sure, the source-of-law factor has less significance here than in *Calvert,* since the federal courts' jurisdiction to enforce the Arbitration Act is concurrent with that of the state courts. [FN32] But we emphasize that our task in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist "exceptional" circumstances, the "clearest of justifications," that can suffice under *Colorado *26 River* to justify the

*surrender* of that jurisdiction. Although in some rare circumstances the presence of state-law issues may weigh in favor of that surrender, see n. 29, *supra,* the presence of federal-law issues must always be a major consideration weighing against surrender. [FN33]

> FN32. See n. 34, *infra.*
> The Arbitration Act is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 (1976 ed., Supp. IV) or otherwise. Section 4 provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue. *E.g., Commercial Metals Co. v. Balfour, Guthrie & Co.,* 577 F.2d 264, 268-269 (CA5 1978), and cases cited. Section 3 likewise limits the federal courts to the extent that a federal court cannot stay a suit pending before it unless there is such a suit in existence. Nevertheless, although enforcement of the Act is left in large part to the state courts, it nevertheless represents federal policy to be vindicated by the federal courts where otherwise appropriate.
> We need not address whether a federal court might stay a state-court suit pending arbitration under 28 U.S.C. § 2283.

> FN33. Cf. n. 20, *supra.*

### D

[15] Finally, in this case an important reason against allowing a stay is the probable inadequacy of the state-court proceeding to protect Mercury's rights. We are not to be understood to impeach the competence or procedures of the North Carolina courts. Moreover, state courts, as much as federal courts, are obliged to grant stays of litigation under § 3 of the Arbitration Act. [FN34] It is less clear, however, whether the same is true of an order to compel arbitration under § 4 of the Act. [FN35] We

103 S.Ct. 927
74 L.Ed.2d 765
(Cite as: 460 U.S. 1, 103 S.Ct. 927)

Page 16

need not resolve that question here; it suffices to say that there was, at a minimum, substantial room for doubt that Mercury could obtain from the state court an order compelling *27 the Hospital to arbitrate. [FN36] In many cases, no doubt, a § 3 stay is quite **943 adequate to protect the right to arbitration. But in a case such as this, where the party opposing arbitration is the one from whom payment or performance is sought, a stay of litigation alone is not enough. It leaves the recalcitrant party free to sit and do nothing--neither to litigate nor to arbitrate. If the state court stayed litigation pending arbitration but declined to compel the Hospital to arbitrate, Mercury would have no sure way to proceed with its claims except to return to federal court to obtain a § 4 order--a pointless and wasteful burden on the supposedly summary and speedy procedures prescribed by the Arbitration Act.

FN34. Although § 3 refers ambiguously to a suit "in any of the courts of the United States," the state courts have almost unanimously recognized that the stay provision of § 3 applies to suits in state as well as federal courts, requiring them to issue the same speedy relief when a dispute is referable to arbitration. (The North Carolina Supreme Court has so held, although not until after the District Court ordered this stay. _Burke County Public Schools Board of Education v. Shaver Partnership, 303 N.C. 408, 279 S.E.2d 816 (1981.)_ This is necessary to carry out Congress's intent to mandate enforcement of all covered arbitration agreements; Congress can hardly have meant that an agreement to arbitrate can be enforced against a party who attempts to litigate an arbitrable dispute in federal court, but not against one who sues on the same dispute in state court. See also _Prima Paint, 388 U.S., at 404, 87 S.Ct., at 1806._

FN35. Section 4, unlike § 3, speaks only of a petition to "any United States district court." Nonetheless, at least one state court has held that § 4 does require state courts to issue § 4 orders to arbitrate where the section's conditions are met. _Main v. Merrill Lynch, Pierce, Fenner & Smith Inc., 67 Cal.App.3d 19, 24-25, 136 Cal.Rptr. 378, 380-381 (1977)._

FN36. As a historical matter, there was considerable doubt at the time of the District Court's stay that the North Carolina court would have granted even a § 3 stay of litigation. The then-controlling precedent in North Carolina was to the effect that a contract such as that between Mercury and the Hospital was not subject to the Arbitration Act at all, on the reasoning that a construction project is not "commerce" within the meaning of §§ 1 and 2 of the Act. _Burke County Public Schools Board of Education v. Shaver Partnership, 46 N.C.App. 573, 265 S.E.2d 481 (1980); Bryant-Durham Electric Co. v. Durham County Hospital Corp., 42 N.C.App. 351, 256 S.E.2d 529 (1979)._ The North Carolina Supreme Court has, however, since repudiated those decisions. _Burke County Public Schools Board of Education v. Shaver Partnership, 303 N.C. 408, 279 S.E.2d 816 (1981)._

E

[16] The Hospital argues that the _Colorado River_ test is somehow inapplicable because in this case the District Court merely stayed the federal litigation rather than dismissing the suit outright, as in _Colorado River._ It contends that Mercury remains free to seek to reopen the federal suit on a showing that the state suit has failed to adjudicate its rights, and that a stay is less onerous than a dismissal. We have already rejected this distinction, for purposes of this case, in discussing appellate jurisdiction. _Supra,_ at 935. We reject it in this context for the same reasons.

*28 We have no occasion in this case to decide whether a dismissal or a stay should ordinarily be the preferred course of action when a district court properly finds that _Colorado River_ counsels in favor of deferring to a parallel state-court suit. [FN37] We can say, however, that a stay is as much a refusal to exercise federal jurisdiction as a dismissal. When a district court decides to dismiss or stay under _Colorado River,_ it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all. See _supra,_ at Part IV D; _McNeese v. Board of Education,_

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

373 U.S. 668, 674-676, 83 S.Ct. 1433, 1437-38, 10 L.Ed.2d 622 (1963). Thus, the decision to invoke *Colorado River* necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case, whether it stays or dismisses. See 17 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4247, at 517-519 (1978).

> FN37. This reservation, of course, applies only to cases under *Colorado River*. Cf., *e.g., American Trial Lawyers Assn. v. New Jersey Supreme Court,* 409 U.S. 467, 93 S.Ct. 627, 34 L.Ed.2d 651 (1973) (stay rather than dismissal in *Pullman* abstention).

Moreover, assuming that for some unexpected reason the state forum does turn out to be inadequate in some respect, the Hospital's argument fails to make out any genuine difference between a stay and a dismissal. It is true that Mercury could seek to return to federal court if it proved necessary; but that would be equally true if the District Court had dismissed the case. It is highly questionable whether this Court would have approved a dismissal of a federal suit in *Colorado River* (or in any of the abstention cases, see *supra,* at 936-937) if the federal courts did not remain open to a dismissed plaintiff who later demonstrated the inadequacy of the state forum.

**\*29 V**

In addition to reversing the District Court's stay, the Court of Appeals decided that the underlying contractual dispute between **\*\*944** Mercury and the Hospital is arbitrable under the Arbitration Act and the terms of the parties' arbitration agreement. It reversed the District Court's judgment and remanded the case "with instructions to proceed in conformity herewith." 656 F.2d, at 946. In effect, the Court of Appeals directed the District Court to enter a § 4 order to arbitrate.

[17][18] In this Court, the Hospital does not contest the substantive correctness of the Court of Appeals's holding on arbitrability. It does raise several objections to the procedures the Court of Appeals used in considering and deciding this case. In particular, it points out that the only issue formally appealed to the Court of Appeals was the propriety of the District Court's stay order. Ordinarily, we would not expect the Court of Appeals to pass on issues not

decided in the District Court. In the present case, however, we are not disposed to disturb the Court's discretion in its handling of the case in view of the special interests at stake and the apparent lack of any prejudice to the parties. 28 U.S.C. § 2106 gives a court of appeals some latitude in entering an order to achieve justice in the circumstances. The Arbitration Act calls for a summary and speedy disposition of motions or petitions to enforce arbitration clauses. The Court of Appeals had in the record full briefs and evidentiary submissions from both parties on the merits of arbitrability, and held that there were no disputed issues of fact requiring a jury trial before a § 4 order could issue. Under these circumstances, the Court acted within its authority in deciding the legal issues presented in order to facilitate the prompt arbitration that Congress envisaged.

*Affirmed.*

**\*30** Justice REHNQUIST, with whom THE CHIEF JUSTICE and Justice O'CONNOR join, dissenting.

In its zeal to provide arbitration for a party it thinks deserving, the Court has made an exception to established rules of procedure. The Court's attempt to cast the District Court's decision as a final judgment fails to do justice to the meaning of the word "final", to the Act of Congress that limits the jurisdiction of the courts of appeals, or to the district judges who administer the laws in the first instance.

If the District Court had not stayed the proceeding, but had set a trial date two months away, there would be no doubt that its order was interlocutory, subject to review only by mandamus or pursuant to 28 U.S.C. § 1292(b). This would be true even though § 4 of the Arbitration Act provides that "the court shall proceed summarily" to trial, because an order setting a trial date only guides the course of litigation, and does not, of its own force, dispose of it on the merits. Such an order is tentative; that is, it is subject to change at any time on the motion of a party or by the court, *sua sponte.*

The order the District Court actually entered is no more final. It delayed further proceedings until the completion of pending litigation in the state courts. This order was also tentative; it was subject to change on a showing that the state proceedings were being delayed, either by the Hospital or by the court, or that the state courts were not applying the federal act, or that some other reason for a change had arisen.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

103 S.Ct. 927
74 L.Ed.2d 765
**(Cite as: 460 U.S. 1, 103 S.Ct. 927)**

This order did not dispose of the case on the merits. If the state court had found that there was no agreement to arbitrate within the meaning of the Federal Arbitration Act, the District Court would have been bound by that finding. But res judicata or collateral estoppel would apply if the state court reached a decision before the District Court in the absence of a stay. The likelihood that a state court of competent jurisdiction may enter a judgment that may determine some issue in a case does not render final a federal district court's decision to take a two day recess, or to order additional *31 briefing by the parties in five days or five months, or to take a case under advisement rather than render an immediate decision **945 from the bench. Such a possibility did not magically change that character of the order the district judge entered in this case.

Section 1291 of the Judicial Code is a Congressional command to the federal courts of appeals not to interfere with the district courts' management of ongoing proceedings. Unless the high standards for a writ of mandamus can be met, or the district court certifies an interlocutory appeal pursuant to § 1292(b), Congress has directed that the district courts be permitted to conduct their cases as they see fit. The reason for this rule is simple:

"Since the right to a judgment from more than one court is a matter of grace and not a necessary ingredient of justice, Congress from the very beginning has, by forbidding piecemeal disposition on appeal of what for practical purposes is a single controversy, set itself against enfeebling judicial administration. Thereby is avoided the obstruction to just claims that would come from permitting the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise, from its initiation to entry of judgment. To be effective, judicial administration must not be leaden-footed. Its momentum would be arrested by permitting separate reviews of the component elements in a unified cause." Cobbledick v. United States, 309 U.S. 323, 325, 60 S.Ct. 540, 541, 84 L.Ed. 783 (1940) (Frankfurter, J., for a unanimous court).

The Court's decision places an unwarranted limitation upon the power of district courts to control their own cases. The Court's opinion does not establish a broad exception to § 1291, see ante, at 934, n. 11, but it does create uncertainty about when a district court order in a pending case can be appealed. This uncertainty gives litigants opportunities to disrupt or delay proceedings by taking colorable appeals from interlocutory *32

orders, not only in cases nearly identical to this but in cases which the ingenuity of counsel disappointed by a district court's ruling can analogize to this one. Section 1291 established a policy that district judges should conduct their own cases from beginning to end. The occasional injustice to a litigant that results from an erroneous district court decision is far outweighed by the far greater systemic disruption created by encouraging parties to attempt interlocutory appeals. The former attracts the Court's attention because the legal error it perceives is apparent on the surface of the case. The latter receives inadequate attention because it does not appear in published decisions or in petitions for certiorari. It is, rather, obscured by the "merits" of cases and hidden among statistics on the cost and seeming interminable nature of litigation. Both respect for district judges and concern for the course of litigation generally should make the Court hesitate before creating another exception, however narrow, to § 1291.

The Court has acknowledged the importance of the rule of finality as recently as Coopers & Lybrand v. Livesay, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), which rejected the so called "death-knell" exception to § 1291. In Coopers, a putative representative plaintiff whose motion for class certification had been denied by the district court sought to appeal under § 1291. We accepted his argument that this order effectively put him out of court, id., at 470, 98 S.Ct. at 2458, but held that this circumstance did not justify an exception to the statute. "[A]llowing appeals of right from non-final orders that turn on the facts of a particular case thrusts appellate courts indiscriminately into the trial process and thus defeats one vital purpose of the final-judgment rule--'that of maintaining the appropriate relationship between the respective courts.... This goal, in the absence of most compelling reasons to the contrary, is very much worth preserving.' " Id., at 476, 98 S.Ct. at 2462 (quoting Parkinson v. April Industries, Inc., 520 F.2d 650, 654 (CA2 1975) (concurring opinion) ).

*33 The Court has not given any sound, principled justification for permitting the Court of Appeals to thrust itself into the trial process in this case. It begins by citing **946 Idlewild Liquor Corp. v. Epstein, 370 U.S. 713, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962). There the District Court had stayed an action challenging the constitutionality of a state statute "to give the state courts an opportunity to pass upon the constitutional issues presented, although there was no relevant litigation then pending in the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

103 S.Ct. 927
74 L.Ed.2d 765
(Cite as: 460 U.S. 1, 103 S.Ct. 927)

Page 19

state courts." *Id.,* at 714, 82 S.Ct., at 1296. This court held that the order was appealable because the plaintiff "was effectively out of court." *Id.,* at 715, n. 2, 82 S.Ct., at 1296, n. 2. *Idlewild* does not control this case.

First, Mercury is less "effectively out of court" than was Idlewild. There was no pending state proceeding that might have resolved the issues in the case, and Idlewild might well have been obliged to take the risk of violating the statute and challenging it in an enforcement proceeding in state court.

More importantly, however, the decision in *Idlewild* cannot be good law after *Coopers, supra.* The Court describes *Coopers* as holding only that the collateral-order doctrine of *Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), does not apply to a class decertification order under Fed.R.Civ.P. 23(c)(1). *Ante,* at 935, n. 14. We did hold that "the collateral-order doctrine is not applicable to" a decertification order. 437 U.S., at 468-469, 98 S.Ct. at 2458. We then went on to reject the argument that the decertification order was final under the so-called "death-knell" doctrine, holding that an order does not become final simply because the plaintiff will be unable to pursue his claim if the order stands. *Id.,* at 469-477, 98 S.Ct. at 2458-62. We declined to attach any importance to the fact that the plaintiff in *Coopers* was just as "effectively out of court" as Idlewild or Mercury. We noted that "if the 'death knell' doctrine has merit, it would apply equally to the many interlocutory orders in ordinary litigation ... that may have such tactical economic significance that a defeat is tantamount to a 'death knell' for the entire case." *Id.,* at 470, 98 S.Ct. at 2459. We also noted that 28 U.S.C. § 1292(b) provides for review *34 of certain nonfinal orders, and that the "death knell" doctrine circumvents its restrictions. *Id.,* at 474- 475, 98 S.Ct., at 2460-61. By ignoring this discussion and holding from *Coopers,* the Court has created an unjustified exception to § 1291.

The Court also states that the stay order in this case is appealable under *Cohen, supra.* It quotes the formulation of the *Cohen* collateral order doctrine from *Coopers :*

"[T]he order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment." 437 U.S., at 468, 98 S.Ct., at 2458, quoted, *ante,* at 935.

The District Court's order did not "conclusively

determine the disputed question" for the reasons stated above. The Court's assertion to the contrary, *ante,* at 935, is nothing short of sheer speculation about the state of mind of the District Judge. Such speculation is hardly the "practical rather than ... technical construction" [FN*] of § 1291 contemplated by *Cohen, supra,* 337 U.S., at 546, 69 S.Ct., at 1225. In *Cohen* itself, the District Court denied the defendant's motion to require the plaintiff to post a bond on the ground that the statute requiring the bond did not apply. That order "conclusively determined" the question whether a bond was required because no conceivable change of circumstances could affect the basis of the District Court's decision. In this case, any number of plausible events might have convinced the District Court that a necessary basis of its decision--that the state court would proceed promptly and fairly to adjudicate the issue **947 of the existence of an agreement to arbitrate--no longer applied.

> FN* As a practical matter, it is not at all clear to me that the Court of Appeals's course would have provided arbitration more quickly than that of the District Court, even if this Court had not granted certiorari. If the Court of Appeals was correct that this dispute is plainly arbitrable, there is no reason to expect that the state courts would not have resolved that issue in the 11 months during which the case was before the Court of Appeals.

*35 Furthermore, I am not as certain as is the Court that by staying this case the District Court resolved "an important issue." An issue should not be deemed "important" for these purposes simply because the court of appeals or this Court thinks the appellant should prevail. The issue here was whether the factual question whether there was an agreement to arbitrate should be adjudicated in a state or federal court. Unless there is some reason to believe that the state court will resolve this factual question wrongly, which the Court quite rightly disclaims, *ante,* at 942, I do not see how this issue is more important than any other interlocutory order that may place a litigant at a procedural disadvantage.

For these reasons, I do not believe the District Court's order was appealable. Interlocutory orders are committed by statute to the judgment of the District Courts, and this Court ill-serves the judges of those courts and the overwhelming majority of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

103 S.Ct. 927
74 L.Ed.2d 765
**(Cite as: 460 U.S. 1, 103 S.Ct. 927)**

litigants by devising exceptions to the statute when it believes a particular litigant has been wronged.

Given my view of appealability, I do not find it necessary to decide whether the District Court's order was proper in this case. I am disturbed, however, that the Court has sanctioned an extraordinary departure from the usual and accepted course of judicial proceedings by affirming the Court of Appeals decision on an issue that was not decided in the District Court.

The Court of Appeals ordered the District Court to enter an order compelling arbitration, even though that issue was not considered by the District Court. This Court has maintained the difference between appellate jurisdiction and original jurisdiction at least since *Marbury v. Madison,* 1 Cranch 137, 174- 176, 2 L.Ed. 60 (1803) ("It is the essential criterion of appellate jurisdiction that it revises and corrects the proceedings in a case already instituted."). I do not understand how the Court can say that the Court of Appeals had discretion to perform a non-appellate act.

**\*36** The Court relies on 28 U.S.C. § 2106, which provides that a court of appeals:
> "may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the case and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."

This statute does not grant the courts of appeals authority to constitute themselves as trial courts. Section 4 of the Arbitration Act gives the Hospital a right to a jury trial. See *ante,* at 940, n. 27. By deciding that there were no disputed issues of fact, the Court of Appeals seems to have decided a motion for summary judgment that was not before it. This is the kind of issue that district judges decide every day in the ordinary course of business. It is not the kind of issue that Courts of Appeals determine. The Court of Appeals did have before it the memoranda filed in the District Court but, contrary to the Court's intimation, *ante,* at 943, this issue was not argued in the Court of Appeals. See 656 F.2d 933, 948, n. 1 (Hall, J., dissenting) ("No one argued that this court should decide that issue.").

There was no reason to believe that the District Court would not have acted promptly to resolve the dispute on the merits after being reversed on the stay. That judges of a court of appeals believe they know

how a case should be decided is no reason for them to substitute their own judgment for that of a district judge without regard to the normal course of appellate procedure.

The judgment below should be vacated and the case remanded to the Court of Appeals with directions to dismiss the appeal for want of jurisdiction. Failing that, even if the Court is correct that the stay order was an error, the judgment should be reversed, insofar as it decides the question of arbitrability, and remanded to the district court for further proceedings under the Arbitration Act.

103 S.Ct. 927, 460 U.S. 1, 74 L.Ed.2d 765

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

647 So.2d 192                                                                    Page 1
19 Fla. L. Weekly D1545
(Cite as: 647 So.2d 192)

C

District Court of Appeal of Florida,
First District.

The REGENCY GROUP, INC., Appellant,
v.
Joseph L. McDANIELS and Raymond S. Barbone,
Appellees.

No. 94-509.

July 19, 1994.

Corporation moved to compel arbitration of dispute with officers regarding payment of interest on sale of proceeds. The Circuit Court for Duval County, Frederic Buttner, J., denied motion, and corporation appealed. The District Court of Appeal held that arbitration provision covering payment disputes compelled arbitration of issue regarding payment of interest.

Reversed and remanded.

Wolf, J., filed dissenting opinion.

West Headnotes

[1] Arbitration 🔑1.1
33k1.1 Most Cited Cases

Agreement of parties determines issues subject to arbitration.

[2] Arbitration 🔑1.2
33k1.2 Most Cited Cases

Public policy favors arbitration of disputes because it is efficient and avoids time delay and expense associated with litigation.

[3] Arbitration 🔑7.1
33k7.1 Most Cited Cases

When court must decide whether particular dispute is subject to arbitration agreement, doubts about scope of agreement should be resolved in favor of arbitration.

[4] Arbitration 🔑7.5
33k7.5 Most Cited Cases

Agreement between officers and corporation for release of their rights under phantom stock ownership program and deferred compensation plan required arbitration of officers' claims for payment of interest on sale of proceeds, where arbitration clause referred to any dispute between parties on amount of any payment to be made by any party.
*192 Thomas C. Dearing and Thomas B. Constantine of Leloeuf, Lamb, Greene & McRae, Jacksonville, for appellant.

C. Warren Tripp, Jr. of Bedell, Dittmar, Devault & Pillans, P.A., Jacksonville, for appellees.

PER CURIAM.

The Regency Group, Inc. (Regency) appeals from an order denying a motion to compel arbitration. The issue presented is whether the claims of Joseph L. McDaniels and Raymond S. Barbone (appellees) for payment of interest on sale proceeds were within the scope of the arbitration agreement between the parties. We find that they were, and reverse the order of the trial court.

This action arises out of the Regency's stock sale of all of the outstanding shares of capital stock of Atlantic Mortgage Investment Corp. (AMIC) to Pitney Bowes Credit Corporation (PBCC). The appellees, McDaniels and Barbone, were the president and vice president of AMIC, respectively. The Regency Group and appellees, as a result of their respective interests in AMIC, entered into an agreement dated June 19, 1992, in which appellees agreed to the sale of AMIC to PBCC. In return for release of their rights under a phantom stock ownership program and a deferred compensation plan which they had as key employees of AMIC, McDaniels and Barbone were each to receive a percentage of the final sale proceeds received by Regency. The source of monies for payments to be made by Regency to the appellees under the agreement was the stock sale proceeds paid by PBCC for the shares of AMIC stock. The stock sale proceeds were all deposited by PBCC into an escrow account.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

647 So.2d 192
19 Fla. L. Weekly D1545
**(Cite as: 647 So.2d 192)**

The agreement provided that McDaniels and Barbone shall receive the respective aggregate amounts of $919,197 and $235,242, subject to the adjustments provided in this agreement. Calculation of the ultimate amount of any payments to be made by any party to the agreement is to be made in accordance with the methods set forth in Exhibit A to the agreement. Section 5(a) of the agreement states as follows:

*193 Such amounts are determined in accordance with the terms of the plans and are based upon the calculations and the assumed purchase price and closing costs set forth on Exhibit A. Accordingly, should the amount of the purchase price ultimately received by Regency or the amount of closing costs incurred by Regency vary from those amounts set forth on Exhibit A, the aggregate amounts paid to McDaniels or Barbone shall increase or decrease in accordance with the method of calculations set forth on Exhibit A.

The funds from the sale are and have been held in an interest-bearing escrow account from which distributions to Regency were made on August 19, 1992, July 22, 1993, with all remaining funds to be paid out of escrow on February 22, 1995. When monies were distributed to Regency from the escrow in August 1992 and July 1993, Regency received principal and interest earned on the funds while in escrow, and McDaniels and Barbone received only the principal; they did not receive their proportional shares of that interest. Demand was made for payment of the interest, but Regency took the position that McDaniels and Barbone were not entitled to their proportional shares of the interest and refused to make payment of the interest to McDaniels and Barbone.

McDaniels and Barbone filed suit against Regency. The complaint contained six counts, asserting two claims: One for payment of a portion of the interest accrued on the escrow stock sale proceeds (counts I, II and VI), and the other for bonus payments and salary increases (counts II, IV and V). Only the claim for payment of interest is material to this appeal.

Although the agreement contains no provision for payment by Regency to the appellees of any interest related to the stock sale proceeds, it does address payment disputes. Paragraph 5(c) of the agreement provides for resolution of disputes by binding arbitration and in pertinent part states as follows:

The parties shall use the method of calculation set forth in Exhibit A to determine the amount of payment made by any party.... Any dispute between the parties with respect to the determination of such amounts and percentage shall be settled by KPMG Peat Marwick. Any such determination by Peat Marwick shall be binding upon the parties and the fee of Peat Marwick shall be paid by the party which does not prevail in the dispute or shall be shared among the parties on a basis to be determined by Peat Marwick.

(Agreement, paragraph 5(c), page 6). Regency filed a motion to compel arbitration of counts I, II and VI under the agreement, and the trial court denied the motion, finding that

[P]aragraph 5(c) of the parties' agreement does not constitute a binding agreement to arbitrate the issue of plaintiffs' entitlement to interest, but is sufficient to constitute a binding agreement to arbitrate the determination of the amounts of payments the plaintiffs are entitled to receive.

The court's denial of the motion to compel arbitration is being appealed here.

[1][2][3] The agreement of the parties determines the issues subject to arbitration. *Pacemaker Corp. v. Euster,* 357 So.2d 208 (Fla. 3d DCA 1978); *Roe v. Amica Mutual Ins. Co.,* 533 So.2d 279 (Fla.1988). Only those claims which the parties have agreed are arbitrable may be subject to arbitration. *All American Semiconductor, Inc. v. Unisys Corp.,* 637 So.2d 59 (Fla. 3d DCA 1994). Public policy, however, favors arbitration because it is efficient and avoids the time delay and expense associated with litigation. *See, e.g., Midwest Mutual Ins. Co. v. Santiesteban,* 287 So.2d 665 (Fla.1973). In view of such public policy, this court has expressed that when a court must decide whether a particular dispute is subject to an arbitration agreement, doubts about the scope of the agreement should be resolved in favor of arbitration. *See Lord & Son Constr., Inc. v. Roberts Elec. Contractors, Inc.,* 624 So.2d 376, 377 n. 2 (Fla. 1st DCA 1993). *See also Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Ronbeck Constr. Co., Inc. v. Savanna Club Corp.,* 592 So.2d 344 (Fla. 4th DCA 1992).

In *Beaver Coaches, Inc. v. Revels Nationwide R.V. Sales, Inc.,* 543 So.2d 359, 362 (Fla. 1st DCA 1989), this court stated as follows:

*194 [A]ny time a contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular

647 So.2d 192
19 Fla. L. Weekly D1545
(Cite as: 647 So.2d 192)

Page 3

grievance should not be denied unless it may be said with *positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

*Id.* (quoting *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)) (emphasis added).

[4] In the instant case, the arbitration clause uses broad language to describe the scope of what is to be included in the intent of the parties. The arbitration provision simply refers to "any dispute between the parties with respect to the determination of such amounts and percentages." The "amounts and percentages" referred to in the arbitration clause is defined in that same paragraph as "the amount of any payment to be made by any party."

While the entitlement to interest cannot be determined in accordance with the exhibit attached to the contract, it clearly would constitute a portion of the payment due to a party. We, therefore, cannot find with "positive assurance" that the dispute between the parties was not within the scope of the agreement to arbitrate.

The case is, therefore, reversed and remanded with directions to the trial court to enter an order compelling arbitration as to the claims encompassed within counts I, II, and VI of the complaint.

BARFIELD and ALLEN, JJ., concur.

WOLF, J., dissenting with written opinion.

WOLF, Judge, dissenting.

The broad public policy in favor of arbitration should not override the right of an individual to have legal disputes determined by a court unless there is some indication that it was the intent of the party to have the dispute resolved by means of arbitration. The parties in the instant case did not intend that the legal issue of entitlement to interest should be determined by the accounting firm of KPMG Peat Marwick (Peat Marwick). I would, therefore, affirm the decision of the trial court.

Parties to a contract may provide that only certain disputes arising out of the agreement will be subject to arbitration. *Kincaid Constr. Co. v. Worsham Underground Utility Constr.*, 566 So.2d 600 (Fla. 5th DCA 1990). Only those claims which the parties have agreed are arbitrable should be subject to mandatory arbitration. *All American Semiconductor, Inc. v. Unisys Corp.*, 637 So.2d 59 (Fla. 3d DCA 1994). *See also Roe v. Amica Mut. Ins. Co.*, 533 So.2d 279 (Fla.1988).

Section 5(c) of the agreement between the parties provides as follows:

*Calculation of Payments.* The parties shall use the method of calculation set forth on Exhibit A to determine the amount of any payment to be made by any party. Such calculations contemplate that any portion of the Purchase Price received by Regency shall be shared on a Percentage basis with each of McDaniels and Barbone and that any payment to be made by Regency shall be participated in on a Percentage basis by each of McDaniels and Barbone. *The relevant amounts and Percentages shall be determined by utilizing the relevant figures in the method of calculation set forth on Exhibit A. Any dispute between the parties with respect to the determination of such amounts and Percentages shall be settled by KPMG Peat Marwick.* Any such determination by Peat Marwick shall be binding upon the parties and the fees of Peat Marwick shall be paid by the party which does not prevail in the dispute or shall be shared among the parties on a basis to be determined by Peat Marwick.

(Emphasis added). The arbitration provision in the instant case is a limited agreement to have a selected type of dispute resolved by the named third party. Thus, this case is distinguishable from *Beaver Coaches, Inc. v. Revels Nationwide R.V. Sales, Inc.*, 543 So.2d 359 (Fla. 1st DCA 1989), and *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), the cases relied on by the majority. Those cases dealt with broad *195 arbitration clauses intended to apply to any dispute arising out of a contractual relationship between the parties, unlike this case where the agreement was specifically to have Peat Marwick resolve disputes concerning the calculations made pursuant to Exhibit A.

The calculations pursuant to Exhibit A were to be made only if the purchase price and closing costs involved in the sale of Atlantic Mortgage and Investment Corporation varied from the estimated amounts stated in the contract. The payments and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

647 So.2d 192
19 Fla. L. Weekly D1545
**(Cite as: 647 So.2d 192)**

Page 4

calculations envisioned by Exhibit A were
mathematical calculations based on the net proceeds
of the sale to determine the appropriate portion of the
sale price to be paid to each party.    This
methodology would be within the expertise of the
accounting firm of Peat Marwick.

Exhibit A and section 5, however, are silent as to
appellees' entitlement to their proportionate share of
interest accrued while the proceeds from the purchase
price are being held in escrow.   This determination
cannot be made by simple calculation, but rather
involves a legal question concerning interpretation of
the contract which I do not believe the parties
intended to be resolved by Peat Marwick.

647 So.2d 192, 19 Fla. L. Weekly D1545

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Westlaw.

750 So.2d 633                                                        Page 1
24 Fla. L. Weekly S540
**(Cite as: 750 So.2d 633)**

▷

<u>Briefs and Other Related Documents</u>

Supreme Court of Florida.

Patricia SEIFERT, Petitioner,
v.
U.S. HOME CORPORATION, et al., Respondents.

**No. 91,821.**

Nov. 18, 1999.

Home purchaser brought wrongful death action against builder arising out of death of purchaser's husband after air conditioning system picked up carbon monoxide from garage and distributed it into house. The Circuit Court, Hernando County, Richard Tombrink, Jr., J., denied builder's motion to compel arbitration, and builder appealed. The District Court of Appeal, Dauksch, J., 699 So.2d 787, reversed and remanded. The Supreme Court, Anstead, J., held that wrongful death claim against house builder was not subject to arbitration agreement in contract for purchase and sale.

Decision of District Court of Appeal quashed and case remanded.

Overton, Senior Justice, filed a concurring opinion.

West Headnotes

**[1] Arbitration** 23.3(1)
33k23.3(1) Most Cited Cases

**[1] Arbitration** 23.13
33k23.13 Most Cited Cases

**[1] Arbitration** 23.14
33k23.14 Most Cited Cases

There are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists, (2) whether an arbitrable issue exists, and (3) whether the right to arbitration was waived.

**[2] Arbitration** 7
33k7 Most Cited Cases

Because arbitration provisions are contractual in nature, construction of such provisions and the contracts in which they appear remains a matter of contract interpretation.

**[3] Arbitration** 7.5
33k7.5 Most Cited Cases

Determination of whether an arbitration clause requires arbitration of a particular dispute necessarily rests on the intent of the parties.

**[4] Arbitration** 1.1
33k1.1 Most Cited Cases

No party may be forced to submit a dispute to arbitration that the party did not intend and agree to arbitrate.

**[5] Arbitration** 7.5
33k7.5 Most Cited Cases

Determination of whether a particular claim must be submitted to arbitration necessarily depends on the existence of some nexus between the dispute and the contract containing the arbitration clause.

**[6] Arbitration** 7.5
33k7.5 Most Cited Cases

Mere fact that the dispute would not have arisen but for the existence of the contract and consequent relationship between the parties is insufficient by itself to transform a dispute into one "arising out of or relating to" the agreement that would subject dispute to arbitration under arbitration clause.

**[7] Arbitration** 7.6
33k7.6 Most Cited Cases

Wrongful death claim against house builder, alleging breach of duty to use due care in designing and manufacturing new homes to prevent air conditioning unit from pulling in carbon monoxide from garage and breach of duty to warn of known dangerous condition, was not subject to arbitration agreement in contract for purchase and sale, as agreement did not indicate that parties intended to include such common

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

750 So.2d 633
24 Fla. L. Weekly S540
**(Cite as: 750 So.2d 633)**

Page 2

law tort claims within scope of contract or arbitration provision; and factual allegations did not rely on contract; dispute did not have "significant relationship" to contract even though dispute would not have arisen but for contract.

**[8] Arbitration** 🔑 7.5
33k7.5 Most Cited Cases

If the contract places the parties in a unique relationship that creates new duties not otherwise imposed by law, then a dispute regarding a breach of a contractually-imposed duty is one that arises from the contract, and such a claim would be one arising from the contract terms and therefore subject to arbitration where the contract required it.

**[9] Arbitration** 🔑 7.5
33k7.5 Most Cited Cases

If the duty alleged to be breached is one imposed by law in recognition of public policy and is generally owed to others besides the contracting parties, then a dispute regarding such a breach is not one arising from the contract, but sounds in tort, and thus, a contractually-imposed arbitration requirement would not apply to such a claim.

**[10] Contracts** 🔑 155
95k155 Most Cited Cases

Provisions of contract are construed against its drafter.
***635** Poses & Halpern, P.A., Miami, Florida; and Sharon L. Wolfe and Nancy C. Ciampa of Cooper & Wolfe, P.A., Miami, Florida, for Petitioner.

Fredric S. Zinober of Tew, Zinober, Barnes, Zimmet & Unice, Clearwater, Florida, for Respondents.

ANSTEAD, J.

We have for review *U.S. Home Corp. v. Seifert,* 699 So.2d 787 (Fla. 5th DCA 1997), based upon express conflict with the opinion in *Terminix International Co. v. Michaels,* 668 So.2d 1013 (Fla. 4th DCA 1996). [FN1] We have jurisdiction. Art. V, § 3(b)(3), Fla. Const. For the reasons expressed, we quash the decision below and approve the decision in *Michaels.* We hold that an agreement to arbitrate in a purchase and sale agreement does not necessarily mandate arbitration of a subsequent and independent

tort action based upon common law duties.

> FN1. After briefing and oral argument in this case, the parties settled their claims and filed a stipulation for dismissal of this review proceeding. Because this issue is likely to recur, especially if the matter is left unresolved, we exercise our discretion to retain jurisdiction in this case. *See Holly v. Auld,* 450 So.2d 217, 218 n. 1 (Fla.1984).

MATERIAL FACTS

This is a wrongful death action. At issue is whether the terms of an arbitration provision in a contract for the sale and purchase of a house require the wrongful death action to be arbitrated. Petitioner Patricia Seifert and her husband Ernest Seifert, now deceased, contracted with U.S. Home Corporation ("U.S.Home") for the construction of a house. After the Seiferts moved into the home, the Seiferts' car was left running in the garage, and the air conditioning system located in the garage picked up the carbon monoxide emissions from the car and distributed them into the house, killing Mr. Seifert. Patricia Seifert, as personal representative of her husband's estate, sued U.S. Home alleging claims for strict liability, negligence, and breach of express and implied warranties. Thereafter, the strict liability and warranty claims were dismissed.

U.S. Home moved to submit the negligence claim for wrongful death to arbitration based on an arbitration provision in the purchase and sale contract with the Seiferts which states:

13. ARBITRATION. Any controversy or claim arising under or related to this Agreement or to the Property (with the exception of "consumer products" as defined by the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C. Section 2301 et seq., and the regulations promulgated under the Act) or with respect to any claim arising by virtue of any representations alleged to have been made by the Seller or Seller's representative, shall be settled and finally determined by mediation or binding arbitration as provided by the Federal Arbitration Act (9 U.S.C. Section 1-14) and similar state statutes and not by a court of law. The claim will be first mediated in accordance with the Commercial or Construction Industry Mediation Rules, as appropriate, of the American Arbitration Association. If not resolved by mediation, the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

750 So.2d 633
24 Fla. L. Weekly S540
**(Cite as: 750 So.2d 633)**

Page 3

claim will be settled in accordance with the Commercial or Construction Industry Arbitration Rules, as appropriate, of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction of the matter, provided, however, that if Seller's warranty plan establishes an alternative dispute resolution procedure, a claim covered by Seller's warranty will be determined in accordance with that alternative procedure **\*636** prior to submission to binding arbitration, if necessary. Unless otherwise provided by law or Seller's warranty plan, the cost of initiating any of the foregoing proceedings shall be borne equally by Seller and Buyer.

The trial court denied U.S. Home's request for arbitration and it appealed. The Fifth District reversed the trial court's order and held the action must be decided in accord with the arbitration provision of the contract.

## LEGAL ARGUMENT
### Arbitrability

[1] Under both federal statutory provisions and Florida's arbitration code, there are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived. See *Terminix Int'l Co. L.P. v. Ponzio*, 693 So.2d 104, 106 (Fla. 5th DCA 1997). The issue here relates to the first two prongs, and, of course, boils down to an issue of whether the wrongful death action is subject to arbitration. [FN2]

FN2. We recognize that the issue could be framed in terms of whether a valid written agreement to arbitrate exists, or alternatively, whether the arbitration provision in question covers the tort action filed here. Fortunately, we believe, the analysis to resolve either question is essentially the same. It is something of a chicken and egg situation as to which comes first.

### Rules of Construction

[2][3][4] Today, arbitration provisions are common, and their use generally favored by the courts. However, because arbitration provisions are contractual in nature, construction of such provisions

and the contracts in which they appear remains a matter of contract interpretation. See *Seaboard Coast Line R.R. v. Trailer Train Co.*, 690 F.2d 1343, 1352 (11th Cir.1982); *R.W. Roberts Constr. Co., Inc. v. St. Johns River Water Management Dist.*, 423 So.2d 630, 632 (Fla. 5th DCA 1982). Accordingly, the determination of whether an arbitration clause requires arbitration of a particular dispute necessarily "rests on the intent of the parties." *Seaboard*, 690 F.2d at 1348; see also *Regency Group, Inc. v. McDaniels*, 647 So.2d 192, 193 (Fla. 1st DCA 1994) ("The agreement of the parties determines the issues subject to arbitration."). A natural corollary of this rule is that no party may be forced to submit a dispute to arbitration that the party did not intend and agree to arbitrate. See *Seaboard Coast Line*, 690 F.2d at 1352 (holding that the federal policy favoring arbitration "cannot serve to stretch a contract beyond the scope originally intended by the parties"); see also *Tracer Research Corp. v. National Envtl. Servs. Co.*, 42 F.3d 1292, 1294 (9th Cir.1994); *Miller v. Roberts*, 682 So.2d 691, 692 (Fla. 5th DCA 1996) ("The general rule is that where an arbitration agreement exists between the parties, arbitration is required only of those controversies or disputes which the parties have agreed to submit to arbitration."); *Regency Group, Inc.*, 647 So.2d at 193 ("Only those claims which the parties have agreed are arbitrable may be subject to arbitration.").

### Words

At the outset, we must note that courts around the country, as well as courts here in Florida, have pronounced differing views on the interpretation of contracts and their arbitration provisions. Not surprisingly, courts have given different meaning to clauses on the basis of the actual terminology used. For example, clauses including all claims or controversies "arising out of" the subject contract have been considered by some courts to be narrow in scope; i.e., the scope of the arbitration clause is limited to those claims having some direct relation to the terms and provisions of the contract. See **\*637**_Mediterranean Enters., Inc. v. Ssangyong Corp._, 708 F.2d 1458, 1464 (9th Cir.1983); *In re Kinoshita & Co.*, 287 F.2d 951, 953 (2d Cir.1961). Both *Mediterranean* and *Kinoshita* hold that claims alleging breach of a separate and unrelated contract, breach of fiduciary duty, and quantum meruit, none of which rely on the interpretation or performance of the contract containing the arbitration clause, are not subject to arbitration as disputes "arising out of" the contract. These cases reason that where an arbitration clause refers solely to disputes or

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

750 So.2d 633
24 Fla. L. Weekly S540
(Cite as: 750 So.2d 633)

Page 4

controversies "under" or "arising out of" the contract, arbitration is restricted to claims "relating to the interpretation of the contract and matter of performance." *Mediterranean Enters.*, 708 F.2d at 1464 (quoting *Kinoshita*, 287 F.2d at 953).

On the other hand, the phrase "arising out of or relating to" the contract has been interpreted broadly to encompass virtually all disputes between the contracting parties, including related tort claims. [FN3] *See Southland Corp. v. Keating*, 465 U.S. 1, 15 n. 7, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) (involving claims for fraud, misrepresentation, breach of contract, breach of fiduciary duty, and violation of state franchise investment law); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 406, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (holding that contractual language "[a]ny controversy or claims arising out of or relating to this Agreement, or breach thereof" is "easily broad enough to encompass" claim for fraud in inducement of contract). The addition of the phrase "relating to" to the phrases "arising out of" or "under," has been construed as broadening the scope of the arbitration provision. *See American Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir.1996) (characterizing phrase "arise out of or related to" as broad arbitration clause "capable of an expansive reach").

> FN3. The Seventh and Eleventh Circuits, on the other hand, draw little or no distinction between the two types of clauses and instead elect to follow a strong policy favoring arbitration even where the arbitration clause refers only to those claims or controversies "arising under" the contract. *See Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 642 (7th Cir.1993) ("We find, however, that 'arising out of' reaches all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se."); *Gregory v. Electro-Mechanical Corp.*, 83 F.3d 382, 385 (11th Cir.1996) (rejecting *Kinoshita* "as not being in accord with present day notions of arbitration as a viable alternative dispute resolution procedure").

According to the Fourth Circuit in *American Recovery Corp.*, [FN4] the test for *638 determining arbitrability of a particular claim under a broad arbitration provision is whether a "significant relationship" exists between the claim and the agreement containing the arbitration clause, regardless of the legal label attached to the dispute (i.e., tort or breach of contract). *See id.* at 93-94; *cf. Backus & Stratton, Inc. v. Mann*, 639 So.2d 35, 36 (Fla. 4th DCA 1994) (upholding trial court order compelling arbitration where employee's post-employment claims involved "significant aspects" of the employment relationship). In applying this standard, the court focused on the factual allegations of the complaint to determine whether those allegations implicated the contractual agreement and hence the arbitration clause. *See American Recovery Corp.*, 96 F.3d at 94; *see also Gregory*, 83 F.3d at 384 ("Whether a claim falls within the scope of an arbitration agreement turns on the factual allegations in the complaint rather than the legal causes of action asserted.").

> FN4. In *American Recovery Corp.*, the American Recovery Corporation (ARC) sued Computerized Thermal Imaging, Inc. (CTI), *inter alia*, for tortious interference with a contract and for breach of fiduciary duty. CTI moved to arbitrate the claims based on the terms of an arbitration clause in the contractual agreement between ARC and CTI. The District Court for the Eastern District of Virginia had held that the plaintiff's tortious interference and breach of fiduciary claims were not subject to arbitration because the claims sounded in tort rather than contract and because the resolution of the claims did not turn on the interpretation of the terms of the agreement, relying on *Mediterranean.* The Fourth Circuit, in reviewing the district court's conclusions de novo, held that the district court erred in relying on *Mediterranean. Id.* at 92. The court reasoned that *Mediterranean* involved a narrow arbitration provision, "the scope of which was limited to disputes relating to the interpretation and performance of the contract containing the arbitration clause itself." *Id.* at 93. In the case sub judice, however, the arbitration provision had a much more expansive reach because it included any dispute that "'ar[ose] out of or related to ' the consulting agreement." *Id.* Relying on its earlier holding in *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir.1988), the Fourth Circuit distinguished narrow arbitration clauses

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

750 So.2d 633
24 Fla. L. Weekly S540
**(Cite as: 750 So.2d 633)**

Page 5

such as the one in *Mediterranean,* which mandated only the arbitration of claims "arising under" the contract, from broader provisions which " *'d [id] not limit arbitration to the literal interpretation or performance of the contract* [, but] embrace[d] every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute.' " *American Recovery Corp.,* 96 F.3d at 93 (quoting *J.J. Ryan & Sons,* 863 F.2d at 321).

### Contractual Nexus

[5] After analyzing the governing principles surrounding the determination of whether a particular claim is subject to arbitration, and keeping in mind the general policy favoring arbitration, we believe it is fair to presume that not every dispute that arises between contracting parties should be subject to arbitration. As the prevailing case law illustrates, even in contracts containing broad arbitration provisions, the determination of whether a particular claim must be submitted to arbitration necessarily depends on the existence of some nexus between the dispute and the contract containing the arbitration clause.

[6] Disputes arise in many and varied contexts and the mere coincidence that the parties in dispute have a contractual relationship will ordinarily not be enough to mandate arbitration of the dispute. In other words, the mere fact that the dispute would not have arisen but for the existence of the contract and consequent relationship between the parties is insufficient by itself to transform a dispute into one "arising out of or relating to" the agreement. *See Armada Coal Export, Inc. v. Interbulk, Ltd.,* 726 F.2d 1566, 1568 (11th Cir.1984); *Necchi S. p. A. v. Necchi Sewing Machine Sales Corp.,* 348 F.2d 693, 698 (2d Cir.1965); *Hersman, Inc. v. Fleming Cos., Inc.,* 19 F.Supp.2d 1282, 1287 (M.D.Ala.1998), *aff'd,* 180 F.3d 271 (11th Cir.1999). These cases hold that for a tort claim to be considered "arising out of or relating to" an agreement, it must, at a minimum, raise some issue the resolution of which requires reference to or construction of some portion of the contract itself. *See Hersman,* 19 F.Supp.2d at 1286-87; *see also Koullas v. Ramsey,* 683 So.2d 415, 417 (Ala.1996); *Dusold v. Porta- John Corp.,* 167 Ariz. 358, 807 P.2d 526, 530 (Ct.App.1990).

In *Hersman,* for example, the plaintiff, Hersman,

Inc. ("Hersman"), owned and operated a Piggly Wiggly Supermarket. Acting upon representations by representatives of Fleming Companies, Inc. (Fleming), a wholesale supplier for Hersman, Hersman agreed to build a new store and shopping center if Fleming provided its expertise and oversight for the project. Based on Fleming's representations, Hersman contracted with an architect for the services to the shopping center development project. The standard contract provided the general duties and obligations between the owner (Hersman) and the architect. The contract also provided that Fleming, rather than Hersman, would pay the total contract amount of $27,000. All parties, including Fleming and Hersman, signed the contract. In addition to the above, the contract also contained an arbitration clause whereby "claims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to ... arbitration."

Hersman subsequently filed a complaint against Fleming alleging acts of negligence and misrepresentation by Fleming concerning Hersman's shopping center project. The district court denied Fleming's *639 motion to compel arbitration, holding that the tort claims were not subject to arbitration. The court reasoned that "[t]he key element in determining whether tort claims are subject to an arbitration provision is the relationship between the claims asserted and the underlying contractual obligations." 19 F.Supp.2d at 1285. After considering the contractual relationship between the parties, the court found that none of Hersman's claims against Fleming implicated Fleming's duties under the contract. Indeed, the complaint did not even refer to the contract. Accordingly, the court concluded that because Hersman did not need to inquire into the architect's contract to prove its claims, and the claims did not depend on the relationship between Fleming and Hersman as set out in the contract with the architect, the tort claims against Fleming existed wholly apart from that contract and thus were not subject to its arbitration clause. *Id.* at 1286.

Similarly, in a setting more akin to that involved herein, the Arizona Court of Appeals in *Dusold v. Porta-John Corp.,* 167 Ariz. 358, 807 P.2d 526 (Ct.App.1990), held that certain tort claims were not subject to arbitration, and explained:

The question whether a tort claim arising between parties who have a contractual relationship requiring that a claim "arising out of or relating to" an agreement or a breach of an agreement be

750 So.2d 633                                                                    Page 6
24 Fla. L. Weekly S540
(Cite as: 750 So.2d 633)

subjected to arbitration is not without difficulty....
....

... [T]he better-reasoned cases start with the premise that, in order for the dispute to be characterized as arising out of or related to the subject matter of the contract, and thus subject to arbitration, it must, at the very least, raise some issue the resolution of which requires a reference to or construction of some portion of the contract itself. [*Old Dutch Farms, Inc. v. Milk Drivers & Dairy Employees Local Union No. 584*, 359 F.2d 598 (2d Cir.1966) ]. The relationship between the dispute and the contract is not satisfied simply because the dispute would not have arisen absent the existence of a contract between the parties. *Armada Coal Export, Inc. v. Interbulk, Ltd.*, 726 F.2d 1566 (11th Cir.1984). *See also McMahon v. RMS Electronics, Inc.*, 618 F.Supp. 189 (S.D.N.Y.1985) (where tort claim does not require an interpretation of the underlying contract, no arbitration of that claim is required); *Popper [v. Monroe ]*, 673 F.Supp. 1228] at 1228 [S.D.N.Y.1987] (if defamatory statements have no material relationship to contractual relationship, no arbitration required). If such a connection to the contract is not present, tort claims between the parties could not reasonably be intended to have been subject to arbitration within the meaning of an arbitration clause requiring this method of resolution only for claims "arising out of or related to" the contract.

... If the contract places the parties in a unique relationship that creates new duties not otherwise imposed by law, then a dispute regarding a breach of a contractually-imposed duty is one that arises from the contract. *Barmat [v. John and Jane Doe Partners A-D ]*, 155 Ariz. [519] at 523, 747 P.2d [1218] at 1222 [1989]. Analogously, such a claim would be one arising from the contract terms and therefore subject to arbitration where the contract required it. *If, on the other hand, the duty alleged to be breached is one imposed by law in recognition of public policy and is generally owed to others besides the contracting parties, then a dispute regarding such a breach is not one arising from the contract, but sounds in tort. Id.* Therefore, a contractually- imposed arbitration requirement ... would not apply to such a claim. *Dusold*, 807 P.2d at 529-31 (emphasis supplied).

*Terminix International Co. v. Michaels*

Petitioner relies on the Fourth District's holding in *640Terminix International Co. v. Michaels*, 668 So.2d 1013 (Fla. 4th DCA 1996), which in turn relied

upon and adopted the reasoning and holding of the Arizona court in *Dusold*. In *Terminix*, the plaintiffs filed claims based on negligence and strict liability for personal injuries sustained from Terminix's alleged tortious use of ultrahazardous chemicals during insect eradication at the plaintiff's house. Terminix moved to dismiss based on an arbitration provision in the contract to provide eradication services which stated "that any controversy or claim between them [the contracting parties] arising out of or relating to the interpretation, performance, or breach of any provision of this agreement shall be settled exclusively by arbitration." The trial court denied the motion, emphasizing that arbitration "would dispense with the Michaels' right to trial by jury where it was not clear that personal injuries were subject to arbitration." *Michaels*, 668 So.2d at 1014.

On appeal, the Fourth District Court of Appeal affirmed the order of denial by concluding that the tort claim of the Michaels did not arise out of or relate to the "interpretation, performance, or breach of any provision of this agreement" and, therefore, such claims were not subject to the contract's arbitration provision. Following the logic of *Dusold*, the Fourth District explained that Terminix's duty to warn of the dangerous nature of its chemical product arose not from the terms of the eradication contract but from "a general duty imposed on the producer and distributor of hazardous chemicals." *Michaels*, 668 So.2d at 1015. The court reasoned that the general protection of persons was not within the subject matter of the contract, and therefore the dispute was not subject to the arbitration provision within the contract because it did not arise out of or relate to the contract. *Id.*

*This Case*

[7][8][9] We agree with the reasoning invoked in *Michaels* and *Dusold*. In particular, we agree with the framework for analysis and holding of *Dusold*:

If the contract places the parties in a unique relationship that creates new duties not otherwise imposed by law, then a dispute regarding a breach of a contractually-imposed duty is one that arises from the contract. *Barmat [v. John and Jane Doe Partners A-D ]*, 155 Ariz. [519] at 523, 747 P.2d [1218] at 1222 [1989]. Analogously, such a claim would be one arising from the contract terms and therefore subject to arbitration where the contract required it. If, on the other hand, the duty alleged to be breached is one imposed by law in recognition of public policy and is generally owed to others besides the contracting parties, then a

750 So.2d 633
24 Fla. L. Weekly S540
(Cite as: 750 So.2d 633)

Page 7

dispute regarding such a breach is not one arising from the contract, but sounds in tort. *Id.* Therefore, a contractually- imposed arbitration requirement ... would not apply to such a claim.

*Dusold,* 807 P.2d at 531. As in *Dusold* and *Michaels,* because this case involves a claim sounding in tort, i.e., negligence, we must determine whether the tort claim, as alleged in the complaint, arises from and bears such a significant relationship to the contract between the parties as to mandate application of the arbitration clause. The petitioner concedes that an action for breach of contract or of any of the warranties or other rights and obligations arising out of the contract would be subject to arbitration. However, because the wrongful death action here is predicated upon a tort theory of common law negligence unrelated to the rights and obligations of the contract, petitioner asserts such an action was not contemplated by the parties when the contract was made and should not be subject to arbitration. We agree. Applying the reasoning of *Dusold* and *Michaels,* and upon review of the contract containing the arbitration clause and the factual allegations of the complaint in this case, we find the district court erred in concluding that petitioner's tort claim falls within the arbitration provision.

*\*641 [10] The absence of any mention of the parties' rights in the event of personal injuries or death arising out of any alleged tortious conduct such as that which allegedly occurred in this case creates ambiguity and uncertainty as to the intent of the parties. Under a well-established rule of construction, we are constrained to construe the provisions of the U.S. Home contract against its drafter, U.S. Home. The contract between the Seiferts and U.S. Home explicitly refers only to the sale and purchase of a house. It appears to be a standard commercial contract containing provisions relating solely to the duties and obligations of the parties in regard to the construction and sale of the house. The two-paged sales agreement written by U.S. Home includes such matters as the purchase price and payment schedule, deposits, the time and location of closing, closing costs, title, substitutions, site specifications, insulation requirements, damage to the property before closing, promotional displays, the parties' rights in the event of a default, and the homeowner's warranty. There is nothing within these provisions to indicate that either party intended to include tort claims for personal injuries arising under the common law within the scope of either the contract in general or the arbitration provision in particular. In fact, the only reference to casualties

relates solely to damages to the property itself and not to personal injuries suffered by either party as a consequence of the tortious conduct of the other.

Indeed, the language of the arbitration provision itself supports such a conclusion. Its terms provide, "If not resolved by mediation, the claim will be settled in accordance with the Commercial or Construction Industry Arbitration Rules, as appropriate, of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction of the matter, provided, however, that if Seller's warranty plan establishes an alternative dispute resolution procedure, a claim covered by Seller's warranty will be determined in accordance with that alternative procedure prior to submission to binding arbitration, if necessary." This language essentially suggests that, as in *Michaels,* the parties anticipated potential disputes arising out of the interpretation, performance, or breach of the contract and accordingly provided that disputes as to those matters be arbitrated. Indeed, any arbitration was to be in accord with the "Commercial or Construction Industry Arbitration Rules" or as provided by the "Seller's Warranty Plan." None of this language suggests that tort claims for wrongful death or personal injury arising out of noncontractual common law obligations were contemplated.

Importantly, too, the factual allegations in the complaint do not rely on the contract between the Seiferts and U.S. Home. The negligence claim for wrongful death is based on U.S. Home's breach of its duty to exercise reasonable care in designing, manufacturing, and assembling new homes in a manner that would prevent the air conditioning unit from pulling in carbon monoxide from the garage and distributing it throughout the home. The complaint also asserts a breach of duty to warn of a known dangerous condition and of defects that U.S. Home knew or should have known would render the home unreasonably dangerous to use by anyone, not just the Seiferts. These allegations rely on obligations that would extend to anyone, third parties as well as the Seiferts, who might be injured by U.S. Home's tortious conduct. Indeed, it appears to be entirely fortuitous that it was Mr. Seifert, and not a guest or someone else in the house, who was injured as a result of the alleged neglect by U.S. Home. Obviously, such a guest or other person would not be subject to the arbitration provisions of the contract between U.S. Home and the Seiferts. [FN5]

750 So.2d 633                                                                                                              Page 8
24 Fla. L. Weekly S540
**(Cite as: 750 So.2d 633)**

FN5. No issue has been raised here as to whether the estate of the deceased, Mr. Seifert, is bound by the terms of the contract between the Seiferts and U.S. Home.

**\*642** While it is certainly true that this dispute would not have arisen but for the sales agreement between U.S. Home and the Seiferts, we conclude that the mere existence of such contract is not sufficient to compel that this dispute be arbitrated. *See Armada; Hersman.* None of the allegations assert that U.S. Home's duties or obligations arose from or were governed by the contract. *See Necchi,* 348 F.2d at 696. Even under a broad approach, the dispute does not create a "significant relationship" to the contract because none of the allegations in the complaint refer to or mention the sales agreement between the *Seiferts* and U.S. Home. Accordingly, we are unable to conclude that the tort action dispute in this case bears a significant relationship to the contract or that the parties in contracting necessarily contemplated the existence and arbitration of future tort claims for personal injuries based on a party's common law negligence. [FN6]

FN6. Obviously, a U.S. Home employee injured on the work site by the tortious conduct of the Seiferts would not be obligated to arbitrate the tort claim. Similarly, one might question why the Seiferts should be bound to arbitrate a tort claim based upon the common law neglect of a U.S. Home employee.

*Right to Trial by Jury*

Moreover, public policy also supports the result we reach in this case. As noted by the trial court, to require petitioner to submit her tort claim to binding arbitration would deprive her of her rights to a trial by jury, due process and access to the courts. *See generally* Jean R. Sternlight, *Rethinking the Constitutionality of the Supreme Court's Preference for Binding Arbitration: A Fresh Assessment of Jury Trial, Separation of Powers, and Due Process Concerns,* 72 Tul. L.Rev. 1, 48 (1997). As Sternlight notes:

In particular, lower courts have failed to consider the visibility and clarity of the purported agreement, the relative strength and knowledge of the parties, the voluntariness of the agreement, and the substantive fairness of the agreement. Rather

than ignoring these factual variations, courts should use them to craft a balancing test to determine whether parties waived their constitutional rights by agreeing to arbitration. It is wrong to stretch contractual interpretations to uphold a purported arbitration agreement where such an agreement would waive constitutional rights.

*Id.* Neither the statutes validating arbitration clauses nor the policy favoring such provisions should be used as a shield to block a party's access to a judicial forum in every case. Further, in the absence of express language in the parties' contract mandating arbitration of such disputes, we conclude that such a result is not required here. To deprive petitioner of these certain rights simply because she and her husband signed a contract which contained an arbitration provision, the language of which provides no indication that tort claims arising under the common law were contemplated or included, clearly be unjust. We do not think that the legislature in enacting section 682.02, Florida Statutes (1999), nor the courts in adopting any general policy favoring arbitration, intended such a result.

CONCLUSION

The agreement in this case related to a commercial transaction between a home builder and a purchaser. The tort claim filed in this case neither relies on the agreement nor refers to any provision within the agreement. Rather, the petitioner's tort claim relates to duties wholly independent from the agreement. Further, nothing within the agreement indicates the parties contemplated that death or injuries to persons might occur and that, in the event such injuries did occur, any resulting tort claims would be subject to arbitration. In sum, there is no reference in the agreement signed by the parties to tort claims under the common law for future injuries to persons. Accordingly, we hold that the tort claim in this case does not have a sufficient relationship to **\*643** the agreement as to require submission of the cause to arbitration. Based on this holding, we quash the decision below and approve the decision in *Michaels.* The case is remanded with directions that the trial court's denial of arbitration be affirmed.

It is so ordered.

HARDING, C.J., and SHAW, WELLS and PARIENTE, JJ., concur.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

OVERTON, Senior Justice, concurs with an opinion.


OVERTON, Senior Justice, concurring.

There is no question that appellate tribunals are in dispute in their respective construction of contract arbitration provisions that mandate arbitration of disputes between parties of "[a]ny controversy or claim arising under or related to this Agreement." The real question is whether the parties had the intent for this type of provision to apply to any dispute that would not have arisen but for the contract, including (1) all tort claims, and (2) a waiver of a jury trial for those tort claims as well as contract claims.  I find the intent of the parties is not clear from the use of this language, and consequently agree with the majority.

The authors of these arbitration provisions need to go back to the drafting board.   If the intent is to provide for arbitration broadly for all claims, contract and tort, such a provision should make that intent clear.   I would suggest that such a provision should reflect (1) that the arbitration provision applies to all disputes, contract or tort, that would not have arisen but for the contract and resulting relationship between the parties;  and (2) that the parties by this provision waive their rights to a jury trial on all such contract or tort disputes.

I favor the broad application of arbitration provisions, but the intent of the parties must be made clear by the terms of those provisions.

750 So.2d 633, 24 Fla. L. Weekly S540


Briefs and Other Related Documents (Back to top)


• 1997 WL 33491656 (Appellate Filing) Respondent, U.S. Home Corporation's Amended Answer Brief on Jurisdiction (Dec. 11, 1997)Original Image of this Document (PDF)

• 1997 WL 33491655 (Appellate Filing) Petitioner Seifert's Brief on Jurisdiction (Nov. 13, 1997)Original Image of this Document (PDF)

• 1991 WL 11010360 (Appellate Brief) Amended Brief of Petitioner Seifert (1991)

• 1991 WL 11010361 (Appellate Brief) Amended

Reply Brief of Petitioner Seifert (1991)

• 1991 WL 11010362 (Appellate Brief) Respondent, U.S. Home Corporation's Answer Brief (1991)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

827 So.2d 338
27 Fla. L. Weekly D2145
**(Cite as: 827 So.2d 338)**

Page 1

**C**

District Court of Appeal of Florida,
Third District.

INTEGRATED HEALTH SERVICES OF GREEN
BRIAR, INC., Appellant,
v.
Ernesto LOPEZ-SILVERO and Sandra Lopez-
Silvero, his wife, Appellees.

No. 3D02-1337.

Sept. 30, 2002.

After former patient brought suit against nursing home alleging improper care, nursing home brought action to compel arbitration pursuant to an admission contract. The Judicial Circuit Court, Miami-Dade County, Philip Bloom, J., denied motion. Nursing home appealed. The District Court of Appeal held that even though home did not sign admission contract, it performed under contract, and thus, contract including arbitration clause was valid.

Reversed and remanded with instructions.

West Headnotes

**[1] Arbitration** ☞6.2
33k6.2 Most Cited Cases

**[1] Contracts** ☞35
95k35 Most Cited Cases
(Formerly 198Hk579)

Nursing home assented to terms of the admission contract, even though home did not sign contract, and thus, contract, including its arbitration clause, was valid, where home admitted resident and provided him with nursing home care for over two months.

**[2] Contracts** ☞35
95k35 Most Cited Cases

A contract is binding, despite the fact that one party did not sign the contract, where both parties have performed under the contract.

**[3] Contracts** ☞35

95k35 Most Cited Cases

**[3] Contracts** ☞15
95k15 Most Cited Cases

A contract may be binding on a party despite the absence of a party's signature; the object of a signature is to show mutuality or assent, but these facts may be shown in other ways, including by the acts or conduct of the parties.
*338 Hardeman & Suarez, and Richard A. Warren, Miami, for appellant.

Freidin & Brown, and Robert D. Brown, for appellees.

Before SCHWARTZ, C.J., and GERSTEN and SORONDO, JJ.

PER CURIAM.

Appellant Integrated Health Services of Greenbriar, Inc., ("IHS"), appeals a non-final order denying its motion to compel arbitration. We reverse.

Appellee, Ernesto-Lopez Silvero ("resident"), signed an admission contract for the provision of nursing care in a nursing home owned by IHS. The admission contract provided for arbitration in the event of any disputes or claims. Since there was no place provided on the contract for the nursing home's signature, the admission contract was not signed by IHS. However, both IHS and the resident signed five other documents that same day, both agreeing to the provision of nursing home services.

The resident stayed at the home for over two months. One month after the resident left the nursing home, he and his wife filed suit against IHS, alleging that IHS did not properly care for the resident when he stayed at the nursing home.

IHS moved to dismiss the complaint or, alternatively, to compel arbitration and stay the complaint, based on the arbitration *339 clause of the admission contract. After a non-evidentiary hearing, the trial court denied IHS's motion to compel arbitration.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

827 So.2d 338
27 Fla. L. Weekly D2145
(Cite as: 827 So.2d 338)

Page 2

[1][2][3] A contract is binding, despite the fact that one party did not sign the contract, where both parties have performed under the contract. *See Gateway Cable T.V., Inc. v. Vikoa Contruction Corp.,* 253 So.2d 461 (Fla. 1st DCA 1971). As noted in *Gateway Cable T.V., Inc. v. Vikoa Contruction Corp.,* 253 So.2d at 463, "A contract may be binding on a party despite the absence of a party's signature. The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, for example, by the acts or conduct of the parties." *See also Sosa v. Shearform Mfg.,* 784 So.2d 609 (Fla. 5th DCA 2001) (parties may be bound to the provisions of an unsigned contract if they acted as though the provisions of the contract were in force.)

Here, both the resident and IHS acted as if they had a valid contract. IHS performed under the contract by admitting the resident and providing him with nursing home care for over two months. Moreover, IHS signed five other documents relating to the resident's admission, which were incorporated by reference in the admission contract. Clearly IHS assented to the terms of the admission contract, including its arbitration clause.

Accordingly, we reverse the order below and remand with instructions to the trial court to grant the motion for arbitration. *See Sosa v. Shearform Mfg.,* 784 So.2d at 609; *Security Management Corp. v. Hartford Fire Ins. Co.,* 641 So.2d 184 (Fla. 5d DCA 1994); *James Register Constr. Co. v. Bobby Hancock Acoustics, Inc.,* 535 So.2d 339 (Fla. 1st DCA 1988).

Reversed and remanded with instructions.

827 So.2d 338, 27 Fla. L. Weekly D2145

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

805 So.2d 982                                                                    Page 1
26 Fla. L. Weekly D2798
(Cite as: 805 So.2d 982)

C

District Court of Appeal of Florida,
Second District.

Elvedia ELDRIDGE, Appellant,
v.
INTEGRATED HEALTH SERVICES, INC.;
Central Park Lodges, Inc., d/b/a Integrated
Health Services of Lakeland at Oakbridge; and
Integrated Health Services
Development, Inc., Appellees.

No. 2D01-2344.

Nov. 28, 2001.

Appeal from nonfinal order of the Circuit Court for
Polk County; Dick Prince, Judge.

Mathew L. Bahl of The Philpot Law Group, P.A.,
Lakeland, for Appellant.

James G. Lindquist of Barr, Murman, Tonelli,
Slother & Sleet, Tampa, for Appellees.

PARKER, Acting Chief Judge.

Elvedia Eldridge appeals from a nonfinal order
granting the amended motion to stay action and
motion to compel arbitration of appellees Integrated
Health Services, Inc.; Central Park Lodges, Inc.,
d/b/a Integrated Health Services of Lakeland at
Oakbridge; and Integrated Health Services
Development, Inc., in Eldridge's action for
negligence and violation of nursing home residents'
rights. We affirm the trial court's order.

Eldridge contended in the trial court the admission
contract she entered into with the appellees was
unconscionable and that, therefore, the arbitration
clause in the contract was unenforceable. She cites
Powertel, Inc. v. Bexley, 743 So.2d 570, 574 (Fla. 1st
DCA 1999), review denied, 763 So.2d 1044
(Fla.2000), for the proposition that a party must
establish both procedural and substantive
unconscionability in order to invalidate an arbitration
clause. We affirm the trial court's ruling that, under
the facts of this case, the admission contract was not
procedurally unconscionable. Like the trial court, we

do not reach the issue of substantive
unconscionability because Eldridge failed to establish
the necessary element of procedural
unconscionability. See id. Because these are the
only issues Eldridge raises regarding the validity of
the arbitration clause, we do not address whether any
other basis exists to hold the arbitration clause
unenforceable.

Affirmed.

NORTHCUTT and CASANUEVA, JJ., concur.

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Jmission and Financial Agreement

*(To be completed upon admission)*

Emerald HealthCare         and _____ Cindi Horton _____
   ("Facility")                          ("Resident" or "Responsible Party")
hereby agree to the following admission and financial terms and arrangements providing
for the medical, nursing and personal care of____ **Sophia Schwerak** ____ "Resident".

## Facility Agrees:

- To admit the Resident to the Facility only with a physician's order.
- To furnish room, board, routine meals, linens and bedding, nursing care and such other personal services as are provided by the Facility for the health, safety and well-being of the Resident, and as may be required by law or this Agreement.
- To assist the Resident in obtaining the services of a licensed physician of the Resident's choice, as well as such medications as prescribed by the physician.
- To arrange for the transfer of the Resident to the hospital when ordered by the attending physician or as required in an emergency situation, and to notify the Responsible Party of such transfer.
- To provide an activities program for the Resident, components of which shall be at the discretion of the Facility.
- To make refunds in accordance with the established policy of the Facility.

## Resident /Responsible Party Agrees:

- To provide such personal clothing and effects as needed or desired by the Resident.
- To provide such spending money as desired by the Resident.
- To be responsible for hospital and transportation charges if hospitalization of the Resident, or transportation of the Resident for any other reason, becomes necessary.
- To be responsible for payment of physicians' and other specialists' fees, medications and other treatments or aids not covered by either Medicaid or Medicare programs or private insurance, and as ordered by the physician.
- To pay the Facility, in accordance with terms of this Agreement, the basic rates agreed upon as specified in the Facility's rate schedule accompanying this agreement and as updated from time to time.
- To ensure that complete and accurate information regarding the Resident is provided to the Facility and is updated as appropriate.



ALL-STATE LEGAL

**EXHIBIT**

## Consent to Treatment

The Resident and Responsible Party consent to the administration of such care, treatment, services, and medical or nursing procedures to the Resident as the Facility and the Resident's attending physician or nurse practitioner deem appropriate. A separate consent form may be required for certain healthcare services.

## Assignment of Benefits

The Resident or Responsible Party hereby requests that payments of any authorized benefits (including Medicare, Medicaid and/or private medical insurance benefits, including Medigap) be made on the Resident's behalf for any services provided to the Resident by the Facility, for physician services for which the Facility is authorized to bill, and for any other physician or nurse practitioner services furnished in the Facility, as applicable.

The Resident assigns and transfers to the Facility the right to any and all third-party payments to which the Resident may be or become entitled to for services rendered by the Facility. The Resident or Responsible Party hereby authorizes the Facility to apply and file for all such benefit payments on behalf of the Resident and directs that such payments be made directly to the Facility. Any insurance benefit payments received by the Resident or Responsible Party for services rendered by Facility shall be paid to the Facility. The Resident or and the Responsible Party authorizes and directs the Facility to release to the Centers for Medicare and Medicaid Services (CMS) and its agents, insurance companies, third-party payers, and federal or state agencies any medical or other information needed to determine benefits or to otherwise comply with applicable laws and regulations. The Resident or and Responsible Party acknowledges that he/she the Resident will be responsible for any services not covered by Medicare and/or priSophia or secondary insurance.

The Resident acknowledges that the Facility may bill private insurance companies as a courtesy to the Resident. However, if the Facility does not receive payment from the insurer within 45 days from the date of billing, the Resident will be billed directly for outstanding balances owed the Facility, unless otherwise expressly prohibited under the terms of the insurance contract. If the Facility receives subsequent payment from the insurance company, the Resident will be refunded in accordance with Facility policy.

## Financial Agreement

For residents admitted to the Facility as private pay, upon admission and on the first day of each month following, charges for at least one month's services are due in advance, at the rate effective at that time. The basic daily fee for the Resident in [check one] ($140.00 private) ($130.00 semi-private) ($155.00 Suite) accommodations is $ _13 0᭴_ per day. Additional services and items may be provided at a separate charge as set forth on the Charge Schedule provided as part of the admission information and agreement portfolio or available in the Facility's business office. Rates are subject to change upon advance written notification. A charge of 1.5% per

month will be assessed on any balance that remains unpaid after the 10th day of the month in which the bill is due. The annual percentage rate is 18%. The Facility does not extend credit or accept payments in installments.

The Responsible Party agrees that, to the extent he or she has legal access to the Resident's income or resources, the Responsible Party shall pay the Facility from the Resident's income or resources any amounts owed by the Resident to the Facility for services furnished by the Facility. Liability for payment of charges owed to the Facility from the Resident's funds shall be binding upon the Resident, the Responsible Party and the respective executor, administrator and/or heirs of the Resident's estate. If collection proceedings for unpaid balances become necessary, the Resident is liable for all collection costs, including attorney's fees and court costs. The Responsible Party agrees to provide to the Facility, at all times, a current address and phone number (day and evening).

Notwithstanding the foregoing, the Responsible Party may be required to pay, from his or her own funds, charges for items or services *that are requested by the Responsible Party* and that are *not* covered by the basic daily rate or (with respect to Medicaid or Medicare recipients) by the Medicaid or Medicare programs. *The Resident and Responsible Party shall not be required to request or accept such items and services as a condition of admission, expedited admission, or continued stay in the Facility.*

The Responsible Party shall also be obligated to pay out of his or her own funds, as liquidated damages, an amount equivalent to any payments or funds of the Resident that are available to pay for the Resident's care and that the Responsible Party withholds, misappropriates for personal use, or otherwise does not turn over to the Facility for payment of the Resident's financial obligations under this Agreement unless prohibited by statute or regulation.

## Other Terms, Conditions, and Understandings

1. A copy of the Medicare card, Social Security card and any insurance cards must be provided at the time admission. If a copy is not provided by the Resident or the Responsible Party within three (3) days of admission, the Resident will be charged as a private pay resident.

2. If admitted to the Facility on Medicare, the Resident has a maximum of 20 full covered days and 80 co-insurance days (if no days have being used elsewhere as determined by the Facility review team or the Medicare program). On the 21st day of Medicare, co-insurance will be paid either by Medicaid, private pay or by insurance, as applicable. The daily Medicare co-insurance rate is $ _101.50_. On the date of discharge from Medicare coverage, and if the Resident remains in the Facility, the Resident's source of funding for services will become Medicaid, private pay or insurance, as applicable. If the resident becomes private pay, charges for at least one month's services are due in advance, at the rate effective at that time.

3.   Medicaid application must be made within seven (7) days of admission.   The Resident or the Responsible Party must provide the Facility business office with a copy of the application.   If the application is not received, the Resident will automatically be billed as private pay.  If payment is not received within ten (10) days of billing, the Facility will begin the discharge process.  Also, if receiving services under Medicare, co-insurance amounts will be billed directly to the Resident, rather than to Medicaid, as applicable.

4.   An estimate of the Patient Pay calculation will be prepared during the admission process. This amount may change after Medicaid approval. Any variance in actual amounts due from the Resident compared to the private pay calculation will be applied to the next month's charges, if applicable.  If the Resident is discharged from the Facility and a refund is due, it will be processed in accordance with Facility policy.  If additional amounts are due, such amounts will be billed to the Resident immediately.

5.   If the Resident has private insurance that will pay for Medicare co-insurance amounts or for extended care days after a maximum of 100 days of Medicare, and the Resident or the Responsible Party has provided information to the Facility, the Facility will bill the Resident's insurance company as a courtesy to the Resident. However, if payment is not received within 45 days from the date of billing, the Resident will be billed directly for owed amounts, unless otherwise expressly prohibited under the terms of the insurance contract. Once payment is received from the insurance company, the Resident will be refunded within 30 days.

6.   Upon discharge, if a refund is due, the Resident will receive a refund check by mail within 30 days. If additional amounts are due to the Facility, they will be billed to the Resident immediately.  As referenced above, if outstanding amounts are due to the Facility from third-party payers for services provided to the Resident, any refunds to the Resident will be made only after receipt of any amounts due to the Facility from other payers, and will be paid within 30 days of receipt.

## Duration of Agreement

The Resident or Responsible Party may terminate this Agreement upon five (5) days written notice to the Facility.   Upon termination, the Resident agrees to pay accrued charges up to and including the day of discharge.  Otherwise, this Agreement will remain in effect until a different written agreement is executed.  At no times does this mean that the Resident will be forced to remain in the Facility against his/her will.

The Facility may terminate this Agreement and transfer or discharge the Resident in accordance with applicable state and federal laws and regulations.  The Facility shall give the Resident or Responsible Party advance notice of any reasons for transfer or discharge as required by law.  The Responsible Party upon discharge shall assume custody of the Resident if the Medical Director of the Facility certifies that this is medically appropriate.

### Attending Physician

The Resident or Responsible Party agrees to select an attending physician who will visit the Resident regularly according to the Facility's policies and procedures, state and federal regulations and as dictated by the Resident's needs. The physician must have admission privileges at the Facility and comply with the Facility's policies. In case of emergency, if the Resident's attending physician is not available, the Resident and the Responsible Party give permission to the Facility to summon a physician. A physician so obtained shall bill the Resident directly and the Facility will not be responsible for payment of any part of the bill for such service. The Resident has the right to designate a physician.

### Loss of Personal Property

The Facility will not be responsible for theft, destruction or other loss of money, papers, clothing, jewelry, dentures, eyeglasses, hearing aids or other personal property unless the property was delivered to and accepted in writing by a Facility representative or the loss was caused by the Facility's gross negligence or intentional misconduct.

### Room Assignments

The Facility has the right to transfer the Resident to another room or bed within the Facility consistent with the safety, care and welfare of the Resident and with any applicable laws and regulations. The Facility may also transfer or change the Resident's roommate, if any, at any time consistent with the needs of the Facility.

### Capacity of Resident and Guardianship

If the Resident who has not had a guardian appointed by a court of law, is or becomes unable to make or communicate his medical decisions, as determined by the Resident's attending physician, the facility shall notify the designated Healthcare Proxy or agent under a Durable Power of Attorney, if any. If neither has been appointed, the facility shall designate a Proxy in accordance with Florida law. If neither is available, the Responsible Party agrees to initiate and maintain a proceeding in a court of competent jurisdiction to appoint a legal guardian. If the Responsible Party fails to do so, the Facility shall have the right, but not the obligation, to commence a legal proceeding to adjudicate the Resident incapacitated and to have a court appoint a guardian for the Resident. The cost of the legal proceedings, including attorney's fees shall be paid by the Resident or the Resident's estate.

### Compliance with Rules, Regulations, Policies and Procedures

The Resident agrees to comply fully with the provisions of this Agreement and the Facility's rules, regulations, policies and procedures, as provided in the Admission Information and Agreement Portfolio or other documents or publications made available by the Facility. The Facility reserves the right to amend or change its rules, regulations, policies or procedures. The Facility's rules, regulations, policies or procedures do not impose

contractual obligations on the Facility or grant any contractual rights to the resident and may be changed from time to time.

## Indemnification

The Facility is required by law to exercise reasonable care toward the Resident; however, the Facility is not an insurer of the health, safety and welfare of the Resident and assumes no liability of such.

The Facility is not responsible for the health, safety and welfare of any resident who is away from the Facility with any person not directly employed by the Facility or when the resident knowingly leaves the Facility against the medical advice of the Resident's attending physician or without the approval of the Facility, with or without the knowledge of the Facility.

The Resident and Responsible Party shall defend, indemnify and hold the Facility harmless from any and all claims, demands, suit actions and related costs and expenses, including without limitation attorneys' fees, made against the Facility by any person arising out of or relating to any damage or injury caused by the Resident to any person or the property of any person or entity (including the Facility).

The Resident or the Resident's estate or the Responsible Party from the Resident's funds is responsible for any damages caused to Facility property beyond normal wear and tear, and shall pay for the repair and replacement of damaged property, based on the actual charge or cost to the Facility for such repair or replacement.

## Certification of Information

The Resident and the Responsible Party certify that all information provided to the Facility by the Resident or the Responsible Party is true and correct in all respects. The Resident and Responsible Party acknowledge that the submission of any false information may constitute grounds to terminate this Agreement.

## Severability

If any terms or conditions of this Agreement are invalid or unenforceable by reason of any rule of law, federal or state statute or regulation, or relevant local law, statute or regulation, then the remaining provisions of this Agreement shall be construed as if the invalid or unenforceable terms or conditions did not exist and shall remain in full force and effect.

## Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of Florida and shall be binding and inure to the benefit of each of the undersigned parties and their respective heirs, personal representatives, successors, and assigns.

## Captions

The captions used in connection with the sections of this Agreement are inserted only for the purpose of reference and shall not be deemed to govern, limit, modify, or in any manner affect the scope, meaning or intent of the provisions of this Agreement, nor shall such captions be given any legal effect.

## Modification

The Facility reserves the right to modify unilaterally the terms of this Agreement to conform to subsequent changes in law or regulation. To the extent reasonably possible, the Facility will give the Resident and Responsible Party thirty (30) days advance written notice of any such modifications.

## Waiver of Provisions

The Facility reserves the right to waive any obligations of the Resident under the Provisions of this Agreement in its sole and absolute discretion. No term, provision or obligation of this Agreement shall be deemed to have been waived by the Facility unless the waiver is in writing by the Facility. Any waiver by the Facility shall not be deemed a waiver of any other term, provision or obligation of this Agreement, and the other obligations of Resident and this Agreement shall remain in full force and effect.

## Dispute Resolution

The parties to this Agreement agree to follow the Facility's Grievance Policy and Procedures which may be amended from time to time, for any claim or disputes arising out of or in connection with the care rendered to the Resident by the Facility or its employees. The Facility will review and investigate a complaint and provide a response to the Resident. The Resident or Responsible Party may also request mediation with regard to any such claims or disputes.

## Arbitration

*To the extent that the Grievance Policy and Procedures and Dispute Resolution provisions of this Agreement fail to provide resolution, the parties to this Agreement do hereby agree that any and all controversies, claims, disputes, or disagreements of any kind arising out of, or relating to this Agreement, or concerning any rights arising hereunder or the breach thereof, including, but not limited to, any alleged tort, personal injury, negligence, or other claim of any kind, shall be settled exclusively by binding arbitration, which shall be conducted in accordance with the applicable rules of the American Arbitration Association ("AAA") and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitration shall be conducted where the Facility is located, or if not practical, as close to the Facility as is practical. The arbitration shall be before one neutral arbitrator selected in accordance with the rules of the AAA.*

Admission and Finar....al Agreement – 8

*The prevailing party in any arbitration proceeding hereunder as determined by the arbitrator or in any legal proceedings or actions arising from or in connection with such arbitration proceeding or this section of the Agreement shall be entitled to recover reasonable attorneys' fees and costs actually incurred. The parties hereto acknowledge and agree that this Agreement evidences a transaction involving interstate commerce. Accordingly, the enforcement of this Section of the Agreement shall be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any provision of this Agreement to the contrary. The provisions of this section of the Agreement shall survive any termination or breach of this Agreement.*

## Acknowledgments

This Agreement, together with those documents in the Resident Admission Information and Agreement Portfolio that are executed by both parties, represents the entire understanding between the parties, and supersedes all previous representations, understandings or agreements, oral or written between the parties.

The Resident and Responsible Party acknowledge being informed orally and in writing of the Resident's Rights as included within the Resident Admission Information and Agreement Portfolio, and having an opportunity to ask questions about those rights. Such rights are subject to change from time to time and shall not be construed as imposing any contractual obligations on the Facility or granting any contractual rights to the Resident.

The Resident and Responsible Party acknowledge the receipt of a copy of the Facility's rate schedule and the opportunity to ask questions about the Facility's charges.

The Resident and Responsible Party acknowledge being informed, orally and in writing, of the Facility's policy on advance directives and medical treatment decisions.

The Resident and Responsible Party understand, agree to, and have received a copy of this Agreement, and acknowledge that the terms have been explained to them by a representative of the Facility, and that they have had an opportunity to ask questions about this Agreement.

**[Signatures are contained on the following page.]**

Admission and Financial Agreement – 9

This is a legally binding contract. By signing below, I acknowledge that I have read, understand and hereby agree to all requirements set forth in this Admission and Financial Agreement *including the Dispute Resolution and Arbitration provisions.*

IN WITNESS WHEREOF, the parties, intending to be legally bound, have signed this Agreement on the _____ day of _____ , _____
                      day             month           year

_____        _____
Authorized Representative of the Facility         Resident

                                    _____
                                      Responsible Party

_____        _____
Witness                                Relationship

_____        _____
Address                                  Address

_____        _____

                                      _____
                                      Daytime telephone number

                                      _____
                                      Evening telephone number

## Admission and Financial Agreement

*(To be completed upon admission)*

_Emerald HealthCare_ and _CAROL WIRTCH_
Facility Name ("Facility")          ("Resident" or "Responsible Party")
hereby agree to the following admission and financial terms and arrangements providing for the
medical, nursing and personal care of _SOPHIA SCHWEMIC_ .
                                                    ("Resident")

### Facility Agrees:

- To admit the Resident to the Facility only with a physician's order.
- To furnish room, board, routine meals, linens and bedding, nursing care and such other personal services as are provided by the Facility for the health, safety and well-being of the Resident, and as may be required by law or this Agreement.
- To assist the Resident in obtaining the services of a licensed physician of the Resident's choice, as well as such medications as prescribed by the physician.
- To arrange for the transfer of the Resident to the hospital when ordered by the attending physician or as required in an emergency situation, and to notify the Responsible Party of such transfer.
- To provide an activities program for the Resident, components of which shall be at the discretion of the Facility.
- To make refunds in accordance with the established policy of the Facility.

### Resident /Responsible Party Agrees:

- To provide such personal clothing and effects as needed or desired by the Resident.
- To provide such spending money as desired by the Resident.
- To be responsible for hospital and transportation charges if hospitalization of the Resident, or transportation of the Resident for any other reason, becomes necessary.
- To be responsible for payment of physicians' and other specialists' fees, medications and other treatments or aids not covered by either Medicaid or Medicare programs or private insurance, and as ordered by the physician.
- To pay the Facility, in accordance with terms of this Agreement, the basic rates agreed upon as specified in the Facility's rate schedule accompanying this agreement and as updated from time to time.
- To ensure that complete and accurate information regarding the Resident is provided to the Facility and is updated as appropriate.



EXHIBIT
ᗷ

Admission and Financial Agreement - 2

### Consent to Treatment

The Resident and Responsible Party consent to the administration of such care, treatment, services, and medical or nursing procedures to the Resident as the Facility and the Resident's attending physician or nurse practitioner deem appropriate.  A separate consent form may be required for certain healthcare services.

### Assignment of Benefits

The Resident or Responsible Party hereby requests that payments of any authorized benefits (including Medicare, Medicaid and/or private medical insurance benefits, including Medigap) be made on the Resident's behalf for any services provided to the Resident by the Facility, for physician services for which the Facility is authorized to bill, and for any other physician or nurse practitioner services furnished in the Facility, as applicable.

The Resident assigns and transfers to the Facility the right to any and all third-party payments to which the Resident may be or become entitled to for services rendered by the Facility.  The Resident or Responsible Party hereby authorizes the Facility to apply and file for all such benefit payments on behalf of the Resident and directs that such payments be made directly to the Facility.  Any insurance benefit payments received by the Resident or Responsible Party for services rendered by Facility shall be paid to the Facility.  The Resident or and the Responsible Party authorizes and directs the Facility to release to the Centers for Medicare and Medicaid Services (CMS) and its agents, insurance companies, third-party payers, and federal or state agencies any medical or other information needed to determine benefits or to otherwise comply with applicable laws and regulations.  The Resident or and Responsible Party acknowledges that he/she the Resident will be responsible for any services not covered by Medicare and/or primary or secondary insurance.

The Resident acknowledges that the Facility may bill private insurance companies as a courtesy to the Resident.  However, if the Facility does not receive payment from the insurer within 45 days from the date of billing, the Resident will be billed directly for outstanding balances owed the Facility, unless otherwise expressly prohibited under the terms of the insurance contract. If the Facility receives subsequent payment from the insurance company, the Resident will be refunded in accordance with Facility policy.

### Financial Agreement

For residents admitted to the Facility as private pay, upon admission and on the first day of each month following, charges for at least one month's services are due in advance, at the rate effective at that time.  The basic daily fee for the Resident in [check one] (____ private) (____ semi-private) (____ Other) accommodations is $ _175.00_ per day.    Additional services and items may be provided at a separate charge as set forth on the Charge Schedule provided as part of the admission information and agreement portfolio or available in the Facility's business office.  Rates are subject to change upon advance written notification.  A charge of 1.5% per

**Admission and Financial Agreement – 3**

month will be assessed on any balance that remains unpaid after the 10th day of the month in which the bill is due. The annual percentage rate is 18%. The Facility does not extend credit or accept payments in installments.

The Responsible Party agrees that, to the extent he or she has legal access to the Resident's income or resources, the Responsible Party shall pay the Facility from the Resident's income or resources any amounts owed by the Resident to the Facility for services furnished by the Facility. Liability for payment of charges owed to the Facility from the Resident's funds shall be binding upon the Resident, the Responsible Party and the respective executor, administrator and/or heirs of the Resident's estate. If collection proceedings for unpaid balances become necessary, the Resident is liable for all collection costs, including attorney's fees and court costs. The Responsible Party agrees to provide to the Facility, at all times, a current address and phone number (day and evening).

Notwithstanding the foregoing, the Responsible Party may be required to pay, from his or her own funds, charges for items or services *that are requested by the Responsible Party* and that are *not* covered by the basic daily rate or (with respect to Medicaid or Medicare recipients) by the Medicaid or Medicare programs. *The Resident and Responsible Party shall not be required to request or accept such items and services as a condition of admission, expedited admission, or continued stay in the Facility.*

The Responsible Party shall also be obligated to pay out of his or her own funds, as liquidated damages, an amount equivalent to any payments or funds of the Resident that are available to pay for the Resident's care and that the Responsible Party withholds, misappropriates for personal use, or otherwise does not turn over to the Facility for payment of the Resident's financial obligations under this Agreement unless prohibited by statute or regulation.

### Other Terms, Conditions, and Understandings

1.  A copy of the Medicare card, Social Security card and any insurance cards must be provided at the time admission. If a copy is not provided by the Resident or the Responsible Party within three (3) days of admission, the Resident will be charged as a private pay resident.
2.  If admitted to the Facility on Medicare, the Resident has a maximum of 20 full covered days and 80 co-insurance days (if no days have being used elsewhere as determined by the Facility review team or the Medicare program). On the 21st day of Medicare, co-insurance will be paid either by Medicaid, private pay or by insurance, as applicable. The daily Medicare co-insurance rate is $ _ici. 50_. On the date of discharge from Medicare coverage, and if the Resident remains in the Facility, the Resident's source of funding for services will become Medicaid, private pay or insurance, as applicable. If the resident becomes private pay, charges for at least one month's services are due in advance, at the rate effective at that time.

**Admission and Financial Agreement – 4**

3.      Medicaid application must be made within seven (7) days of admission. The Resident or the Responsible Party must provide the Facility business office with a copy of the application. If the application is not received, the Resident will automatically be billed as private pay. If payment is not received within ten (10) days of billing, the Facility will begin the discharge process. Also, if receiving services under Medicare, co-insurance amounts will be billed directly to the Resident, rather than to Medicaid, as applicable.

4.      An estimate of the Patient Pay calculation will be prepared during the admission process. This amount may change after Medicaid approval. Any variance in actual amounts due from the Resident compared to the private pay calculation will be applied to the next month's charges, if applicable. If the Resident is discharged from the Facility and a refund is due, it will be processed in accordance with Facility policy. If additional amounts are due, such amounts will be billed to the Resident immediately.

5.      If the Resident has private insurance that will pay for Medicare co-insurance amounts or for extended care days after a maximum of 100 days of Medicare, and the Resident or the Responsible Party has provided information to the Facility, the Facility will bill the Resident's insurance company as a courtesy to the Resident. However, if payment is not received within 45 days from the date of billing, the Resident will be billed directly for owed amounts, unless otherwise expressly prohibited under the terms of the insurance contract. Once payment is received from the insurance company, the Resident will be refunded within 30 days.

6.      Upon discharge, if a refund is due, the Resident will receive a refund check by mail within 30 days. If additional amounts are due to the Facility, they will be billed to the Resident immediately. As referenced above, if outstanding amounts are due to the Facility from third-party payers for services provided to the Resident, any refunds to the Resident will be made only after receipt of any amounts due to the Facility from other payers, and will be paid within 30 days of receipt.

## Duration of Agreement

The Resident or Responsible Party may terminate this Agreement upon five (5) days written notice to the Facility. Upon termination, the Resident agrees to pay accrued charges up to and including the day of discharge. Otherwise, this Agreement will remain in effect until a different written agreement is executed. At no times does this mean that the Resident will be forced to remain in the Facility against his/her will.

The Facility may terminate this Agreement and transfer or discharge the Resident in accordance with applicable state and federal laws and regulations. The Facility shall give the Resident or Responsible Party advance notice of any reasons for transfer or discharge as required by law. The Responsible Party upon discharge shall assume custody of the Resident if the Medical Director of the Facility certifies that this is medically appropriate.

Admission and Financial Agreement – 5

## Attending Physician

The Resident or Responsible Party agrees to select an attending physician who will visit the Resident regularly according to the Facility's policies and procedures, state and federal regulations and as dictated by the Resident's needs. The physician must have admission privileges at the Facility and comply with the Facility's policies. In case of emergency, if the Resident's attending physician is not available, the Resident and the Responsible Party give permission to the Facility to summon a physician. A physician so obtained shall bill the Resident directly and the Facility will not be responsible for payment of any part of the bill for such service. The Resident has the right to designate a physician.

## Loss of Personal Property

The Facility will not be responsible for theft, destruction or other loss of money, papers, clothing, jewelry, dentures, eyeglasses, hearing aids or other personal property unless the property was delivered to and accepted in writing by a Facility representative or the loss was caused by the Facility's gross negligence or intentional misconduct.

## Room Assignments

The Facility has the right to transfer the Resident to another room or bed within the Facility consistent with the safety, care and welfare of the Resident and with any applicable laws and regulations. The Facility may also transfer or change the Resident's roommate, if any, at any time consistent with the needs of the Facility.

## Capacity of Resident and Guardianship

If the Resident who has not had a guardian appointed by a court of law, is or becomes unable to make or communicate his medical decisions, as determined by the Resident's attending physician, the facility shall notify the designated Healthcare Proxy or agent under a Durable Power of Attorney, if any. If neither has been appointed, the facility shall designate a Proxy in accordance with Florida law. If neither is available, the Responsible Party agrees to initiate and maintain a proceeding in a court of competent jurisdiction to appoint a legal guardian. If the Responsible Party fails to do so, the Facility shall have the right, but not the obligation, to commence a legal proceeding to adjudicate the Resident incapacitated and to have a court appoint a guardian for the Resident. The cost of the legal proceedings, including attorney's fees shall be paid by the Resident or the Resident's estate.

## Compliance with Rules, Regulations, Policies and Procedures

The Resident agrees to comply fully with the provisions of this Agreement and the Facility's rules, regulations, policies and procedures, as provided in the Admission Information and Agreement Portfolio or other documents or publications made available by the Facility. The Facility reserves the right to amend or change its rules, regulations, policies or procedures. The Facility's rules, regulations, policies or procedures do not impose contractual obligations on the Facility or grant any contractual rights to the resident and may be changed from time to time.

Admission and Financial Agreement – 6

## Indemnification

The Facility is required by law to exercise reasonable care toward the Resident; however, the Facility is not an insurer of the health, safety and welfare of the Resident and assumes no liability of such.

The Facility is not responsible for the health, safety and welfare of any resident who is away from the Facility with any person not directly employed by the Facility or when the resident knowingly leaves the Facility against the medical advice of the Resident's attending physician or without the approval of the Facility, with or without the knowledge of the Facility.

The Resident and Responsible Party shall defend, indemnify and hold the Facility harmless from any and all claims, demands, suit actions and related costs and expenses, including without limitation attorneys' fees, made against the Facility by any person arising out of or relating to any damage or injury caused by the Resident to any person or the property of any person or entity (including the Facility).

The Resident or the Resident's estate or the Responsible Party from the Resident's funds is responsible for any damages caused to Facility property beyond normal wear and tear, and shall pay for the repair and replacement of damaged property, based on the actual charge or cost to the Facility for such repair or replacement.

## Certification of Information

The Resident and the Responsible Party certify that all information provided to the Facility by the Resident or the Responsible Party is true and correct in all respects.   The Resident and Responsible Party acknowledge that the submission of any false information may constitute grounds to terminate this Agreement.

## Severability

If any terms or conditions of this Agreement are invalid or unenforceable by reason of any rule of law, federal or state statute or regulation, or relevant local law, statute or regulation, then the remaining provisions of this Agreement shall be construed as if the invalid or unenforceable terms or conditions did not exist and shall remain in full force and effect.

## Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of Florida and shall be binding and inure to the benefit of each of the undersigned parties and their respective heirs, personal representatives, successors, and assigns.

Admission and Financial Agreement – 7

## Captions

The captions used in connection with the sections of this Agreement are inserted only for the purpose of reference and shall not be deemed to govern, limit, modify, or in any manner affect the scope, meaning or intent of the provisions of this Agreement, nor shall such captions be given any legal effect.

## Modification

The Facility reserves the right to modify unilaterally the terms of this Agreement to conform to subsequent changes in law or regulation.  To the extent reasonably possible, the Facility will give the Resident and Responsible Party thirty (30) days advance written notice of any such modifications.

## Waiver of Provisions

The Facility reserves the right to waive any obligations of the Resident under the Provisions of this Agreement in its sole and absolute discretion.  No term, provision or obligation of this Agreement shall be deemed to have been waived by the Facility unless the waiver is in writing by the Facility.  Any waiver by the Facility shall not be deemed a waiver of any other term, provision or obligation of this Agreement, and the other obligations of Resident and this Agreement shall remain in full force and effect.

## Dispute Resolution

The parties to this Agreement agree to follow the Facility's Grievance Policy and Procedures which may be amended from time to time, for any claim or disputes arising out of or in connection with the care rendered to the Resident by the Facility or its employees.  The Facility will review and investigate a complaint and provide a response to the Resident.   The Resident or Responsible Party may also request mediation with regard to any such claims or disputes.

## Arbitration

*To the extent that the Grievance Policy and Procedures and Dispute Resolution provisions of this Agreement fail to provide resolution, the parties to this Agreement do hereby agree that any and all controversies, claims, disputes, or disagreements of any kind arising out of, or relating to this Agreement, or concerning any rights arising hereunder or the breach thereof, including, but not limited to, any alleged tort, personal injury, negligence, or other claim of any kind, shall be settled exclusively by binding arbitration, which shall be conducted in accordance with the applicable rules of the American Arbitration Association ("AAA") and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.   The arbitration shall be conducted where the Facility is located, or if not practical, as close to the Facility as is practical. The arbitration shall be before one neutral arbitrator selected in accordance with the rules of the AAA.*

Admission and Financial Agreement – 8

*The prevailing party in any arbitration proceeding hereunder as determined by the arbitrator or in any legal proceedings or actions arising from or in connection with such arbitration proceeding or this section of the Agreement shall be entitled to recover reasonable attorneys' fees and costs actually incurred. The parties hereto acknowledge and agree that this Agreement evidences a transaction involving interstate commerce. Accordingly, the enforcement of this Section of the Agreement shall be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any provision of this Agreement to the contrary. The provisions of this section of the Agreement shall survive any termination or breach of this Agreement.*

## Acknowledgements

This Agreement, together with those documents in the Resident Admission Information and Agreement Portfolio that are executed by both parties, represents the entire understanding between the parties, and supersedes all previous representations, understandings or agreements, oral or written between the parties.

The Resident and Responsible Party acknowledge being informed orally and in writing of the Resident's Rights as included within the Resident Admission Information and Agreement Portfolio, and having an opportunity to ask questions about those rights. Such rights are subject to change from time to time and shall not be construed as imposing any contractual obligations on the Facility or granting any contractual rights to the Resident.

The Resident and Responsible Party acknowledge the receipt of a copy of the Facility's rate schedule and the opportunity to ask questions about the Facility's charges.

The Resident and Responsible Party acknowledge being informed, orally and in writing, of the Facility's policy on advance directives and medical treatment decisions.

The Resident and Responsible Party understand, agree to, and have received a copy of this Agreement, and acknowledge that the terms have been explained to them by a representative of the Facility, and that they have had an opportunity to ask questions about this Agreement.

**[Signatures are contained on the following page.]**

**Admission and Financial Agreement – 9**

This is a legally binding contract.  By signing below, I acknowledge that I have read, understand and hereby agree to all requirements set forth in this Admission and Financial Agreement *including the Dispute Resolution and Arbitration provisions.*

IN WITNESS WHEREOF, the parties, intending to be legally bound, have signed this Agreement on the _____/_____ day of _____April_____ , _____2002_____ .

         day               month          year

_____        _____
Authorized Representative of the Facility        Resident

 

                                    _____Carol Weston POA_____
                                      Responsible Party

_____        _____
Witness        Relationship

_____        _____
Address        Address

                                      _____
                                        Daytime telephone number

                                        _____
                                        Evening telephone number

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR ST. LUCIE COUNTY, FLORIDA

The Estate of SOPHIA SCHWERAK, by and through
CAROL A. HORTON and JOHN P. SCHWERAK,
as Co-Personal Representatives,

        Plaintiffs,

                                 Case No. 04-CA-000635 (ON)

vs.


CENTENNIAL HEALTHCARE INVESTMENT CORPORATION,
CENTENNIAL HEALTHCARE CORPORATION,
CENTENNIAL HEALTHCARE MANAGEMENT CORPORATION,
and CENTENNIAL HEALTHCARE PROPERTIES CORPORATION
(as to EMERALD HEALTH CARE),

        Defendants.
_____/

## SUGGESTION OF BANKRUPTCY

Defendant Centennial Healthcare Investment Corporation, by and through the undersigned attorneys, hereby file this Suggestion of Bankruptcy and affirmatively state that, on December 20, 2002, all named Defendants filed for Chapter 11 Bankruptcy Protection pursuant *to In Re: Centennial Healthcare Corporation, et al.*, in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta, Division, Case No. 02-74974 et al, Jointly Administered.  11 U.S.C. Section 362(a)(1) of the Code provides for an automatic stay of all legal proceedings against the debtor. In accordance therewith, Defendant Centennial Healthcare Investment Corporation respectfully prays that this matter be automatically stayed.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to W. LEE KING, JR., ESQ., 900 South Federal Highway, Suite 100, Stuart, Florida 34994, by regular U.S. Mail, this 1st day of June, 2004

ULLMAN & KURPIERS, LLC

Lauren M. Levy
Florida Bar No. 0062103
410 South Ware Boulevard, Suite 1100
Tampa, Florida 33619
813/739-1900
813/739-1919 (fax)
*Attorney for Defendant*



IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR ST. LUCIE COUNTY, FLORIDA

The Estate of SOPHIA SCHWERAK, by and through
CAROL A. HORTON and JOHN P. SCHWERAK,
as Co-Personal Representatives,

        Plaintiffs,

                                Case No. 04-CA-000635 (ON)

vs.

CENTENNIAL HEALTHCARE INVESTMENT CORPORATION,
CENTENNIAL HEALTHCARE CORPORATION,
CENTENNIAL HEALTHCARE MANAGEMENT CORPORATION,
and CENTENNIAL HEALTHCARE PROPERTIES CORPORATION
(as to EMERALD HEALTH CARE),

        Defendants.
_____/

## NOTICE OF FILING NOTICE OF REMOVAL

**PLEASE TAKE NOTICE** that Defendant, **CENTENNIAL HEALTHCARE INVESTMENT CORP.**, in the above-styled action has, on this date, filed its Notice of Removal, a copy of which is attached hereto, in the office of the Clerk of the Circuit Court, Nineteenth Judicial Circuit in and for St. Lucie County, State of Florida.

                        Respectfully submitted,


                        _____
                        Lauren M. Levy
                        Florida Bar No. 0062103
                        ULLMAN, KURPIERS, BURSA & RAGANO, LLC
                        410 South Ware Blvd., Suite 1100
                        Tampa, FL  33619
                        (813) 739-1900
                        *Attorney for Defendant Centennial Healthcare*
                        *Investment Corp.*

1



EXHIBIT
C

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to W. LEE KING, JR., ESQ., 900 South Federal Highway, Suite 100, Stuart, Florida 34994, by regular U.S. Mail, this 4th day of June, 2004

Lauren M. Levy
Florida Bar No. 0062103
ULLMAN, KURPIERS, BURSA & RAGANO, LLC
410 South Ware Blvd., Suite 1100
Tampa, FL 33619
(813) 739-1900
*Attorney for Defendant Centennial Healthcare Investment Corp.*

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. PIERCE DIVISION

The Estate of SOPHIA SCHWERAK,                    Case No.
by and through CAROL A. HORTON
and JOHN P. SCHWERAK,                              Division
as Co-Personal Representatives,

                    Plaintiffs,


vs.


CENTENNIAL HEALTHCARE
INVESTMENT CORPORATION,
CENTENNIAL HEALTHCARE
CORPORATION, CENTENNIAL
HEALTHCARE MANAGEMENT
CORPORATION, and CENTENNIAL
HEALTHCARE PROPERTIES
CORPORATION (as to
EMERALD HEALTH CARE),

                    Defendants.
_____/

## DEFENDANT'S NOTICE OF REMOVAL

Defendant, CENTENNIAL HEALTHCARE INVESTMENT CORP. pursuant to 28 U.S.C.

§1441, removes that action now pending in the Circuit Court of the Nineteenth Judicial Circuit in

and for St. Lucie County, State of Florida, Case No. 04-CA-000635 (ON), styled The Estate of

SOPHIA SCHWERAK, by and through CAROL A. HORTON and JOHN P. SCHWERAK, as Co-

Personal Representatives, Plaintiffs, v. CENTENNIAL HEALTHCARE INVESTMENT

CORPORATION, CENTENNIAL HEALTHCARE CORPORATION, CENTENNIAL

HEALTHCARE MANAGEMENT CORPORATION, and CENTENNIAL HEALTHCARE

PROPERTIES CORPORATION (as to EMERALD HEALTH CARE), Defendants, wherein Plaintiff

1

demands judgment against CENTENNIAL HEALTHCARE INVESTMENT CORP. and the other

listed Defendants, and respectfully shows unto this Honorable Court as follows.

      1       Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332.

      2.      This is a civil action regarding a former resident of the Emerald Health Care nursing home, wherein Plaintiff purportedly pleads claims brought pursuant to Florida Statutes §400.023 for deprivation of nursing home resident's rights set forth in Florida Statutes §400.022, negligence, and wrongful death against the Defendants. Based on the allegations within Plaintiffs' Complaint, CENTENNIAL HEALTHCARE INVESTMENT CORP. in good faith avers that Plaintiffs are seeking to recover damages in excess of $75,000.00, plus interest, costs and attorney's fees.

      3.      At all times material to this action, Plaintiffs' decedent, Sophia Schwerak, was a citizen of the state of Florida.

      4.      At all times material to this action, Defendant CENTENNIAL HEALTHCARE INVESTMENT CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia.

      5.      At all times material to this action, Defendant CENTENNIAL HEALTHCARE CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia.

      6.      At all times material to this action, Defendant CENTENNIAL HEALTHCARE MANAGEMENT CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia.

2

7.    At all times material to this action, Defendant CENTENNIAL HEALTHCARE PROPERTIES CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia

8.    Because all the named Defendants, including CENTENNIAL HEALTHCARE INVESTMENT CORP., were foreign corporations, complete diversity of citizenship exists and, accordingly, this cause is properly removable pursuant to 28 U.S.C. §1332.

9.    This action was commenced in the Circuit Court of the Nineteenth Judicial Circuit in and for St. Lucie County, Florida. CENTENNIAL HEALTHCARE INVESTMENT CORP. initially learned of Plaintiff's Complaint, said pleading specifically naming it as a Defendant for the first time, on or about May 12, 2004, following service of process on CENTENNIAL HEALTHCARE INVESTMENT CORP.

10.   Named Defendant, CENTENNIAL HEALTHCARE MANAGEMENT CORP., consents to the removal of this action. Named Defendants, CENTENNIAL HEALTHCARE CORP., and CENTENNIAL HEALTHCARE PROPERTIES CORP., likewise consent to the removal of this action. The Affidavit of counsel, Kirsten K. Ullman, Esq., is submitted as **Exhibit "A"** in support of this Notice of Removal.

11.   Copies of all process, pleadings and orders served upon CENTENNIAL HEALTHCARE INVESTMENT CORP. and such other papers that are attachments as required by 28 U.S.C. §1446 and local court rules, are filed herein. (See composite **Exhibit "B".**)

3

12.    Pursuant to 28 U.S.C. §1446(d), CENTENNIAL HEALTHCARE INVESTMENT CORP. has provided written notice to all adverse parties and has filed a copy of this Notice of Removal with the Clerk of the Circuit Court of the Nineteenth Judicial District, in and for St. Lucie County, Florida. (A copy of the Notice of Filing Notice of Removal to opposing counsel is attached hereto as **Exhibit "C"**; a copy of the Certification of Notice of Removal is attached hereto as **Exhibit "D"**.)

WHEREFORE, Defendant, CENTENNIAL HEALTHCARE INVESTMENT CORP. submits this matter to this Court's jurisdiction.

Respectfully submitted,


KIRSTEN K. ULLMAN
Florida Bar No. 857210
ULLMAN, KURPIERS, BURSA & RAGANO, LLC
410 South Ware Blvd., Suite 1100
Tampa, FL  33619
(813) 739-1900
Fax:  (813) 739-1919
E-Mail:  kullman@uklawoffices.com
*Attorney for Defendant Centennial Healthcare Investment Corp.*

4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to W.

LEE KING, JR., ESQ., 900 South Federal Highway, Suite 100, Stuart, Florida 34994, by regular

U.S. Mail, this 4th day of June, 2004

KIRSTEN K. ULLMAN
Florida Bar No. 857210
ULLMAN, KURPIERS, BURSA & RAGANO, LLC
410 South Ware Blvd., Suite 1100
Tampa, FL  33619
(813) 739-1900
Fax:  (813) 739-1919
E-Mail:  kullman@uklawoffices.com
*Attorney for Defendant Centennial Healthcare*
*Investment Corp.*



IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR ST. LUCIE COUNTY, FLORIDA

The Estate of SOPHIA SCHWERAK, by and through
CAROL A. HORTON and JOHN P. SCHWERAK.
as Co-Personal Representatives,

        Plaintiffs,

                            Case No. 04-CA-000635 (ON)

vs.


CENTENNIAL HEALTHCARE INVESTMENT CORPORATION,
CENTENNIAL HEALTHCARE CORPORATION,
CENTENNIAL HEALTHCARE MANAGEMENT CORPORATION,
and CENTENNIAL HEALTHCARE PROPERTIES CORPORATION
(as to EMERALD HEALTH CARE),

        Defendants.
_____/

## CERTIFICATION OF NOTICE OF REMOVAL

TO:   JoAnne, Holman
      Clerk of Circuit Court, St. Lucie County
      P.O. Box 700
      Fort Pierce, FL  34950

In compliance with 28 U.S.C. §1446(d), you are hereby notified of the filing of a Notice of

Removal of that action now pending in the Circuit Court of the Nineteenth Judicial Circuit in and for

St. Lucie County, State of Florida, Case No. 04-CA-000635 (ON), styled The Estate of SOPHIA

SCHWERAK, by and through CAROL A. HORTON and JOHN P. SCHWERAK, as Co-Personal

Representatives, Plaintiffs, v. CENTENNIAL HEALTHCARE INVESTMENT CORPORATION,

CENTENNIAL    HEALTHCARE    CORPORATION,    CENTENNIAL    HEALTHCARE

MANAGEMENT   CORPORATION,   and   CENTENNIAL   HEALTHCARE   PROPERTIES

CORPORATION (as to EMERALD HEALTH CARE), Defendants, to the United States District

1


EXHIBIT
ALL-STATE LEGAL®

Court for the Southern District of Florida, Fort Pierce Division. A copy of the Notice of Removal is

attached hereto.

This _4th_ day of June, 2004.

Respectfully submitted,

Lauren M. Levy
Florida Bar No. 0062103
ULLMAN, KURPIERS, BURSA & RAGANO, LLC
410 South Ware Blvd., Suite 1100
Tampa, FL 33619
(813) 739-1900
*Attorney for Defendant Centennial Healthcare
Investment Corp.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to W.

LEE KING, JR., ESQ., 900 South Federal Highway, Suite 100, Stuart, Florida 34994, by regular

U.S. Mail, this _4th_ day of June, 2004

Lauren M. Levy
Florida Bar No. 0062103
ULLMAN, KURPIERS, BURSA & RAGANO, LLC
410 South Ware Blvd., Suite 1100
Tampa, FL 33619
(813) 739-1900
*Attorney for Defendant Centennial Healthcare
Investment Corp.*

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. PIERCE DIVISION

The Estate of SOPHIA SCHWERAK,                    Case No.
by and through CAROL A. HORTON
and JOHN P. SCHWERAK,                             Division
as Co-Personal Representatives,

                    Plaintiffs,


vs.


CENTENNIAL HEALTHCARE
INVESTMENT CORPORATION,
CENTENNIAL HEALTHCARE
CORPORATION, CENTENNIAL
HEALTHCARE MANAGEMENT
CORPORATION, and CENTENNIAL
HEALTHCARE PROPERTIES
CORPORATION (as to
EMERALD HEALTH CARE),

                    Defendants.
_____/

## DEFENDANT'S NOTICE OF REMOVAL

Defendant, CENTENNIAL HEALTHCARE INVESTMENT CORP. pursuant to 28 U.S.C.

§1441, removes that action now pending in the Circuit Court of the Nineteenth Judicial Circuit in

and for St. Lucie County, State of Florida, Case No. 04-CA-000635 (ON), styled The Estate of

SOPHIA SCHWERAK, by and through CAROL A. HORTON and JOHN P. SCHWERAK, as Co-

Personal Representatives, Plaintiffs, v.   CENTENNIAL HEALTHCARE INVESTMENT

CORPORATION, CENTENNIAL HEALTHCARE CORPORATION, CENTENNIAL

HEALTHCARE MANAGEMENT CORPORATION, and CENTENNIAL HEALTHCARE

PROPERTIES CORPORATION (as to EMERALD HEALTH CARE), Defendants, wherein Plaintiff

1

demands judgment against CENTENNIAL HEALTHCARE INVESTMENT CORP. and the other listed Defendants, and respectfully shows unto this Honorable Court as follows:

1.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332.

2.      This is a civil action regarding a former resident of the Emerald Health Care nursing home, wherein Plaintiff purportedly pleads claims brought pursuant to Florida Statutes §400.023 for deprivation of nursing home resident's rights set forth in Florida Statutes §400.022, negligence, and wrongful death against the Defendants. Based on the allegations within Plaintiffs' Complaint, CENTENNIAL HEALTHCARE INVESTMENT CORP. in good faith avers that Plaintiffs are seeking to recover damages in excess of $75,000.00, plus interest, costs and attorney's fees.

3.      At all times material to this action, Plaintiffs' decedent, Sophia Schwerak, was a citizen of the state of Florida.

4.      At all times material to this action, Defendant CENTENNIAL HEALTHCARE INVESTMENT CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia.

5.      At all times material to this action, Defendant CENTENNIAL HEALTHCARE CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia.

6.      At all times material to this action, Defendant CENTENNIAL HEALTHCARE MANAGEMENT CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia.

7.  At all times material to this action, Defendant CENTENNIAL HEALTHCARE PROPERTIES CORP. was a citizen of Georgia, and a Georgia corporation, having its principal place of business in Atlanta, Georgia.

8.  Because all the named Defendants, including CENTENNIAL HEALTHCARE INVESTMENT CORP., were foreign corporations, complete diversity of citizenship exists and, accordingly, this cause is properly removable pursuant to 28 U.S.C. §1332.

9.  This action was commenced in the Circuit Court of the Nineteenth Judicial Circuit in and for St. Lucie County, Florida. CENTENNIAL HEALTHCARE INVESTMENT CORP. initially learned of Plaintiff's Complaint, said pleading specifically naming it as a Defendant for the first time, on or about May 12, 2004, following service of process on CENTENNIAL HEALTHCARE INVESTMENT CORP.

10. Named Defendant, CENTENNIAL HEALTHCARE MANAGEMENT CORP., consents to the removal of this action. Named Defendants, CENTENNIAL HEALTHCARE CORP., and CENTENNIAL HEALTHCARE PROPERTIES CORP., likewise consent to the removal of this action. The Affidavit of counsel, Kirsten K. Ullman, Esq., is submitted as **Exhibit "A"** in support of this Notice of Removal.

11. Copies of all process, pleadings and orders served upon CENTENNIAL HEALTHCARE INVESTMENT CORP. and such other papers that are attachments as required by 28 U.S.C. §1446 and local court rules, are filed herein. (See composite **Exhibit "B"**.)

3

12.     Pursuant to 28 U.S.C. §1446(d), CENTENNIAL HEALTHCARE

INVESTMENT CORP. has provided written notice to all adverse parties and has

filed a copy of this Notice of Removal with the Clerk of the Circuit Court of the

Nineteenth Judicial District, in and for St. Lucie County, Florida. (A copy of the

Notice of Filing Notice of Removal to opposing counsel is attached hereto as

**Exhibit "C"**; a copy of the Certification of Notice of Removal is attached hereto

as **Exhibit "D"**.)

WHEREFORE, Defendant, CENTENNIAL HEALTHCARE INVESTMENT CORP.

submits this matter to this Court's jurisdiction.

Respectfully submitted,

KIRSTEN K. ULLMAN
Florida Bar No. 857210
ULLMAN, KURPIERS, BURSA & RAGANO, LLC
410 South Ware Blvd., Suite 1100
Tampa, FL  33619
(813) 739-1900
Fax:  (813) 739-1919
E-Mail:  kullman@uklawoffices.com
*Attorney for Defendant Centennial Healthcare*
*Investment Corp.*

4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to W.

LEE KING, JR., ESQ., 900 South Federal Highway, Suite 100, Stuart, Florida 34994, by regular

U.S. Mail, this 4ᵗʰ day of June, 2004

KIRSTEN K. ULLMAN
Florida Bar No. 857210
ULLMAN, KURPIERS, BURSA & RAGANO, LLC
410 South Ware Blvd., Suite 1100
Tampa, FL 33619
(813) 739-1900
Fax: (813) 739-1919
E-Mail: kullman@uklawoffices.com
*Attorney for Defendant Centennial Healthcare
Investment Corp.*

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.

## I. (a) PLAINTIFFS

Estate of Sophia Schwerak, by and through
Carol A. Horton and John P. Schwerak,
as Co-Personal Representatives,

**DEFENDANTS**

Centennial Healthcare Investment Corporation,
Centennial Healthcare Corporation, Centennial
Healthcare Management Corporation, et al.

04 - 14114

04CV14140 MARRA/LYNCH MAGISTRATE JUDGE

(b) County of Residence of First Listed Plaintiff **St. Lucie**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED

(c) Attorneys (Firm Name, Address and Telephone Number)
W. Lee King, Jr., Esq.; 773/334-2100
Fulford & King, LLC, 900 S. Federal Hwy., Suite 100
Stuart, Florida 34994

Attorneys (if known)
Kirsten K. Ullman, Esq.; 813/775-2300
Ullman Kurpiers Bursa & Ragano LLC
410 S. Ware Boulevard, Suite 1100, Tampa, FL 33619

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 3 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commercial ICC Rates etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Fed. Employers' Liability | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 650 Airline Regs. | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (excluding Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | ☐ 820 Copyrights | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 690 Other | ☐ 830 Patent | ☐ 850 Securities/Commodities Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **LABOR** | ☐ 840 Trademark | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 862 Black Lung | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN OF ACTION (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Removal pursuant to 28 U.S.C. Sec. 1441. Jurisdiction is proper pursuant to 28 U.S.C. Sec. 1332.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE: _____

DOCKET NUMBER: _____

DATE: 6/4/04

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 221607  AMOUNT $150.00  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____